## APRIL TERM, 1855.

### BUCKNER and STANTON *vs.* JAMES L. CALCOTE.

B., S., and H. were the sole members of three distinct and separate mercantile firms, engaged in the same business; one of which firms, styled B., S. & Co., was situated in New Orleans, La., where B. resided; another, styled S., B. & Co., was situated in Natchez, Miss., where S. resided; and the other, styled Hamer & Co., was situated in Yazoo City, Miss., where H. resided, who died in 1842, and B. & S. still continued the business of the firm at the same places as before, until they filed their petitions in bankruptcy, which took place in 1842, after the death of H. B. by agreement with S. applied in the State of Louisiana for a discharge from his individual debts, and his liabilities on account of the partnerships in the three firms, and he was discharged; but before this was done, B. returned in his inventory of assets, belonging to B. S. & Co. two large balances in their favor, — one against S., B. & Co., and the other against H. & Co., as debts due by those firms to the firm of B., S. & Co. In like manner S. by agreement with B. filed in this State his petition, and obtained his discharge from his individual debts as well as his liabilities on account of said firms having returned in his schedule of debts due by S., B. & Co. and H. & Co., the balances against them in favor of the firm of B., S. & Co. J. S., the assignee in bankruptcy of B. in Louisiana, sold by order of the bankrupt court, the two balances or claims in favor of B., S. & Co. against the firms of S., B. & Co. and H. & Co., which claims were considered as accounts stated, and had been surrendered by B. in his schedule, when O. became the purchaser of the claims at the sale, and he was permitted to prove said claims against the estate of S. in the State of Mississippi, and he received his dividend accordingly; and afterwards O. transferred and assigned all his title and interest in the balances and claims proved and allowed to J. L. C., who filed his bill against B. & S. to subject their property to the payment of the claims, who demurred to the bill, and the court below overruled the demurrer. *Held*, that the demurrer should have been sustained.

As to B. individually, the right surrendered to the assignee, was not a debt against him, but it was merely his individual property and rights of property, and his interest in the assets of B., S. & Co., including the balance due that firm from the firms in the State of Mississippi, and his interest in them; and cannot be considered as having greater force and effect than a claim due him, which vested in his assignee. Nor could it possibly be converted into a claim against him, which could be used to impeach his discharge, or otherwise be used as a debt against him.

Whatever was the character and legal force of the claim, it passed to the assign-

ee, S., and from him to O., and from him to J. L. C., who can acquire no greater extent in the claim as a debt, than it had when it passed to the original assignee.

Upon the application of a copartner to the court for a discharge from his individual debts and partnership liabilities, and a surrender of his individual and partnership assets, it is incompetent for the assignee to take possession of the partnership assets as of a bankrupt firm under the fourteenth section of the bankrupt law, without a special order of court. And a sale by him of the partnership assets even by order of the court, will not affect or divest the interest of other partners in the assets, without such special order ; and it being an extraordinary power, it is incumbent on the party claiming title under it, to show it affirmatively.

Where two or more partnership firms, composed entirely of the same members, are entirely distinct and separate, a debt due from one to the other is, as to the creditors of the latter, considered as assets of the latter, and a trust fund for the payment of the creditors, who have dealt with it in case of the bankruptcy of the firms only ; and when the " firms " and the " trades " are perfectly distinct. When the claim accrued from distinct dealings in articles of distinct trades, and when all the partners are included in the same commission, and all the firms are bankrupt, even then the firms are only considered separate and distinct for the purpose of distributing the assets among the creditors, under the authority of the bankrupt court.

The judgment of the bankrupt court, admitting certain claims to proof, and decreeing their payment *pro rata*, will be regarded by this court in a controversy respecting those claims as conclusive only in establishing the right to proof of the claim, and a reception of the dividends *pro rata*, arising out of the assets of the debtor, administered by the bankrupt court. The grounds upon which the court based its judgment, are not *res adjudicata*, and cannot be made the foundation of another suit. This court is only bound by what the bankrupt court ordered to be done; the judgment of the bankrupt court being a judgment *in rem*, it became *functus officio* so soon as the dividends ordered thereby were paid.

The fifth section of the bankrupt law of 1841, which provides that " no creditor or other person, coming and proving his debt or other claim, shall be allowed to maintain any suit at law or in equity therefor, but shall be deemed thereby to have waived all right of action, and suit against such bankrupt, and all proceedings already commenced, and all ' unsatisfied judgments already obtained thereon, shall be deemed to be surrendered thereby," &c., is a complete bar to any proceeding, to set aside and annul the decree allowing the bankrupt discharge, on the ground of fraud, instituted by a creditor who has proved his claim and received his *pro rata* share of the dividends arising from the bankrupt's estate.

Only creditors whose claims were provable, but who failed to prove them, and receive a part of the dividends, have a right to complain that the bankrupt's discharge is fraudulent.

The statute of limitations will run in favor of a bankrupt against a creditor who seeks to annul his discharge on the ground of fraud; and the date from which it will commence running, is the date of decree of discharge.

· It is a general rule in equity, that the statute of limitations only begins to run, in cases of fraud, from the time of the discovery of the fraud, but the party complaining of the fraud, and seeking to avoid the statute on that account, must show that he used due diligence to detect it, and if he have the means of discovery in his power, it will be equivalent to a knowledge of the fraud; and when the fraud itself is the basis of his right of action, he can only be excused from a showing of diligence, where there existed, at the time of the commission of the fraud, a relation of trust and confidence between the parties, or where the party committing the fraud was guilty of some positive act of fraudulent representation or concealment directly towards the party injured, which lulled him into security, and caused him to rely upon the good faith of the other. *Held,* that no such relation of confidence and trust exists between the bankrupt and his creditors in this case.

It is a well settled rule in equity, that judgments will not be disturbed, nor new trials granted, and matters of litigation reopened, unless it be shown, that all proper diligence has been used, in the assertion of complainant's rights. A court of equity always refuses its aid to stale demands, when the party ·has slept upon his rights, and acquiesced for a great length of time. Laches and neglect are always discountenanced; and when, therefore, eleven years had elapsed before any efforts were made to discover the fraud, the court will refuse to entertain a bill to set aside a decree discharging a bankrupt on the ground that it was obtained through fraud.

The laches of the assignees of the claims not occasioned by the positive acts of the parties since their discharge in bankruptcy, is sufficient ground to refuse the relief sought in equity; and that objection will apply with additional force to J. L. C., who has voluntarily placed himself in the attitude of a speculator in litigation.

On appeal from the superior court of chancery; Hon. Charles Scott, chancellor, having been engaged as counsel in a branch of this case, the Hon. D. C. Glenn sat as special chancellor, and delivered an opinion which is here published by permission of the court.

The facts of this case will be found fully stated in the opinion of the court, and the following opinion of the Hon. D. C. Glenn, as special chancellor: —

Syllabus of the Hon. *D. C. Glenn's* opinion, prepared by himself.

1. *Choses in Action. Assignment.* — The fact that a claim is disputed, will not forbid its transfer or assignment; nor will

public policy avoid such a sale because it may become neces-sary in the assignee to set aside the fraud of the debtor, in order to effectuate his purchase.

2. *Champerty. Maintenance.* — The doctrine of champerty and maintenance is now only applied to the purchase of con-troverted titles, productive of naked litigation, among persons claiming the same thing by different titles, and is only enforced (if at all) in cases where there is an adverse right claimed under an independent title, not in privity with the assignor or seller, and not under a disputed right claimed in privity, or under a trust for the assignor or seller.

3. *Estoppel.* — Where B. and S. were the sole and only sur-viving members of three distinct firms, but each composed of the same individual members, and B., in the State of Louisi-ana, in his inventory and schedules filed in the bankrupt court, represented that the firms of S., B. & Co., and M. B. H. & Co., in the State of Mississippi, were each largely indebted to B., S. & Co., in the State of Louisiana, and S. also made the same representations in his schedules and inventory in bankruptcy in the State of Mississippi, and which indebtedness of said firms of S., B. & Co. and M. B. H. & Co. to B., S. & Co., were sold as assets for the benefit of the creditors of the firm of B., S. & Co., by the order and decree of the bankrupt court in the State of Louisiana to C.: Held, B. & S., upon principles of justice, are estopped from denying the existence, amount, and validity of said indebtedness, both as to C. and his assignee.

4. *Partnerships. Bankruptcy. Creditors.* — Where the same parties composed three distinct firms at different places and under different names, and which were entirely separate and distinct from each other, and kept their business books and ac-counts accordingly, upon the bankruptcy of all the firms : held, that the social creditors of one firm in a court of equity can enforce payment of stated accounts or balances due it from the other firms.

5. *Rule in Equity as to Partnerships.* — In equity, all con-tracts and dealings between such firms, of a moral and legal nature, are deemed obligatory, though void at law; and in all such cases, equity looks behind the form of transactions to their

substance, and treats the different firms, for the purposes of substantial justice, exactly as if they were composed of strangers, or were in fact corporate companies.

6. *Equity. Jurisdiction. Assignment.* — (1.) Whenever a remedy is more full and complete in equity than at law, or, from the subject-matter of a suit, or the circumstances surrounding it, more full and perfect relief can be had in equity than at law, equity will take jurisdiction.

(2.) Where an equitable interest in a chose in action is vested in the holder by assignment, his rights will be enforced in equity, if there is no legal remedy, or the remedy at law is doubtful or a difficult one.

(3.) Courts of equity are not ousted of an original jurisdiction because the same has been assumed by courts of law, or has been conferred upon the latter by statute.

7. *Chancery. Pleading.* — (1.) It is a proper mode of pleading in equity, to anticipate and avoid the defences which the defendant is supposed to set up.

(2.) Complainant may anticipate and avoid the defence of a discharge and certificate in bankruptcy by showing the same were obtained by fraud, or in violation of the bankrupt act.

8. *Certificate of Bankruptcy. Fraud.* — Bankruptcy is pleadable in bar to all actions, and in all courts; and this bar may be avoided, whenever it is interposed, by showing fraud in the procurement of the discharge, or a violation of any of the provisions of the bankrupt act.

9. *Fraudulent Discharge in Bankruptcy. Jurisdiction.* — Where discharge and certificate in bankruptcy are obtained by fraud, or in violation of bankrupt act, it is not necessary to institute proceedings in bankrupt court to annul the same; for, when so obtained, they are absolutely void, and will be treated as nullities in all courts whatsoever, whenever it is shown they were obtained by fraud.

10. *Bankrupt Law of* 1841. *Fraud. Proof of Claim.* — A creditor of any class, whether he has or has not proved his claim against the bankrupt, whether he has or has not participated in the bankrupt proceedings, is not barred from suit or recovery on his claim, when he can show that the discharge

was fraudulently obtained, and that the bar is a nullity; provided he was ignorant of the fraud, and there were no circumstances which would justly put him upon inquiry, and he has not delayed action too long after coming to a knowledge of the fraud.

11. *5th Section. No Bar in Case of Fraud.* — The 5th section act of 1841 did not intend that the proving of claims by creditors should effect an absolute abandonment of all claims against the future acquisitions of the bankrupt, but simply a waiver of all rights of such creditors, in law or equity, inconsistent with the bankrupt proceedings, in case the bankrupt should obtain a discharge which was not "impeachable for some fraud or wilful concealment of his property."

12. *Law of* 1841. *Effect on Creditors.* — The bankrupt law of 1841 was a legislative confiscation of existing rights for the benefit of the debtor, with the privilege to the creditor to avoid the same for fraud on the part of bankrupt, when it became known to him.

13. *Statute of Limitations. Law and Equity.* — Courts of law are bound by the statute of limitations, and equity also regards it, except in cases of fraud and pure trust; yet courts of equity are not within the statute, and never permit a plea thereof when conscience would be violated.

14. *Fraud. Concealment. Equity. Limitations.* — In cases where the party by fraud has kept concealed the rights of complainant, and has thereby delayed him in the assertion of those rights, lapse of time ought not, on principles of justice, be admitted to repel relief. On the contrary, it would seem that length of time, during which the fraud has been successfully concealed and practised, is rather an aggravation of the offence, and calls more loudly upon a court of equity to grant ample and decisive relief.

This case has been argued and submitted on the demurrer of the defendants to the complainant's bill.

The facts charged in the bill are substantially as follows:

The defendants, together with M. B. Hamer, who died in April, 1842, had been, during the years 1841 and 1842, and for several years prior thereto, partners in trade, doing business in

37 *

the city of New Orleans, under the style of Buckner, Stanton & Co., Buckner being the resident and sole managing partner; and in the city of Natchez, under the style of Stanton, Buckner & Co., said Stanton being the resident and sole managing partner; and in Yazoo city, under the style of M. B. Hamer & Co., Hamer being the resident and sole managing partner. Although composed of the same individual members, the three firms were entirely separate and distinct from each other, and kept their business, books, and accounts accordingly. The firms in 1841, and for several years before that time, were insolvent, and so were the individual members, and so continued until Buckner and Stanton were declared bankrupts. On the 21st July, 1842, Stanton, as an individual, and as a member of the three firms, filed his petition in bankruptcy in the United States bankrupt court in Mississippi, and on the 8th November, 1842, was declared a bankrupt, and on the 21st February, 1843, received his discharge. On the 18th July, 1842, Buckner, as an individual, and as a member of the three firms, filed his petition in bankruptcy in the United States bankrupt court in Louisiana, and on the 5th September, 1842, was decreed a bankrupt, and on the 5th of December, 1842, received his discharge. These applications, and the proceedings under them, were made by the defendants, in concert with each other, with an agreement to continue in business when they received their discharge.

Joseph Sill was appointed assignee in the case of Buckner.

In the inventory of assets annexed to the petition of Buckner, were the two claims or stated accounts which it was alleged were due to Buckner, Stanton & Co. One of said claims was due to it from the firm of Stanton, Buckner & Co., and amounted to $254,987.21. The other of said claims was due to it from M. B. Hamer & Co. for $392,463.92. In the schedule of debts annexed to the petition of Stanton, these two claims were set forth and alleged to be due from Stanton, Buckner & Co. and M. B. Hamer & Co. to Buckner, Stanton & Co. These two claims were vested in Joseph Sill, assignee of Buckner, and were by him, in pursuance of an order of the district court of Louisiana, sold on the 21st June, 1844, to S. W. Oakey, who became the owner of them.

Sill, the assignee, is dead, and no other assignee has been appointed in his place.

After Oakey became the owner of said claims, he filed his petition in the district court of the United States in Mississippi, claiming to be entitled, as a creditor of the firm of M. B. Hamer & Co., and Stanton, Buckner & Co., to a *pro rata* division of the property in the hands of the assignee; and such proceedings were accordingly had, that, on the 19th May, 1845, Oakey was decreed and adjudged to be a creditor of said firms for the sums aforesaid, and received a dividend accordingly. On the 22d March, 1854, Oakey, for value received, by writing under seal, transferred to the complainant all his right, title, and interest in the claims so purchased by him of Sill.

The bill further states, that when Stanton filed his petition in bankruptcy, the firm of Stanton, Buckner & Co. was indebted to Montgomery & Boyd, in the sum of $1,315.51, which debt was proved and allowed in the district court, and a *pro rata* dividend of $77.67 received thereon. This debt was also, on the 25th March, 1854, transferred and assigned by Montgomery & Boyd to complainant.

The bill further charges, that the several decrees, by which the defendants were discharged in bankruptcy, were obtained by fraud, and are therefore void, and various acts of fraudulent preferences and concealments and secretions are specifically set forth and enumerated in the bill, all of which fraudulent acts, it is alleged, were kept concealed by the defendants, and only came to the knowledge of Oakey, and Montgomery & Boyd, and the complainant, within eighteen months before the filing of the bill, who, up to that time, remained in entire ignorance of the same.

The bill prays for a decree for the amounts of the several claims, now amounting, principal and interest, to upwards of a million of dollars. It also prays that the decrees of discharge in bankruptcy so obtained by fraud, may be declared to be void and of no validity against the claims of complainant.

Thus situated, this case has been argued at great length, and with very great ability, by counsel on either side. As briefly as

possible, I will state the opinion of the court on the most material points involved.

I. It is insisted that the assignment of the claims of Oakey, and Montgomery & Boyd, was champertous; that it savored of maintenance, was contrary to public policy, and therefore void.

In order to determine the force of such a defence in this case, it will be proper to inquire what champerty and maintenance meant at common law. In treating of them, Blackstone places them in the list of crimes, and says they are punishable by fine and imprisonment. He defines maintenance to be " an officious intermeddling in a suit which no way concerns one, by maintaining or assisting either party with money, or otherwise, to prosecute or defend it." " Champerty, *campi partitio*, is a species of maintenance, and punishable in the same manner; being a bargain with a plaintiff or defendant, *campum partire*, to divide the land or other matter sued for between them if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense." Com. 4 B. 135.

There is no statute in this State in regard to either of these offences, and if they exist at all here in their original signification, (which I seriously doubt,) they must exist as at common law, and in order to avoid this assignment the offence must be complete.

If, then, we bear in mind this definition of these offences, it must become manifest that the transfer of the claims in the bill mentioned is not void. A. and B. are the holders of claims against C., and for a valuable consideration, assign them to D. There is here no bargain that D. shall aid A. and B. in maintaining a suit thereon, with money or otherwise, or that D. shall carry on their suit for them, and to divide the matter sued for between them. The assignor parts with his whole interest in the claim for a valuable consideration, and D. becomes the absolute owner of it. He may dispose of it as he thinks proper. He may never sue on it. He may compromise or settle it. The assignor, by the assignment, totally divests himself of all right or interest in the thing assigned, and thereafter, as to all

third parties, becomes an entire stranger to the claim. Can it, then, be said that such facts make a case of champerty and maintenance as at common law? Clearly not. It is useless to examine, at any extent, what is said of these offences at common law. The reasons given in connection with them certainly do not apply at the present day, and it will be seen that they were not originally directed at the sale or assignment of choses in action, but that the rigorous rule as to such, arose from considerations which have long ceased to have any weight.

But it is argued that the assignment here was of a mere right to sue. So it might be said of every assignment of a chose in action, and such is the case in nearly every assignment in a commercial community. The assignment of a note or bill of exchange is an assignment of a right to sue if necessary. Such are termed choses in actions; that is, things or rights of things resting or existing in action as distinguished from property actually existing and capable of a material transfer or seizin.

But, it is insisted, that here there was assigned a mere right to litigate. But in one sense, upon every assignment of every thing, there passes also, *ipso facto*, a right to sue; because the right to have, recover, and enjoy the thing is of the very essence of the thing itself. If you purchase a promissory note, you purchase, at the same time, the right to sue on or litigate it if the maker refuses to pay it; and if the assignment in this instance is void, so would be the transfer of every disputed claim, and of all rights which rest or exist in action, and which may be contested.

The question here is, perhaps, more fairly presented when we inquire, not whether Calcote had the right to purchase the claim, but had Oakey the right to sell the chose in action? To deny such a right because the debtor disputes the claim, would be a novel doctrine, and would call for a retrograde movement in the courts. But looking at it from a different point of view, counsel have very ingeniously urged that this was a purchase of a mere right to vacate the discharge of Buckner & Stanton for fraud. Now it may be, that Calcote must invalidate this dis-

charge before he can recover and effectuate his purchase. Yet does this make him a purchaser of a mere right to litigate a fraud? I think not. Suppose he should prove fraud and invalidate the discharge. Does he recover the fruits of the fraud, or damages for the fraud? Not at all. He recovers his debt, which is the foundation of his action. Suppose the parties do not avail themselves of their discharge, and the court possesses jurisdiction, and the claim is a good one, the assignee obtains his decree on his debt or claim. It would be quite as correct to say a man purchased the right to litigate any other defence which might be set up against a chose in action. An assignee purchases the right to enforce his claim, and to recover it unless there is a just and legal reason for not so doing, and to recover it over all unjust, illegal, and unconscientious defences. His right to the claim clothes him as with an incident thereto, with a right to avoid all such defences. It is illogical to say that he has purchased a naked right to litigate a fraud, because he has become the owner of a claim against which a fraudulent defence may be urged.

It is well settled, that at common law, no possibility, right, title, or thing in action could be transferred to a third person. For it was said a different rule would authorize the transfer of a lawsuit to a mere stranger. That such is not now the law, or the spirit of the law, is matter of legal history, which needs no authority. The assignability or negotiability of choses in action is the basis of half the litigation in this country, and if the transfer of a lawsuit is champertous, our courts are full of it. But the reason of the rule against the transfer of choses in action ceasing, the rule itself has ceased. At an early day courts of equity, and many eminent law judges, disregarded this rule. " Accordingly," says Judge Story, " they give effect to assignments of trusts, and possibilities of trusts, and contingent interests and expectancies, whether they are in real or in personal estate, as well as to assignments of choses in action." And in § 1040, b. n. 4, he has enumerated cases showing the great extent to which courts of equity will go to protect and enforce assignments.

I am not unmindful of the rule laid down by the same writer

Buckner and Stanton *v.* Calcote.

in § 1040 g., which he has sustained by a reference to the case of *Prosser* v. *Edmonds*, 1 Younge & Coll. R. 481, 499. He says : " An assignment of a bare right to file a bill for a fraud committed on the assignor will be held void, as contrary to public policy, and savoring of maintenance. . . . . Indeed, it has been laid down as a general rule, that when an equitable interest is assigned, in order to give the assignee a *locus standi in judicio* in a court of equity, the party assigning such right must have some substantial possession, and some capability of enjoyment, and not a mere naked right to overset a legal instrument or to maintain a suit."

Admitting this to be correct, and that we can understand it, apply it in this case practically : Oakey, and Montgomery and Boyd had a just claim against Buckner and Stanton. They assign it to Calcote. Calcote sues on it. Buckner and Stanton reply, that Oakey, and Montgomery & Boyd had not a substantial possession or capacity to enjoy the claims when assigned by them. Why ? Because they were discharged in bankruptcy. But Calcote alleges that this discharge was fraudulent. Buckner and Stanton admit it. If so, the discharge is utterly null and void ; and if a nullity, Oakey, and Montgomery & Boyd had a substantial possession, &c., which gave them a right to assign, and their assignee a *locus standi in judicio.* Now, when only assignor, assignee, and debtor are concerned, is it pertinent to talk of champerty and maintenance ? When the easy and unrestricted transfer of every species of property is the policy of our law, and especially of choses in action, can it be said to be against public policy to permit an assignee to avoid a fraud and recover his debt ? If Oakey, and Montgomery & Boyd have not, or had not, the *status* delineated in § 1040, the fraud of Buckner and Stanton ousted them ; the act is null and void. Can Buckner and Stanton then plead the advantage of their own fraud ? There does not seem to me to be any reason in this.

The same writer presents us with various instances where the assignment of a disputed claim or chose in action is held good in equity. 2 Eq. § 1050, *n.* 5, and notes 1, 2, same section, pp. 434–437, 6th ed. § 1051–1057.

If there were controverted rights as to the ownership of this claim at the time the assignment was made, there might be some ground for the rule insisted on. It is the purchase of controverted titles productive of naked litigation among persons claiming the same thing by different titles, which alone now calls for the assertion of the doctrines of champerty or maintenance. The true distinction will be found to be, (and so Judge Story asserts it,) that the doctrines of maintenance and champerty, and the buying pretended titles, apply only to cases where there is an adverse right claimed under an independent title not in privity with the assignor or seller, and not under a disputed right claimed in privity and under a trust for the assignor or seller. So in this State, in one of the few cases which recognize the doctrine of champerty at all, (11 Smedes & M. R. 431,) it is said that a party out of possession of real estate, which is held adversely by another under a title, though it be imperfect, cannot sell so as to pass a good title to his vendee.

I cannot avoid remarking that the section from Story relied on, is taken almost literally from the body of Lord Abinger's decision in *Prosser* v. *Edmonds.* General principles laid down in a case are only valuable in connection with the facts to which they are applied, and without the facts to mark the true meaning and extent of the principles they may mislead us. I have no report of the facts of the case, and only a part of the opinion before me. In n. 2, pp. 434–437, 6th ed. to § 1050, Judge Story speaks of it as a case where " there was a mere naked right to set aside a conveyance for fraud," and in 69 Com. L. R. Lord Campbell says of it, " In that case there had been a sale of rights, which were a subject of contest."

Thus understood, the doctrine has not only authority but reason to support it.

This, however, is clearly no such case. Here there is no adverse right asserted to these debts or demands, under an independent title, not in privity with the assignors or sellers, Oakey, and Montgomery & Boyd. But the defence when literally stated, is that the assignors had an undisputed right to these claims; that they were prevented from collecting them by fraud; that they have assigned them, and that the assignee,

in order to collect them, must set aside a fraud; that it was champertous in him to purchase the claim, and it would be against public policy to allow him to expose or vacate, or disregard the fraud. Thus stated, the fraud charged in the bill, and confessed by the demurrer to have been perpetrated by these defendants, is relied on as their strongest ground of defence. See generally *Morresdale* v. *Birchall,* 2 Black. R. 820; *Masters* v. *Miller,* 4 T. R. 203; 2 Story, Eq. 1039, 1040; *Baker* v. *Whiting,* 3 Sumner, R. 475, 481–484; 3 Cowen's Rep. 623, 643–650; 1 Swanston, R. 56, 57; 3 Harringt. R. 208–217.

II. It is further insisted that the claim sold by the assignee in Louisiana, against Stanton, Buckner & Co., and M. B. Hamer & Co., and purchased by Oakey, and by him transferred to complainant, is no claim. The argument is this: that the same persons constituted each and all the firms; that they could not owe or sue themselves, and therefore there was no such debt or claim in existence to sell or transfer.

I will examine the position of the parties in this case before disposing of the main question.

The bill states: "The three firms were entirely separate and distinct from each other, and kept their business and accounts accordingly; each, however, constituted of the same individual members."

Upon his bankruptcy, and the bankruptcy of his firm of Buckner, Stanton & Co., in Louisiana, Buckner rendered in his schedule of assets on oath. Among these assets, as so much property of the firm, he returned the stated accounts due from Stanton, Buckner & Co., and M. B. Hamer & Co. to Buckner, Stanton & Co. As such, they passed with his other assets to Sill, his assignee, and were sold for the benefit of creditors. Under such circumstances, Oakey was induced to become the purchaser, and has since assigned to the complainant.

Upon his bankruptcy, and the bankruptcy of his firms of Stanton, Buckner & Co., and M. B. Hamer & Co., in Mississippi, Stanton rendered in a schedule of debts and liabilities on oath. Among these debts, as liabilities against the firms, and the re-

spective persons composing them, entitled to a *pro rata* share of dividends, he rendered in the claims or stated accounts due from Stanton, Buckner & Co., and M. B. Hamer & Co. to Buckner, Stanton & Co., which were sold by Sill, and purchased by Oakey, and transferred *to complainant.*

With these facts admitted, can Buckner and Stanton, or either of them, be now permitted to say that there is no such claim in existence? that it is mere fiction, and the possession of it vests no substantial rights in any one? If such a point was contested between Buckner and Stanton, the position might be tolerated, but not where third parties and those creditors of both are concerned. By the course pursued by both, each has effected a practical result which they must not now be allowed to gainsay. Buckner and Stanton have received the benefits of the proceeds of the sale of this claim in Louisiana, and it has been divided among their creditors there; and by it Stanton and Buckner have lessened the dividend of their creditors in Mississippi to the extent of the *pro rata* allowance made here on these claims. In thus acting, they gave notice to the world, and placed it on record, that these accounts were actual and substantive claims, liable to be sold as other assets, and entitled to be paid as other debts. If the claims are mere fictions, as is argued by the conduct of those on whose behalf the argument is offered, they have been made and have become practical realities in the hands of third persons. By their own act the claims were made debts; by their action they were sold as *bonâ fide* debts, and by their acts Oakey was induced to part with his money therefor, and they are thus estopped from denying their existence.

I grant that technical estoppels are not favored in law; but an estoppel here is not formal or technical, but is the enforcement of a rule of great propriety. All persons are responsible for effects growing out of their own voluntary action. If one, then, by his conduct or representations, induces another to act, he cannot, upon principles of reason and fairness, be allowed to deny the results of his own proceedings. This rule does not rest simply on authority, but on the highest principles of justice

Buckner and Stanton *v.* Calcote.

which govern the transactions of men. But see 33 Eng. Com. Law R. 116, 117; 19 Wend. R. 557; 21 Ib. 172; 5 Leigh, R. 1; 5 Howard, R. 698, and others.

Then, Buckner, one of the defendants, has returned this claim, on oath, as an existing debt, and Stanton, the other defendant, having acknowledged it to be such, and Oakey, upon such representations, having parted with his money for the same, upon principle, Buckner and Stanton cannot now be heard to dispute the existence of the claim in the hands of Oakey, or which is the same thing in the hands of his assignee, Calcote, the complainant.

Moreover, as between these parties, I regard the existence of these claims as *res adjudicata* by the order and judgment of the United States circuit court. When Oakey presented his claim in Mississippi against the assets of Stanton, Buckner & Co., and M. B. Hamer & Co., it was resisted on the ground now assumed. Mr. Justice Daniel, of the supreme court, overruled them, and ordered its *pro rata* allowance with the claims of other creditors, and this judgment still stands.[1] On this, if on

---

[1] [The able and learned opinion of Mr. Justice Daniel, never having been regularly reported, is here appended.]

DECISION IN BANKRUPTCY.

*Opinion of the Hon. P. V. Daniel,* delivered May 19, 1845, in the circuit court for the southern district of Mississippi, on the petition and appeal of S. W. Oakey, in the matter of F. Stanton, a bankrupt.

*Statement.* — There were three firms, each composed of the same three partners — Buckner, Stanton & Co., of New Orleans, of which Henry S. Buckner was the resident partner; Stanton, Buckner & Co., at Natchez, of which Frederick Stanton was the resident partner; and M. B. Hamer & Co., at Manchester, of which M. B. Hamer was the resident partner. In the course of many years' operation, the Mississippi firms fell in arrear to the New Orleans house, large balances respectively, which were struck on the books of the latter firm prior to the bankruptcy of Buckner, or of F. Stanton, or the death of Hamer. Buckner's bankruptcy was conducted in Louisiana; the balances due the New Orleans house were reported as assets of that firm, and were sold by the assignee there, for the satisfaction of the creditors of that firm, and Oakey purchased. The claims thus originating were presented as entitled to *pro rata* distribution, out of the products of the Mississippi firms, raised on Stanton's bankruptcy here. The main question was, whether the claims were provable.

On consideration of the claim presented by this petition, I can perceive no

no other ground, I should regard this question as no longer an open one between these parties.

---

valid objection to it arising either from generality, indefinitiveness, or uncertainty in its character; or from defectiveness in the proofs on which it is rested. The claim is founded upon accounts current between the bankrupt and his creditor, and upon a comparison between those accounts current and the correspondence and books of the bankrupt, by the agent of the latter who kept those books.

Accounts current have always been regarded as evidences between merchants, and as admitted proofs of the amounts they purport, upon their face, if not objected to within the usual lapse of mercantile correspondence. They are deemed in law a proper foundation on which to sustain the action *indebitatus assumpsit*, and it has been settled that claims upon which *indebitatus assumpsit* will lie, are provable in bankruptcy. It seems to me, therefore, that the claim in question, for any thing connected with its form, was provable under the bankruptcy, and I might add, if necessary, that it appears to me to have been sufficiently established by proof.

Let us now inquire whether there be any thing relative to the nature of this claim, as being in reality a separate and individual or a social demand; or any consequence deducible from the identity of the individuals constituting these several firms which should lead to its rejection. Without instituting a comparison between the rule approved by Lord Hardwicke, and that adopted by Lord Thurlow and the later decisions, we will take the modern rule in its most ample and unqualified extent, namely: That social creditors must be satisfied to the entire exhaustion of the social effects, and that the individual partner who may have advanced to the firm his separate and private means to any amount, cannot prove against the firm in opposition to the social creditors. This is putting the principle as broadly as any person can desire. Still, it may be asked, whether, even within this wide scope, the case before us be comprised? Is this the case of an individual partner attempting to prove his separate claim against the social effects, and in opposition to the social creditors? It is true, according to the proof adduced, there existed three firms, which were all composed of the same individuals. But although this natural identity as to the component members of these firms existed, still each was a distinct and separate mercantile body; and, as to its separate corporate transactions, which it had an unquestionable power to conduct, and as to its separate and peculiar creditors, each was as distinct and entire as if no other whatever existed. The social creditors of each of those separate bodies had the right to claim whatever was due to it as a firm; had a right to claim first, and, if necessary, to the full extent of its rights and effects. They had a right to claim whatever was due to this firm, as a firm, from any other person or persons, natural or artificial. It matters not whether such artificial body or firm was or was not composed of the same persons, or of others; the debts due to the firm, as such, and all its

Buckner and Stanton *v.* Calcote.

In this connection, I might stop here, as the foregoing is conclusive with me; but was this not so, I should be compelled to rule the matter against the defendants.

I admit the principle, that where two firms deal with each other, where some or all of the partners in one firm are partners with other persons in the other firm, by the technical rules of the common law in such cases, no suit can be maintained at law in regard to any transactions or debts between the two firms; for in such suit all the partners must join and be joined, and no person can maintain a suit against himself, or against himself and others. The objection is at law a complete bar to the action. This is the strict rule of the common law, which will recognize no different capacities in an individual, and will not tolerate a conflict in his positive and relative rights and duties. But such distinctions are recognized and acted on, under other systems, where real justice is not cramped by arbitrary rules.

---

property and credits, as a firm, belonged to its creditors, under the bankruptcy. This seems to be the natural and inevitable conclusion from the principle laid down by Lord Thurlow; and, to say that the individual identity of the persons composing the separate firms should have any effect, would amount to a total overthrow of that principle, and would be allowing the individual and not the social character of the party to give the rule. In the case before us, the New Orleans house is declared bankrupt; before the commissioner, its social claim against the Mississippi house is exhibited and proved; by order of the court, sitting in bankruptcy, it is ordered to be sold for the benefit of the social creditors of the New Orleans house, and the proceeds of the sale applied for the benefit of those creditors. Can there exist any reason why the transferree of this claim should not be permitted to prove it, in the same manner and to the same effect, which the creditor of the New Orleans firm or the assignee of that firm might have done? To my mind, no such reason is apparent.

It is, in legal effect, a claim by the assignee of the bankrupt firm of New Orleans, in behalf of the creditors of that firm against the bankrupt firm of Mississippi, and should be allowed against the latter, *pro rata* with other claims against them.

The converse of this proceeding would be an appropriation to the creditors of the Mississippi firm of that which did not belong to it, or to its creditors; but which belonged rightly to the creditors of the New Orleans firm; for, with respect to those several firms, their respective creditors who dealt with them, and them alone, must attach upon those firms, respectively, and be regarded *a priori*, as if they were solitary and unconnected with any other houses.

38*

The laws governing partnerships, Judge Story says, are almost identical in equity with the civil law, where conflicting rights of a person, growing out of his individual and his social relations, as' to third parties, are asserted and enforced.   In equity, all contracts and dealings between such firms of a moral and legal nature are deemed obligatory, though void at law.   Courts of equity, in all such cases, look behind the form of transactions to their substance, and treat the different firms for the purposes of substantial justice exactly as if they were composed of strangers, or were in fact corporate companies.

I may well ask here, with Mr. Justice Daniel, "is this the case of an individual partner attempting to prove his separate claim against the social effects, in opposition to the social creditors?"   It is not.   It is the claim of Buckner, Stanton & Co. against the effects of the bankrupt firms of Stanton, Buckner & Co. and M. B. Hamer & Co.   True.   But a higher claim even still, — it is the claim of the social creditors of the bankrupt firm of Buckner, Stanton & Co., of New Orleans, against the social assets of the bankrupt firms of Stanton, Buckner & Co. and M. B. Hamer & Co.   *Ex contractu* a debt of a moral and a legal nature existed between these houses; though composed individually of the same persons, socially as corporations or artificial actors in the community, they were distinct and separate.   It is unnecessary to say how far this rule could go in a contest among themselves.   I only consider it as affecting the rights of third persons or creditors.   Suppose the Mississippi firms had abstracted two thirds of the means of the New Orleans firm, can it be said that the creditors of the latter cannot avail themselves of the indebtedness upon its books, which represents amounts thus withdrawn by the former, to satisfy their claim; and this by suit thereon?   Not at law, but in equity, which disregards form, and looks to the substantial justice of the case.

This is a partnership debt of the Mississippi houses payable out of the social assets of the firms, and in case of a surplus of assets to pay the separate debts of each partner entitled to such surplus, as the separate creditor would, in case of a surplus of social assets be entitled to the separate share of the partner

separately indebted to him. This is the rule of the fourteenth section of the bankrupt law, and is but the rule in equity which is derived from the civil law, and I suppose of every code which owes its distinctive features to that enlightened system. It certainly is the law of Louisiana, where this account was created, sold, and transferred. 3 Lou. Ann. R. 322. Mr. J. Slidell, at present chief justice of that State, speaks so appositely on the point, that I will quote him. He says: " The partnership once formed and put into action becomes, in contemplation of law, a moral being, distinct from the persons who compose it. It is a civil person, which has its peculiar rights and attributes. *Une personne fictive et morale separee des associes. Fictæ cujusdam personnæ vicem obtinet.* See the authorities cited in Troplong on Part. § 68, &c. Hence, therefore, the partners are not the owners of the partnership property. The ideal being thus recognized by a fiction of law is the owner; it has a right to control and administer the property to enable it to fulfil its legal duties and obligations, and the respective parties who associated themselves for the purpose of participating in the profits which may accrue, are not the owners of the property itself, but of the residuum which may be left from the entire partnership property, after the obligations of the partnership are discharged."

If, then, we disregard the technical intricacy of this transaction, and look at its real and substantial nature, we can have no doubt. We need only to bear in mind the distinction between the social and individual relations of these parties, and the matter is plain and simple, and on behalf of creditors this should, on principles of justice, be sustained. This case is clearly embraced in the principles laid down by Cary in his work on Part., where he says : —

" Where there are minor partnerships and distinct dealings between the different houses, and all the firms become bankrupt, a debt due from one firm to the other, may be proven in the same way as though the dealings had been between strangers, and where the same parties carried on two distinct trades, at different places, and under different names, the concerns were kept totally distinct, and regular accounts were opened be-

tween the houses, and in general both concerns were conducted as if the proprietors of each concern had been different and distinct; on a joint commission against one firm, it was held that the other firm could prove against the joint estate of the bankrupt firm," p. 240.

So in this case, the New Orleans firm being bankrupt, the indebtedness of the Mississippi firms to it is assets in the hands of the social creditors, and can be enforced by Oakey or his assignee, as the purchaser of such indebtedness, regardless of the individual identity of the partners composing the firms; such, unquestionably, is the rule in equity, and reason and justice would seem to uphold it.

See, generally, 1 Story, Eq. § 679; 6 Taunt. 597; 2 Bos. & P. 120; 3 How. Miss. R. 355, 356; Collyer on Part. § 880, 1001, 1002, et seq.; Story on Part. § 376, and § 221, p. 341, n. 2; 2 Bell's Com. 619, 620; Pr. Dec. of Mr. J. Daniel, S. C. U. S.; *Wilson* v. *McElloy*, 3 S. & M. 241, and cases therewith cited.

III. Has the court of chancery jurisdiction in this case?

Before examining the question, it is well to remark, that the mere fact that a party has a remedy at law, will not deprive this court of jurisdiction, for it is a rule without an exception, that whenever a remedy is more full and complete in equity than it is at law, courts of equity will exercise jurisdiction.

If, then, from the subject-matter of this suit, and the circumstances surrounding it, more ample and complete relief can be rendered here than at law, this court will afford it.

If I am right in the view of the nature of the claim, assigned by Oakey to complainant, it is at once evident that there was never a remedy existing at law, but whether in the hands of Buckner, Stanton & Co., or their assignee, or of Oakey, the purchaser, or his assignee, a court of equity had, and has the sole and exclusive jurisdiction over it.

But in another point of view, the question of jurisdiction is a clear one. Joseph Sill, the assignee in bankruptcy, is dead, and no other has ever been appointed, and if living, the eighth section of the bankrupt law forbids any suit by or against him, after the lapse of two years. Then, if this suit could ever have been prosecuted in his name, (which I doubt,) that right

is gone, and gone by no laches of complainant or his assignor. There is then no one. *in esse* in whose name this suit could be prosecuted at law. If the party, therefore, had no original right to relief in equity, the special facts of the case would entitle him to it. The law on this subject was greatly discussed in our State, upon the assignment of the Planters Bank to the United States Bank, and as it exists in Mississippi, will be found in the case of *Bacon et al.* v. *Cohea,* 12 S. & M. R. The former assigned to the latter a large amount of bills receivable. After assignment, and before suit brought, the charter of the Planters Bank was forfeited. Afterwards, suits were commenced in equity by the assignees of the United States Bank, insisting that an equitable interest was vested in them by the assignment, that their legal remedy was gone, and asking naked money decrees with execution. The bills were filed asking no account, averring no trust or accident, and charging no fraud. Indeed, but for the averment that the transfer had vested in the assignees an equitable interest in the choses in action, the bills were simply declarations at law. The cases were severely contested in all the courts, yet the court of appeals asserted the jurisdiction of equity, there being no party in whose name the right could be enforced at law. It was strongly urged that suit could be brought at law in the name of the statutory trustee of the extinct bank, for the use of complainants, but this was overruled, it being answered that their powers were limited by the terms of the law under which they were appointed. So here it may be said that the powers of the assignee, under the bankrupt law, are limited in express terms to two years, and afterwards his assignees possess but an equitable interest. I will here remark, that I cannot agree that this assignee had no power to sell or assign this claim. The "speedy settlement" intended by the law, would seem clearly to indicate that he could sell in a case like this, and the power becomes manifest, when he is required by the law "to collect the assets and reduce the same to money, as soon as the rights of creditors would admit," and when, in the eighth section, he is limited to two years, within which to bring any suit at law or in equity.

It was also argued in the case last cited, that an equity was

a mere incident to a legal right, and the incident was involved in the destruction of the principal. The answer was: "This argument is not well founded in its application to mere rights or intangible things, such as choses in action. Such rights are often equitable merely. Even the payee of a lost note, not negotiable, had not, according to the English decisions, a remedy at law; his remedy was exclusively in equity."

Again, the court say: "The transfer of a note by mere delivery, which is not payable to bearer, vests an equity or beneficial interest in the holder. If, by any casualty, he should be deprived of his remedy at law, the nature of his right entitles him to redress in a court of equity. His equity is not destroyed because his payee may happen to die. His is precisely such a right as a court of equity may take cognizance of, because he has taken but an imperfect conveyance of the thing transferred," quoting 2 Wheat. 373, where C. J. Marshall, in a similar case, said, a court of equity was the proper and only court in which such a right can be asserted.

The natural and inevitable deductions from the principles of this case, and the reasoning in 2 Wheaton, amply support the jurisdiction of equity in a case in the condition of the one at bar. I agree with the senior counsel in his position as to the manner of charging fraud, so as to give a court of equity jurisdiction. But I will here say, that the charges of fraud in the bill have no controlling weight with the court in settling its jurisdiction. It is exercised because the claim of Oakcy, in its inception, and in all its stages, has been one purely of equitable cognizance, and if suit could ever have been maintained at law on either claim, in the name of the assignee, he is both *functus officio* and physically dead, and complainant's is precisely such a right as courts of equity may take cognizance of, because he has taken an imperfect conveyance of the thing transferred.

I might assign other reasons for the conclusion arrived at; such as the rule that the assignee of a chose in action, unless negotiable, obtains but an equitable interest which equity alone enforces; that originally, at common law, assignments of choses in action were void, as contended by counsel for defendants, and

equity exercised exclusive jurisdiction in the premises, which is not taken away because statutes have conferred the like on law courts, or because they have seen proper to assume it. See, generally, 1 How. (Miss.) 562, 563; 1 Story, Eq. Pl. § 91, 96; *Bacon* v. *Cohea*, 12 S. & M. 516; 2 Story, Eq. § 1057; 4 Mason, R. 16; 3 Paige, R. 466; 2 Ib. 289; 5 Ib. 539; 1 Story, Eq. § 80; 1 Cushm. 90; 4 Cow. 717, 727, 728.

I cannot perceive the force of the remark that this proceeding is to impeach the judgment of a court of exclusive jurisdiction, or to enjoin a decree of the district court of the United States. Much was here said, the application of which I cannot see. I admit the rule that parties and privies can only impeach a judgment in the court where it was rendered. General rules are of little use unless the case admits of a practical application. I do not understand this bill to impeach any judgment or to enjoin any decree. It sets out a defence to the claim, which the parties may interpose, and says this defence is founded on a certificate of discharge as bankrupts, which is fraudulent, null, and void. This is admitted to be true. It is properly said by counsel of complainants, that where, as here, the pleadings in chancery are simply by bill and answer, it is regular in complainant to set out in his bill the pretences of defendants, as here, the pretence of a fraudulent discharge. Story, Eq. Pl. § 31, 677, 678.

Counsel say, they do not rely on their discharge; that they do not plead their discharge; that they plead and rely on the bankrupt law. If so, it may be naturally inquired how they can rely on the law, unless they show a discharge under it; for if they have or plead no discharge, the law is no protection to them; the law only protects and can only be relied on by those who hold a discharge under it, and a valid discharge at that, and if they admit their discharge null and void, neither it, nor the law which provides for it, will avail them.

But is it correct to say a judgment is impeached or enjoined when a party alleges there is no such judgment; that it is a fraud, a nullity? This certificate of discharge, or, if you please, this judgment of discharge, does not of itself and in itself bar and defeat this action. The party entitled to it must plead it. If the party does not do so, of course it is not in question. But

complainant apprehends he will plead it, as he must do to avail himself of it, and proceeds to avoid it as any other defence. Can he not then impeach it for fraud ?  The bankrupt law itself gives him a right (if not for other reasons debarred) to "impeach it for fraud."  Does the fact that the fraud grows out of a judicial proceeding, (or rather a *quasi* judicial proceeding,) take away this right ?  Mere terms sometimes mislead, and the mode of putting a point changes its nature practically.  Is it not a universal principle, that fraud vitiates every thing into which it enters ?  In *Niles* v. *Anderson,* 3 How. (Miss.) R., Chief Justice Sharkey says, p. 386, "Any act, however solemn, even though it be a judgment of a court of competent jurisdiction, may be set aside if procured by fraud," and the cases cited by Clayton Counsel, p. 376, abundantly make good the remark. Contracts, solemn assurances, judgments of courts, and even the statutes of the land, have been impeached for fraud.

To say that a judgment is a nullity cannot well be said technically to impeach it, for it denies that it ever had a legal existence.  But is this right of impeaching a discharge for fraud confined to the court where it was obtained ?  This would scarce be reasonable, when the bankrupt law says the discharge " may be pleaded in any court of judicature whatever."  It also says that the discharge shall be a bar " in all courts of justice, unless impeached for some fraud," &c.  Then, if it may be pleaded in any court whatever, and is a bar, unless impeached, is it not manifest that it may be impeached " everywhere ? "

Chancellor Desaussure, in 3 Des. 269, 270, speaking of a fraudulent insolvent discharge, says, " that in case there was any fraud or concealment in obtaining this dicharge, this court is not bound to give effect to the discharge obtained in any other court.  That it is essential to the jurisdiction of this court to detect fraud, and prevent its having its intended effect, and even formal judgments at law cannot resist its all-searching power, and when the frauds on which they have been obtained are exposed, such judgments are decreed to be nullities.  . . . . If the discharge was obtained by fraud or concealment it was a mere nullity, like every other judgment or sentence of a court obtained by fraud or surreptitiously."

These views are fully sustained by Chief Justice Ruffin, of North Carolina, in 8 Iredell, L. R. N. C. 142. Among other things, he says, "the remedy of the creditor is not an application to the court of bankruptcy, upon the ground of fraud newly discovered; but it is by replying the fraud of the bankrupt to his plea of the certificate, so as thereby to avoid the bar. As the certificate may be pleaded in all courts, it follows that it may be impleaded in any court in which it may be set up as a bar." These positions meet my unqualified assent, and the mere forms of pleading or technical rule cannot avail to avoid substantial right. See, generally, 3 Des. R. 269, 270; 8 Ire. L. N. C. R. 180–183; 1 Denio, 75; 1 Cush. 564; 8 Met. 75; 9 Ib. 434–438; 2 Story, R. 349; 1 Barr, Ch. R. 352; 18 Ohio R. 412, 413; 9 Georgia, 9, 14.

IV. It is next insisted that Oakey, and Montgomery & Boyd, the assignors of complainant, by coming in and proving their claims under the proceedings in bankruptcy, notwithstanding the alleged fraud therein, waived all right of action against these defendants, and that the certificate of discharge was final and conclusive upon said assignors, they being parties to said bankrupt proceedings.

The decision of the point thus presented will require an examination of the provisions of the bankrupt act of 1841, to which the court is so earnestly and so properly invited by the counsel. With the proceedings in cases of involuntary bankruptcy, we have here nothing to do. It is the true extent and meaning of the law touching voluntary bankrupts which we must look to. It is now generally conceded, though at one time doubted by some, that congress possesses the power to discharge insolvents from their debts at their own instance; yet, as remarked by Chief Justice Ruffin, it was a new principle in the law of bankruptcy. Previously, creditors possessed the power to compel their debtors, under certain circumstances, to go into bankruptcy; it was a privilege of creditors, and though the act of 1841 may secure some rights to the creditors in cases of voluntary bankruptcies, yet it would seem to have been done *ex gratiâ*, and it must be fairly admitted the provision was made for the benefit of debtors. I might say that the history of

the law so proves, but I will only remark that the nature of the provision itself demonstrates it; for it was a principle unknown to bankrupt laws, and it was a privilege the debtor could, at his own option, exercise, and by which he could compel his creditors to come into bankruptcy with him.

Counsel have said to me that the bankrupt law was designed to establish a system, and I agree with them. And to my mind, on examining its entire provisions, there is one main feature, prominent and paramount over all others in the act. By it we may judge the true meaning of minor provisions, for they must all be held and construed to subserve this great object; and any interpretation which tends to defeat or impair this main principle of the law cannot be countenanced.

Then let us sum the law. The great purpose of the act was, that where a man made a full, fair, and honest surrender of all his property of every kind and nature, he should be for ever discharged from all his debts and liabilities, except such as were specially saved, and this, too, without regard to the proportion of his debts to his assets. Though they paid but one cent in an hundred, he was clothed for ever with a legislative exemption from his existing contracts. And his certificate of discharge was made in all courts of justice a full and complete bar to the recovery of all his debts, contracts, and engagements, pleadable to all suits in "any court of judicature whatever," and is made conclusive evidence in favor of such bankrupt. The benefit of the law is extended to all persons who shall, by petition, set forth all their creditors, and "an accurate inventory of their property, rights, and credits, of every name, kind, and description, and the location and situation of each and every parcel and portion thereof, verified by oath." It is further provided, that all transfers, agreements, preferences, &c., and all payments, securities, conveyances, and concealments, made in contemplation of bankruptcy (with notice, &c.), shall be deemed "utterly void and a fraud on the act," and the person making such "shall receive no discharge" under the act; and the effect of the discharge, as a protection to the bankrupt, is without limit, "unless impeached for some fraud or wilful concealment of property, or rights of property, contrary to the provisions of the law."

When we reflect maturely upon the whole scope of this legislation, it becomes manifest, that good faith, on the part of the bankrupt who initiates the proceedings, is the grand essential of the law.   The nature of the proceedings, the relations of the parties thereto, the unusual and extraordinary results flowing therefrom, and the express terms of the act, all make it a prime necessity.   This leading purpose stamps the true character upon all minor matters of the law; in interpreting other provisions, and assigning each its due weight and its function, we bear this in mind, so as to preserve, secure, and effectuate this cardinal and controlling intention of the legislature.   The act was designed to relieve honest but unfortunate men from the thraldom of debt, but to extend no aid or countenance, for the present or in the future, to the unprincipled party who sought a discharge while he secreted his property, or defrauded his creditors under the form and with the fiat of the law.

Under this law, Buckner and Stanton are discharged bankrupts.   Did they make a full and fair surrender of all their property?   Did they deal honestly with their creditors and with the court, in obtaining their discharges?   The bill charges, and the demurrer admits transfers, conveyances, preferences, and secretions, to a vast amount, by them made "in contemplation of bankruptcy," and in fraud of the law; and such the law denounces "as utterly void," and that a person thus acting shall "receive no discharge under its provisions."

And the fact further is, that of these proceedings, the complainant or his assignors had no knowledge until within eighteen months past.

With such premises, the defence is rested on this provision in the 5th section of the law: "That no creditor or other person coming in, or proving his debt or claim, shall be allowed to maintain any suit at law or in equity therefor, but shall be deemed thereby to have waived all right of action and suit against such bankrupt."

The true intent of this section, when we bear in mind what has gone before, is very obvious.   A certain class of creditors are exempted from the operation of the law, as well as peculiar rights; and there are others who are not bound by it, such as

fiduciary creditors, those holding liens, &c., and foreign credi-
tors. It was the wish of congress to induce a complete settle-
ment of a bankrupt's estate by one and a joint proceeding of
all creditors of every class. Therefore, it simply provides, that
though not bound to come in, yet if a party will voluntarily so
do, he shall be held to the natural consequence of his own
action. If the fiduciary creditor comes in, he is for ever barred
from suit when the bankrupt has acted in good faith; and so
with the holders of liens, &c., and so with the foreign creditors.
The general creditor, whether he comes in or stays out, is barred
from the recovery of his claim where there has been *bona fides*
on the part of the bankrupt. Every person who voluntarily
participates in the bankrupt proceedings is held to yield his
assent thereto, and the law will shield the debtor by its own
decree of discharge; but never except upon the assumption that
he has acted in good faith, and fairly and openly with the law
itself. This assumption is the very gist and essence of the
whole system, the lifeblood of the law, which lends a healthful
vigor to all its provisions, both great and small, and without it
the law itself becomes a delusion and a fraud.

Guided by the dictates of sound justice and a correct inter-
pretation, I am clearly of opinion, that no creditor of any class,
whether he has proved or not proved his claim, whether he has
come in or stayed out, is barred from suit and recovery, when he
can show that the discharge was fraudulently obtained, and
that the bar is a nullity: provided he was ignorant of the fraud,
and there were no circumstances which would justly put him
upon inquiry, and he has not delayed action too great a length
of time after he came to a knowledge of the fraud. To my
mind, to hold otherwise, is to involve a monstrous assumption,
which is, that the 5th section was not only intended to hold
parties to the just and natural consequences of their coming in
and proving their demands, and to protect fair and honest bank-
rupts from harassment and litigation, but that the legislature,
while inviting all, as if for purposes of entrapment, further
intended to protect alike good faith and fraud, honesty and dis-
honesty. Such is the practical result of the arguments ad-
dressed to me, to which I can never assent. I admit that

congress designed to free the land from a load of debt, which crippled the resources and crushed the energies of our people. I admit its design was to secure a prompt and complete settlement of a bankrupt's estate, and to put an end to litigation. But this relief is had and settlement secured, and litigation ceased, only where good faith and fair dealing are observed. Such, and only such, as act on these rules, are intended to be benefited by the law, or can be protected by the courts acting under it.

The law itself pronounces such conduct, as these defendants stand confessing, " utterly void, and a fraud upon the act," and such person shall receive no " discharge under the provision of the act." It further empowers the bankrupt to use his discharge at any time and everywhere, " in all courts of justice, and in any court of judicature whatever," " unless impeached for some fraud or wilful concealment contrary to the law." Is it not manifest that this recognizes the right of any party to impeach a discharge for fraud to the same broad extent to which the party holding it is authorized to use it ? But by the rule asserted, the 5th section will annihilate the plea of fraud, or rather the fraud itself, on the day of the creditor's coming in, while the 4th section leaves standing the discharge in full vigor ever afterwards. Yet by the same law this discharge can and may be at any time "impeached for fraud." If this be so, are not the two sections in conflict? Do they not practically contradict and refute each other ? If it is possible both should operate. This can only be by giving such weight to the coming in of a creditor as naturally belongs to it; to bar his suit where the debtor has acted in good faith; to make it an estoppel of litigation and a waiver of rights — not an estoppel of justice and a sanctification of fraud, for which the discharge may be impeached whenever it is interposed between him and the right of whose exercise he has been fraudulently deprived.

In a bankrupt proceeding, in one sense, the petitioner acts as the trustee of his creditors. He brings them into court. He makes his own showing. *Quo ad hoc,* the proceedings are *ex parte.* The creditors do not represent or protect each other. The petitioner on oath represents each, and is bound to protect

all. If he is guilty of fraud or concealment, it is not probable they can or will be apprised of it. The presumption is, in fact as well as in law, that he is acting fairly, and this presumption is the primal warrant for the extraordinary relief he seeks. Viewing, then, the practical as well as legal nature of these proceedings, is it consonant with reason to say, that " the creditor has had his day in court, was a party to the proceedings, was invited to litigate the discharge, and is therefore bound in the face of concealed fraud ?" He was invited in, but he was invited to participate in a fair and not a fraudulent proceeding. He came into court where presumptions both of law and fact favored fairness — where the solemn oath of the party bespoke fairness — and he knew of no fraud and had no right to suspect fraud. But there *was* fraud — fraud on him, fraud on all creditors, fraud on the court and on the law. Can the bankrupt say, *True*, but you are estopped by the law — the 5th section is a waiver and a bar ? Can he plead the protection of a law whose spirit he has wronged, and whose letter he has defrauded ? No one can say such a position is sound in morals, and to my mind it is equally untenable in law, and especially in a court of conscience.

I would here remark, that even admitting there is force in the position assumed in regard to those creditors who are not included in the law, and who are not bound by proceedings under it, unless " *ex mero motu* " they become parties thereto, it loses any such force, and for a palpable reason, when applied to those creditors whose claims are barred, whether they come in or not. Their action does not alter their condition. The law confiscates their debt in any event. I might trace the consequences of such a rule as to them by striking illustrations, but more I think is not needed.

I have carefully examined the authorities relied on by counsel, but find nothing to shake my conclusion.

The majority simply decide, that fiduciary and foreign creditors, and those having liens, &c., who are not within the law, may yet come in under it, and if so, they are held to the election thus made and barred of remedies thus yielded. 5 Law Rep. 225, so much relied on, was a proceeding by creditors

against their debtor.   In such a case they will be held bound
by all the legal results flowing from and growing out of a pro-
ceeding of their own institution.   None of them are cases of
fraud in the bankrupt.

*Humphreys* v. *Swett*, 31 Maine, 194, is the only case in which
fraud was charged on the bankrupt, and the creditors who had ·
proved against him, were held to be barred.   But the court in
its opinion evidently speaks upon the assumption that the credi-
tors were cognizant of the fraud at the time and failed to liti-
gate it.   It says: " If the creditor was one who came in, and
his claim was allowed against the estate of the bankrupt,
he was entitled to object, for all legitimate causes embracing
fraud and wilful concealment, and the fullest opportunity was
afforded by the law for him to do it.   If he omitted to make
the objection, or having made it without success, he was de-
barred from instituting suit upon his debt or other claim, which
had been allowed."

It is true that if the creditor was aware of the fraud at the
time he is barred, for he then acts knowingly, but can it be
said that the law afforded him an opportunity to object, or that
he omitted to object matter of which he had no knowledge?
This would not savor of reason.   The bill states that neither
Oakey, or Montgomery & Boyd, or the complainant had knowl-
edge of the fraud charged within eighteen months of the filing
of the bill, nor had they knowledge of any facts which would
properly put them on inquiry.   Therefore, though I may not
question the law as laid down in 31 Maine, it does not apply
to the case made by the pleadings.

On the other hand several courts of high authority give their
sanction to a different rule.

In 8 Iredell, 142, Chief Justice Ruffin, an eminent jurist,
speaks this manly language:

" Though it may be in the power of congress to discharge
insolvents from their debts at their own instance, it was, we
believe, a new principle in the law of bankruptcy, and so
strongly tends to encourage men dishonestly to contract debts
which they do not intend or mean to pay as to make it highly
proper, as far as possible, to guard the courts from imposition

and to protect creditors from fraud in obtaining discharges. It is enough to put it in the power of a man after running in debt to spend all his property, and then, on his own motion and upon his own oath, free himself and his future acquisitions from liability to his own creditors. . . . ." He says, "where they have acted fraudulently, the discharge should be refused, and in the next place to hold a discharge, obtained by such means, ineffectual and void, whenever the fraud shall appear."

The supreme court of Tennessee, in a case where the creditor unsuccessfully resisted a discharge, allowed him afterwards to impeach it and say, "if the fraud appear pending his suit against his creditor, no decree of discharge could be made. If it appear afterwards, its effect is to annul and destroy the discharge and certificate as though they had never been obtained." 11 Humphreys, R. 289.

And in *Haxton* v. *Corse*, 2 Barb. Ch. R. 508–533, Chancellor Walworth, in a masterly opinion, has explained the decisions under the English bankrupt laws, (our laws as to excepted creditors,) and the difference between those laws and the act of 1841 as regards the rights of general creditors. The doctrine of election of funds and proceedings "*in rem*," &c., belong to the one while they have no bearing on the other. Creditors in England, and here a certain class, can go against the after acquired assets of the bankrupt. But general creditors can only reach the fund surrendered. The one elects under the law and is bound; the other is bound with or without an election, and confined to the fund surrendered. The chancellor concludes by saying: "Therefore, notwithstanding the general language contained in the 5th section of the act, the lawmakers did not intend that the proving of debts by creditors should be an absolute abandonment of all claim against the future acquisitions of their debtor if his discharge is refused," (for the argument is as good where the discharge is refused as where it is granted,) "or if it was void for any of the frauds specified in the act; but merely that the proving of debts under the decree should be considered as a waiver of the right of the creditors at law or in equity, which were in any way inconsistent with the election of such creditors to obtain satisfaction of their debts out of

property of the bankrupt under the decree, and as a consent to be barred by the discharge in case the bankrupt should obtain one which was not impeachable for fraud or wilful concealment of his property."

In concluding the point, I cannot help remarking, that if the creditor is stripped of the power of impeaching his debtor's discharge under such facts as are here presented, you strip him of the only material privilege reserved to him by the law. Counsel have characterized this law as a statute judgment with execution in favor of creditors. I rather regard it as a legislative confiscation of existing rights for the benefit of the debtor, with the privilege to creditors to avoid it for fraud when known to them; and this right the court should sedulously guard and preserve for him. See, generally, 2 Howard, U. S. R. 202; 5 Law Rep. 259; 1 Cushman, R. 275; 7 Metcalf, R. 152–424; 26 Wendell, R. 54; 9 Met. R. 438.

V. The next and the last defence which I shall notice is of the statute of limitations.

On behalf of complainant it is said that he and his assignors have been prevented from recovering these claims by the frauds of the defendants, that these frauds were unknown to them, and were concealed from them by the defendants, and that a court of equity will not extend to them the benefit of the statute on account of their fraudulent conduct.

On the part of defendants, it is answered that a court of chancery is bound by the statute, and can create no exceptions to it; that the defendants have never concealed the frauds or the cause of action of complainant, and that it would be productive of confusion and litigation to maintain this suit.

On the issue thus joined, it is said there is some conflict of authority. Therefore, I will first present my own view of the law upon principles of reason and justice before looking to adjudged cases.

I premise, then, that courts of equity are not bound by statutes on this subject. They are not within the statute. They look to the true merits of each case and decide it on its own equity. As is aptly said by a learned judge, they use the statutes as aids to their conscientious discretion. Where there is

no controlling circumstance to prevent, they act in obedience to the statute, but the statute is never permitted to be used when conscience would be violated.

A court of equity, I apprehend, never says that it will deprive a party of the right to the benefit of the statute of limitation; because a party has no absolute right to it in that forum; the right is a qualified one, qualified by the principles of the forum in which it is sued for, and by the character and conduct of the party seeking it. It is an equitable plea, addressed to the sound discretion of the court, which is always exercised in analogy to the rules of law unless their adoption would violate those principles which stamp the jurisdiction of the court. It must, then, depend on the attitude of the parties before it, whether the court will exercise its discretion so as to extend the benefit of the statute or refuse it.

Upon the highest principles of justice, a court of equity will never enable a party to avail himself of the statutes for purposes of fraud or injustice, or where it will protect him in the commission of a fraud. Nor will it permit him thus to secure to himself the consequences or fruits of his fraud. When the party whose rights are injured is ignorant of the fraud, or the fraud is concealed from him, lapse of time is not permitted to destroy the one or sanctify the other. If apprised of the fraud, his acquiescence is presumed; but concealment of fraud, however prolonged, whether directly practised, or as an essential constituent of its perpetration, avails nothing, and when brought to light, leaves the parties as they stood when it was first committed.

Guided by these views, I have no difficulty in coming to a conclusion in this case. The defendants obtained a discharge by a fraud on the bankrupt law, and by a fraud on the rights of their creditors. They have defeated the recovery of these claims by fraud, and they confess the fact. In this simple sentence consists this whole case. They appeal to this court to lend them its aid in availing themselves of a defence which has grown out of their own unjust conduct. Can or will it do so? I answer, no.

To do so, it would no longer be a court of conscience. It

would no longer punish fraud.  It would no longer administer equity.  Its pure and enlightened system would be resolved into mere technical and arbitrary rules, to be invoked for the protection and sustenance of fraud and covin, and not for the aid and furtherance of justice and equity.

That the defendants are guilty of the frauds charged, and that these frauds have prevented the recovery of the complainant's demand, is not denied.

But it is said that defendants did not conceal the alleged frauds, and that, therefore, complainant is in default for not assailing them.  To this I cannot assent.

Concealment is an ingredient of all fraud, for it is essential to its commission.  It is an element in the thing itself, because fraud cannot exist without it.  In nine cases out of ten, the fraud of a transaction consists in its concealment from the party whose rights are to be injured.

But here the fraud was directly concealed.  As before said, a petitioner in bankruptcy occupied a peculiar relation to his creditors.  He was bound in conscience, and by his oath, to make a full and fair disclosure of his assets, as required by law. They look to him for information, and have a right to look to him.  They have a right to rely on him.  If he fails to make a full disclosure, it is a fraud.  To the extent of his failure it is a concealment, for it withdraws from the eye of the creditor a knowledge of transactions which constitute fraud, which would deny him his discharge, and which would vitiate and annul it when obtained.  If A. occupies such relation to B. as authorizes him to go to B. for information on a given subject, to enable him to act, and B. affords him partial information only, and A. is induced to act thereupon, though the information given may be true, yet B. is none the less guilty of a fraud, and the concealment of a fraud upon A.  It is a fraud to withhold the information, and it is a concealment of a fraud because A. is ignorant of the suppression.  It is at once a *suppressio veri* and a *suggestio falsi* — a suppression of truth in the information withheld, and a suggestion of falsehood, that the facts furnished comprise the whole case.  Defendants committed the frauds; they suggested falsehood in their proceedings, and by represent-

ing them as full and fair, they concealed their commission of these frauds from their creditors.

It is unnecessary to say any thing of a concealment of the cause of action. If defendants did not conceal the plaintiff's cause of action, as is argued, it does not alter the case. The authority cited from 4 Cushing, R. is not in point. It was decided upon a special statute of Massachusetts, and is only law under the special legislation of that State.

In my judgment, the adjudged cases amply sustain this view. I will first notice cases relied on by defendants. The cases of *Cocke* v. *McGinnis*, Mar. & Yer. R. 351; and *Hamilton* v. *Shepperd*, 3 Mur. N. C. 115, were both cases at law, and in the case of *Walker* v. *Smith*, 8 Yerg. R. 238, no fraud is alleged. Courts of law are bound by the letter of the statute, and courts of equity, in cases free from fraud or pure trust, also regard it. So much is actually decided in these cases, and so far they are not disputed. The case cited from 5 Mason, R. has not been furnished me.

Courts have sometimes forgotten the difference between courts of law and equity on this subject. It is impossible to read Judge Catron's opinion, in *Cocke* v. *McGinnis*, and then turn to the cases cited by him, without perceiving that he has not borne this distinction in mind in examining the authorities. In the leading case relied on by him, *Troup* v. *Smith*, Chief Justice Spencer says:

" There is a marked distinction between a plea of the statute of limitations in a court of law and a court of equity;" and the chief justice sums up by saying the plea must prevail at law, and will not prevail in equity, on the principles stated by me. And yet Mr. Justice Catron has used Mr. Chief Justice Spencer's reasoning in showing that a court of law is bound by the statute to support his own position, that a court of equity is also bound, when Judge Spencer unequivocally says it is not bound.

Our own court has settled the question for us. In the case of *Livermore* v. *Johnson*, MS. Opinion, Chief Justice Smith says:

" It has long been the settled rule in England, that where a

party has been kept in ignorance of his rights by the person sought to be charged, the statute shall not begin to run until after the fraud has been discovered. The reason assigned why the statute bar will not be applied in a court of equity in a case of that character is, that it would be a violation of the principles of natural justice to permit a party to avail himself of the lapse of time as a bar to the suit where the party has by fraud kept concealed the rights of the complainant, and has thereby delayed him in the assertion of those rights. *Hoveden* v. *Lord Annesly*, 2 Sch. & Lefroy, R. 634. Such is, without doubt, the doctrine of courts of equity in this country. Story, Eq. 738. And such is unquestionably the law in this country. Angell on Lim. 188, and cases cited."

Lord Redesdale, in the case cited, expresses the whole doctrine in one admirable sentence : " That the statute ought not in conscience to run, the conscience of the party being so effected that he ought not to be allowed to avail himself of the length of time."

In New York, Chief Justice Spencer, in *Troup* v. *Smith*, 20 Johns. R. says :

" Courts of equity not being bound by the statute any further than they have seen fit to adopt its provisions as a reasonable rule, and then only in analogy to the doctrine of a court of law, are perfectly right in saying, that a party cannot, in good conscience, avail himself of the statute, when by his own fraud he has prevented the other party from coming to a knowledge of his rights, until within six years prior to the commencement of the suit."

The same principles will be found acted upon by the supreme court of the United States, in a recent case, in which the court has gone even further than is demanded here. 10 Howard, S. C. R. 174. And the same will be found in many decisions of the State courts, as well as elementary works of first authority. See, generally, Angell on Lim. 20, 28, 188, et seq. ; *Livermore* v. *Johnson*, MS. Opinion, Court of Appeals ; 2 Sch. & Lefroy, R. 634 ; 2 Story, Eq. Jurisp. § 1521, 1522 ; 20 Johns. R. 45 ; 19 Conn. R. 435 ; 3 Leigh, R. 732–738 ; 6 Yerg. R. 90 ; 3 Murph. N. C. R. 593 ; 6 Wheat. R. 497.

Holding, then, that the defendants, as applicants for the benefit of the bankrupt law, were bound to observe good faith towards their creditors, believing that their discharge is fraudulent as this case now stands, and that the complainant has been prevented from a recovery of his demands by the frauds and wilful concealments of the defendants, and by the concealments of these frauds by the defendants, and that to a knowledge of his rights consequent thereupon, complainant hath only come within eighteen months, I must further hold with the supreme court of the United States, in 6 Wheat. R., " that length of time ought not, upon principles of eternal justice, to be admitted to repel relief. On the contrary, it would seem that the length of time during which the fraud has been successfully concealed and practised, is rather an aggravation of the offence, and calls more loudly upon a court of equity to grant ample and decisive relief."

I have given due weight to the warning of the senior counsel of the defendants, that suits and litigation may grow out of the result I have reached. I can only say, if so, the innocent are in no danger, while the offending party will meet but a just reward.

In conclusion, it may be noted as a significant fact, that the case stands upon the bill and a simple demurrer, unaccompanied by an answer denying the frauds.

Let the demurrer be overruled, with leave to the parties to answer, &c.

*George L. Potter,* for appellants.

I. The bill shows but one partnership between the alleged debtors, Buckner, Stanton and Hamer; and consequently, inasmuch as the same debt cannot be due to, and due from, the same partnership, and a partnership cannot sue itself, the alleged balances of account, in favor of Buckner, Stanton & Co., against Stanton, Buckner & Co., and M. B. Hamer & Co., are no demands at all, either at law or in equity.

The averment is that Henry S. Buckner, Frederick Stanton, and Malachi B. Hamer, " constituted and were the only members" of said three firms, and the claim in fact is, that, origi-

nally, those balances were due to, and also due from, the same persons, under those firm, names. The facts on which it is sought to establish a case of indebtedness, as from one distinct firm to another, are these : —

It is charged that said three persons, " were partners in trade, doing business as commercial partners in the city of New Orleans, in the State of Louisiana, in the city of Natchez, in said county of Adams, and State of Mississippi, and in Yazoo City, in the county of Yazoo, and State of Mississippi ;" that "the said partners transacted their commercial business, and carried on their partnership trade in the said city of New Orleans under the partnership firm, name, and style of Buckner, Stanton & Co., said Buckner being the resident and sole managing partner, — in the said city of Natchez, under the partnership firm name of Stanton, Buckner & Co., said Stanton being the resident and sole managing partner, — and in Yazoo City under the partnership firm, name, and style of M. B. Hamer & Co., said Hamer being the resident and sole managing partner ; " that although, in 1841, said three persons were insolvent, they " continued to transact their partnership business under the said three firm names and styles," until the death of Hamer, — and thereafter, said Buckner & Stanton " continued to transact the said partnership business under said three firm names and styles, at said city of New Orleans, Yazoo City, and at Natchez; " that Buckner & Stanton each, individually, and as a member of said three firms, petitioned to be discharged under the bankrupt law; that their petitions were thus filed by preconcert, and because " it was necessary in order to their future business, that they should obtain, each of them, discharges in bankruptcy from their individual indebtedness, and from their indebtedness as members of said firms ; " that with their said petitions, they filed schedules and inventories, " showing both their individual indebtedness and effects, and the partnership indebtedness and effects of each of said firms," and showing that " each of said firms " was insolvent; that " among the effects and estate of Buckner, Stanton & Co.," surrendered by both Buckner and Stanton, with their respective petitions, " were two claims, being balances of accounts due the said firm of Buckner, Stanton & Co., from the

respective firms of Stanton, Buckner & Co., and M. B. Hamer & Co."

To recapitulate. The averments are, that Buckner, Stanton and Hamer, " were partners in trade, doing business as commercial partners," in New Orleans, Natchez, and Yazoo City ; that they " transacted their commercial business and carried on their partnership trade," under those firm names, with one of the partners resident in each of said places, as sole manager there ; that after the death of Hamer, Buckner and Stanton " continued to transact the said partnership business," under said firm names, at said places, and thereafter, "in order to their future business," petitioned in bankruptcy, both " individually and as members of said three firms," and surrendered the accounts due to one of said firms from the other two.

It is obvious that these statements show but one common partnership between the parties, and but one general commercial business transacted by them ; which business was the same before and after the partnership was dissolved by the death of Hamer, and was the same " future business " that Buckner and Stanton intended to continue after their discharges in bankruptcy. Buckner, Stanton and Hamer were, exactly what the bill avers, " partners in trade, doing business as commercial partners," at three places of trade. There is no pretence to say these averments indicate that they were partners in a separate, distinct, and independent business, at each place; or that the sole purpose of the partnership, thus formed, with a firm name for each place of trade, was not the transaction of one common, general business, as factors and commission merchants, and the inevitable conclusion from the statements is, that there was but one partnership between them.

It is true there is an averment which seems intended to convey the idea of three separate, distinct, and independent partnerships between these parties, under those three firm names ; but it is wholly insufficient for such a purpose. The charge is, that " said three firms were entirely separate and distinct from each other, and kept their business books and accounts accordingly, but each, as before stated, constituted of the same individual members." The previous averments and the exact iden-

tity of parties being considered, this allegation will be construed only as an assertion that the sole managing partner at each point conducted, separately, the common business of the partners at that place, and kept books of account for the business so transacted through him.

Upon the facts stated, the legal result could not be otherwise. The three parties might have engaged, together, in twenty different pursuits, under as many different firm names, at different places; and the aggregate of the multiform dealings of all the firms would but constitute the transactions of the common partnership between them. The result would have been precisely the same as if there had been but one person, instead of three, engaged in those transactions, under those firm names, at those places. In either case, there would be a like identity, unity, and oneness, throughout the whole transactions, at all places.

Upon the face of the bill, it is impossible to say that this "commercial business" and "partnership in trade" amounted to more or less than this: each partner, at his residence, under a distinct firm name, conducted a separate business, for the common benefit of the general partnership between the parties; and it was thus that they, "partners in trade, doing business as commercial partners, transacted their commercial business and carried on their partnership trade in the city of New Orleans, in the city of Natchez, and in Yazoo City." They were not engaged in "separate trades, on separate accounts," but were associated, in their combined operations, at their different places of trade, in one common union, in one common business, constituting, as described by Lord Thurlow, "only one partnership, arranging different concerns, belonging to them all, in different ways, for the benefit of different parts of that joint concern." *Ex parte St. Barbe,* 11 Ves. 414.

"Where parties agree to transact business jointly, under an agreement to share in the profits, the name or firm which they use is arbitrary and conventional. They may use the name of both, or of one alone, or any distinct designation by which all of them will be bound, as if their names were used." They may trade under different firm names at different places, but it

will be all one partnership. *Baring* v. *Crafts*, 9 Pick. 392; *Gage* v. *Rollins*, 10 Met. 354.

The conventional name under which they choose to deal is nothing; all will be bound " as if their names were used." Now, suppose, in this case, the business had been transacted by the three partners, at each place, under the names of H. S. Buckner, F. Stanton, and M. B. Hamer; could it be pretended, under the allegations of this bill, that their dealings, at each place of trade, were not parcel of the joint operations of one common partnership between them? A partnership is described to be " a voluntary contract between two or more persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, with the understanding that there shall be a communion of the profits thereof between them,"— " a community of the property of the partnership between the parties," and " a community of interest in the profits of the business of the partnership." Story, Part. § 2, 16, 18; and the averments of the bill, in relation to the interests and operations of those three parties at their several places of trade, describes exactly such a case. Whether we consider them as dealing at New Orleans, or at Natchez, or at Yazoo City, or at all three places conjointly, the common result of all their contracts and common dealings is but a community of property and a communion of profits. Where A. and B. are partners at one place, and A., B. and ○. are partners at another, the diversity is apparent; there is not an exact identity of parties, and C. has not a common interest with his copartners at both places of trade; but where, as in the case at bar, the three persons are common, sole partners, at each place, there is the same identity of parties and interests, between place and place, the like impossibility of a diversity in parties or interests, as if A., alone, was solely interested and transacted all the business at the several places.

The fact that there were different firm names, and separate books of account at each place, cannot at all affect the result. If it were shown that A. under different names, carried on large dealings at New Orleans, at Natchez, and at Yazoo City, the idea conveyed would relate to the extent and diversity of his

transactions; and the necessary conclusion would be that separate " business books and accounts " were kept at each place. So, when we speak of these three persons as " partners in trade doing business as commercial partners," transacting " their commercial business " and carrying on " their partnership trade" " in the city of New Orleans, in the city of Natchez, and in Yazoo City," and aver that they " kept their business books and accounts accordingly," we but suggest the extent and diversity of the transactions of their one partnership; and the consequence that they kept separate books, &c., resulting necessarily from the fact that their conjoint operations were conducted at different places of trade remote from each other.

They were equal partners; and if each had drawn one hundred thousand dollars from his local house, they would each have owed the common partnership that sum, were it not for the fact that, under the circumstances, the items of indebtedness being equal, would mutually balance and extinguish each other. Nor would the case have been altered, if Stanton and Hamer, each under his local firm name, had received his hundred thousand from the local house at New Orleans, instead of receiving it from the house at his residence.

The whole matter, in relation to these balances, was simply this: the three partners received from New Orleans, and used for their joint benefit, and unfortunately lost in the trade of the common partnership, the sums debited to the local firms, at Natchez and Yazoo City, respectively; and it is impossible to conceive how the transaction could give a right of action between them.

II. But admit an impossibility, and suppose these three firms were three distinct partnerships, between the same parties, and entirely separate from each other; these balances of accounts would be neither causes of action between the firms nor assets of Buckner, Stanton & Co.; and their creditors could not make them available, or enforce them by any process whatever.

To test this proposition, suppose this a suit between the original parties, Buckner, Stanton and Hamer as members of the Louisiana firm, sue themselves as members of the Mississippi

firms.  Waiving the objection, alike fatal in equity and at law, that the same parties are complainants and defendants, suppose the balances proved and the case at final hearing.  What shall be the decree?  From the bill, it seems these partners had equal shares in the three firms and equal claims upon the assets of each firm.  As equal partners in the Louisiana firm, each would have a third interest in the demands sued for, whilst, as equal partners in the Mississippi firms, each would owe one third of the same demands.  Now what equities have such parties against each other?  Clearly, none whatever.  They stand in a common predicament, and each may do equal justice to himself and his copartners, by paying out of one pocket into the other.  *Rogers* v. *Rogers*, 5 Iredell, Eq. 31.  In such a suit, there could be but one decree, — to dismiss the bill.  It would be vain to urge that firms are a sort of corporations, " civil persons," holders instead of partners, of all the assets ; such fancies may have been indulged, and they may serve a purpose as figures of speech.  But the settled rule, here and in Louisiana is, that the individual partners hold the assets ; the firm cannot sue its members, nor a partner the firm, nor can partners sue each other, upon transactions of the firm, except for a final adjustment and settlement of their affairs.

Judge Story has given a clear intimation of the rule in equity in such a case.  He says, " Another illustration of the beneficial results of equity jurisdiction in cases of partnership, may be found in the not uncommon case of two persons dealing with each other, in which some persons, but not all, are partners in each firm.  Upon the technical principles of the common law in such a case, no suit can be maintained at law, in regard to any transactions or debts between the firms ; for in such a case, all the partners must join and be joined ; and no person can maintain a suit against himself, or against himself and others.  Moreover, in a legal view, there never was any subsisting contract between the firms ; as a partner cannot contract with himself.

" But there is no difficulty in proceeding in a court of equity to a final adjustment of all the concerns of both firms, in regard to each other ; for in equity, it is sufficient, that all the parties

in interest are before the court, as plaintiffs or as defendants; and they need not, as at law, in such case be on opposite sides of the record." 1 Story, Eq. § 679, 680.

It is impossible not to perceive the reason of the careful limitation, as to the partners, in the language of this author. Although the case be remediless at law, there may be relief in the special case of dealings between partnerships, in which " some persons, but not all," are partners in each firm. The reason why the rule in equity would not apply to a case where the same persons constituted both firms, is manifest; there can be no right where the only obligation arising upon a transaction must exist, if at all, jointly and mutually, both in favor of and against the same individuals. But in the case put by the author, which is that of the firm A. & B., and firm A., B. & C., there is neither an identity in the persons, nor an identity of obligation, among the partners of the two firms, arising from such dealings. If the firm of A., B. & C. becomes creditor or debtor of the firm of A. & B., there can be no case in which C. is both debtor and creditor upon any one transaction between the firms; but upon each such transaction, on credit, he would be the creditor or debtor of A. & B., as the case might be. If A. & B. sold goods to A., B. & C., they would have a clear equity against C. for a third of the purchase-money, as he would have acquired a one third interest in their goods. So, if A., B. & C. sold goods to A. & B., an equity would arise in favor of C., against A. & B. for one third of the price. But suppose, if possible, that A., B. & C. sell their goods to A., B. & C., — to themselves; what title passes, and what equity arises? None at all.

But how does Judge Story suppose the parties are to sue in equity? The suit must be between the individuals — some suing the others, and not between the firms; for, says he, " it is sufficient, that all the parties in interest are before the court, as plaintiffs or as defendants; and they need not, as at law, in such case be on opposite sides of the record " — promisors on the one side and promisees on the other. What are they to sue for? upon any one transaction? Not at all; but for " a final adjustment of all the concerns of both firms, in regard to each

other." Such adjustment would, necessarily, involve a final settlement between the respective partners, and the amount of the recovery would depend on the state of accounts between the partners and their firms, and between them individually.

Such a case is like that of a claim by one partner against his firm; as to which it has been declared, by high authority, "a note in the name of the firm to one of the partners, is a writing somewhat anomalous in its character; it creates but an imperfect obligation; it is not enforceable at law according to its import. It is, in effect, merely the evidence of one item of indebtedness in the account between the partners; its availability in equity depending upon the condition of the firm, and the relative interests and liabilities of the partners as such. *Simrall* v. *O'Bannons*, 7 B. Monroe, 608.

In a case, where Hugh Rogers, Geo. W. Lowe & John C. Rogers, partners under the name of John C. Rogers & Co., filed their bill against that John C. Rogers & W. L. Otey, partners under the name of Rogers & Otey, alleging dealings between the firms and a balance due, the amount of which complainants could not precisely ascertain, and prayed that defendants disclose the amount and be decreed to pay it, Ruffin, C. J., said, " it is impossible there can be any decree for the plaintiffs on this bill. It seems to have been drawn upon some vague sort of notion, that the firms are in the nature of corporations, and that one of them might have a decree against the other, as firms. Still, it does not pray that payment of the debt be decreed out of the effects of Rogers & Otey; on the contrary, it looks behind the names of the firms to the persons who compose them," &c. " The bill, therefore, involves the absurdity of a man's having a decree against himself for a sum of money." " There can be no decree for the plaintiffs; not one against Rogers by himself, or jointly with Otey; because it would be to pay to John C. Rogers himself, jointly with others, and for that reason would be repugnant, absurd, and void." He held, also, that the settlement of that indebtedness would involve a final settlement of the two firms, and between all the partners. *Rogers* v. *Rogers*, 5 Iredell, Eq. 31.

Courts of justice are not governed by names and designa-

Buckner and Stanton *v.* Calcote.

tions. " The law looks beyond mere names and firms, and sees who are the real parties, and treats them as the persons who are to enforce their contracts." *Gage* v. *Rollins*, 10 Met. 354.

The creditors of a firm can demand no more, upon accounts due to it, than the firm itself is entitled to recover; and if the transaction be such that no right of action, at law or in equity, exists in favor of the firm, the creditors can claim nothing upon it. Even where the firm is insolvent and dissolved, the right of its creditors attaches upon the partnership effects, as Judge Story declares, only " as a derivative, subordinate right, under and through the lien and equities of the partners." Story, Part. § 361. *Ex parte Ruffin*, 6 Ves. 126.

But suppose Buckner, Stanton & Co. might have collected these balances by suit against the individual partners of the Mississippi firms, it is very clear that the firm creditors had no equity to enforce such a suit. For the demands held by those creditors against that firm, were debts against those very partners, and might have been enforced, as such, by suit at law, against them individually; and a court of chancery would not permit the creditors to waive suit upon their own demands, and enforce payment, indirectly, upon those demands of the firm against the same parties.

If A. held a note made by Stanton, Buckner & Co., and by Buckner, Stanton & Co., and the latter also held a note of Stanton, Buckner & Co., for the like amount, A. would be a creditor of Buckner, Stanton & Co., and both would be creditors of Stanton, Buckner & Co. Upon what pretence could A. go into equity, claiming a right to waive suit at law, upon his own note, against Stanton, Buckner & Co., and insist upon a right, as such creditor of Buckner, Stanton & Co., to collect the amount, indirectly, and in a court of chancery, by enforcing payment of the note held by them against the same parties? Such a claim would be absurd, and yet it is the sort of pretence insisted on for this complainant.

The plain conclusion is, that these balances of account never constituted assets of Buckner, Stanton & Co., to which their creditors were entitled.

*Ex parte Johns*, a case in English bankruptcy, is specially

relied on to maintain this dogma of the counsel. That was a case in which S. & A. Field were partners, under that name, as woolstaplers in London; and also partners, as woolstaplers, at Leeds, under the firm of Barker & Co. As between themselves, Barker was not a partner, but a mere servant of the Fields. The concerns were kept totally distinct from each other, and in all matters of mutual dealing between the two houses, the same conduct was, in all respects, observed, as though the proprietors of each concern were different persons. " A joint commission issued against Barker and the two Fields," as members of the firm of Barker & Co. Barker & Co. were largely indebted to the firm of S. & A. Field; and it was held that the creditors of S. & A. Field might prove that debt, under the commission, against the estate of Barker & Co. The statement of the case, and the facts necessarily involved, prove that the estates of both firms, as well as the separate estates of all the three bankrupts, passed to the assignees in bankruptcy; and that it was a mere controversy between different classes of creditors as to their respective rights upon portions of the assets. 1 Cooke, B. L. 509. It was pure matter of administration, and did not at all relate to suits or settlements of partners, *inter se;* nor was there a pretence that the individual responsibilities of the several partners were increased or diminished by the rule adopted; much less was it pretended that, by force of the rule new liabilities were created against them.

And it is to be noted here, that *Ex parte Johns* was not a case similar or analogous to the case at bar. This is a case where the same persons, as sole joint debtors, are alleged to owe themselves as sole joint creditors; but, in *Ex parte Johns*, the claim was that Barker, Field & Field owed Field & Field; that the three owed the two. The Fields held out Barker to the world as a member of their firm of Barker & Co.; the public had a right to treat the three as partners in that firm; and, accordingly, a joint commission in bankruptcy was issued against the three as such partners. The joint commission fixed the character of the estate of Barker & Co.; it was thereafter necessary to regard it and administer it as the joint firm estate of Field, & Field & Barker, and no regard could be had to the fact,

that, as between the bankrupts themselves, that estate belonged to Field & Field alone. The fact of a partnership between the three, and their consequent joint ownership of the assets, must necessarily be assumed and acted on, or the proceedings would be annulled.

"A fiat issued against several persons as partners may be annulled as to one, on the ground that he is not a partner." Coll. Part. (Perkins' Ed.) § 1058.

"Before the late statute (6 Geo. 4), all the ostensible partners must have been included; for a commission being, to some purposes, considered as in the nature of an action at law, it was held that a joint commission against two of several partners could not be supported." Gow, Part. 283.

"Where there are several partners, and the partnership property belongs to some of them only, the others having an interest in the profits, but no share in the capital, a joint fiat may, nevertheless, be supported against all, their creditors taking the joint property as the promiscuous property of them all." Coll. § 1019.

Under the commission against Barker & Co., the suit or proceeding was against Field & Field & Barker as partners, and the assets of that firm were administered accordingly, "as the promiscuous property of them all."

The case is never cited as an authority in cases like the present, where the same persons constitute all the members of two firms; but always as a decision showing the rule for the administration of assets, "where there is a minor partnership or house of trade constituted of persons who are members of a larger firm." Gow, 319; 1 Montag. Part. 136 and notes, p. 57 et seq.; Coll. § 991, 1000, et seq.; Eden, Bankruptcy (32 Law Lib.), 143; Story, Part. § 394; 1 Cooke, B. L. 509; *Ex parte St. Barbe*, 11 Vesey, 414. Or, as it is elsewhere expressed, "where two or more, part but not all, of a large firm are partners in a distinct trade." *Ex parte Castell*, 1 Harr. Dig. 911, 912; Gow, 319, n. 1; 1 Chitt. Eq. Dig. 113.

Mr. Montagu, who cites *Ex parte Johns*, says, "it has not been decided that such proof may be made between two firms consisting of only the same members." 1 Montagu, 136.

And so Lord Eldon. " In none of the cases in which the partner, constituting a distinct house, has ever been admitted to prove, has the estate against which he has been admitted been liable with that distinct house for joint debts." *Ex parte Adams*, Montagu, notes, 59, 60.

The fact is that *Ex parte Johns*, applicable only in certain peculiar cases, declares but an exception to the rule, itself an arbitrary one, under which the assets of firms are administered in English bankruptcy. It does not at all relate to suits, or to settlements of their affairs by partners between themselves. And there is no pretext to assume it as an authority to show that the same persons, whether two or more, may contract together as a body, become both promisor and promisee with each other together, and that all may sue all upon that anomalous sort of contract in which all of them promise to pay themselves a sum of money. No authority can be found for such a case as the case at bar, for no lawyer ever before had the hardihood to sue on such a bald pretence of a claim.

Considered as a case between a minor firm and a larger one, both having a common partner, *Ex parte Johns* is the case of a debt due from the firm of A., B. & C. to the firm of A. & B.; of which each partner, A., B. & C., would owe one third, and which would be settled when C. paid his third, to be divided equally between A. & B. Had it been, as here, upon a claim in favor of the firm of A., B. & C., against a firm of A., B. & C., each partner would be equally creditor and debtor for one third, and the whole matter would be amicably adjusted so soon as each partner made up his mind to settle with himself for that third. Each had but to cry quits to himself, and there would be a full acquittance, as to all, of the whole debt. Such would be the result of a suit or settlement *inter se.* The question now is, whether a commission in bankruptcy would give to the partners or their creditors any other or greater rights than the partners possessed before, as against each other.

It is plain to see how the English rule of administration in bankruptcy originated, whatever may be the diversities of opinion as to the reason on which the exception declared in *Ex parte Johns* is founded.

Upon the bankruptcy of a partner or a firm, there was an immediate dissolution of all partnerships in which any of the parties, against whom the commission issued, were concerned. This resulted " by virtue of the relation in the statutes which avoided all acts of the bankrupt from the day of his bankruptcy; and from the necessity of the thing, all his property being vested in the assignees." Coll. § 111.

" Under a joint bankruptcy, not only the joint but the separate property also passes to the assignees." " Under a separate bankruptcy, all the separate property, and such part of the joint property as the bankrupt himself would be entitled to, passes to his assignees." Coll. § 853.

Now take the case of *Ex parte Johns*, which, as we have shown, was, for all the purposes of the administration of assets, the case of a claim by the firm of A. & B. against the firm of A., B. & C. Under the joint commission, the joint estates of Barker & Co., and the separate estates of S. Field and A. Field, including the estate of the firm of S. & A. Field, and also the separate estate of Barker, passed to their joint assignees, to be administered according to the rules in bankruptcy. Each firm and each partner might have separate creditors, and questions might arise as to the administration of the assets; but it is obvious that no question could arise as to the right of the assignees to sue any of the bankrupts upon any indebtedness, inasmuch as the contemplated result of the proceedings was the discharge of each from all his debts. It would necessarily be a mere question of administration, not at all involving a right of suit.

At an early day it was settled, that " joint creditors, as they gave credit to the joint estate, have first their demand on the joint estate; and separate creditors, as they gave credit to the separate estate, have first their demand on the separate estate." Coll. § 920.

It was settled, as a general rule, that a party should not be admitted to prove in competition with his own creditors; and the rule was applied in cases where partners, creditors of their firms, or firms creditors of their partners, or of firms in which some of them were concerned, interposed their claims, in com-

petition with other creditors, for shares in the distribution of assets. Coll. § 990.

Lord Eldon declared it a settled rule, that "those who, being in partnership, are themselves, or some of them, debtors to the creditors of every class, cannot come in competition with the creditors." *Ex parte Reeve*, 9 Vesey, 589.

Lord Hardwicke held that where a partner had loaned money to his firm, his separate creditors might prove the loan against the firm estate, in competition with the joint creditors. Lord Thurlow denied the rule, on the ground that, as the partner could not so prove, his creditors, claiming through him, could not. Gow, 317.

Yet here were clear demands in equity, which would be regarded in the settlement of their affairs between the partners. *Ex parte Harris*, 2 Vesey & B. 212.

But, to the general rule, that joint and separate creditors cannot come in competition, and that partners cannot compete with their creditors, there are now two established exceptions, one of which was declared in *Ex parte Johns.*

"1. Where money or effects have been fraudulently abstracted from one estate, and applied for the benefit of the other.

"2. Where some of the members of a partnership form an entirely distinct firm, carrying on a distinct trade from that of the general partnership, and where the articles of one trade have been furnished by one firm to the other." Coll. § 991.

Under the first exception, it was immaterial whether the claimant was a single partner or a firm; and the term fraudulent was used to designate all cases of appropriation without consent. Coll. § 993 et seq.

Where there were two firms having a common partner, as A. & B. and A., B. & C., it is plain the creditors of firm A. & B. would not be creditors of firm A., B. & C., for C. would not owe them; and there would be reason to say that the proper assets of each firm should be applied to pay its own creditors.

Accordingly, it was decided, that "when there have been different partnerships, and a joint commission issues against the firm, including all the partners, the creditors of each of the firms

and of each partner must be paid out of the respective funds belonging to the estate which they have trusted; and the surplus, if any, of either of the estates, must be applied to some deficient fund." 1 Montagu, 137, and he cites *Ex parte Johns.*

Prior to that, the statute 21 James 1, c. 19, had established, for the benefit of creditors, the doctrine of reputed ownership. The 11th section provided that where the owner of property permitted another to hold and deal with it as his own, the same should pass to the assignee in bankruptcy of the latter, quoted in *Gordon* v. *East India Co.* 7 Durn. & E. 117 (230). And Mr. Montagu considers that this second exception is "founded upon the reputation of ownership in each firm of the debts due to it." He asks, " Why is this right confined to bankruptcy, and why is it confined to the distinctness of the houses, except by operation of the statute of James?" 1 Montagu, notes, 60.

Mr. Collyer says, " the exception to the general rule of proof, which has been allowed with regard to debts arising from distinct trading, is founded on a universal principle, which, if adopted in one case, ought also to be adopted in another. This principle is the same as that which suggested the doctrine of reputed ownership." Coll. § 1005.

Our bankrupt law recognized no such principle as that of reputed ownership. Whatever may be the reason of this exception, it is plain that it does not depend, at all, upon any peculiar characteristic — *quasi corporate* or otherwise, of firms; nor yet, upon the mere fact of an indebtedness between firms having common partners. It applies in favor of and against individuals, as well as firms, and is strictly limited to a particular kind of indebtedness between the parties.

Lord Eldon, in *Ex parte Silletoe*, thus declared the limits of this exception: " The general rule in bankruptcy is, that a partner in a firm against which a commission of bankrupt issues shall not prove a personal debt against that firm, in competition with the creditors of the firm, who are, in fact, his own creditors; and this general rule admits of no exception, unless where the partner to whom the firm was indebted carried on a distinct trade, and the debt from the firm was in respect of that distinct trade; the case of two or more persons carrying on a distinct

41*

trade is the same as that of one partner carrying on a distinct trade." Coll. § 1003.

In that case, the persons had carried on business as bankers, and two of them had also carried on a separate business as iron-mongers, and the claim was for money loaned by the latter to the former firm. A joint commission had issued against the six.

As to this claim for money loaned, Lord Eldon said : " Al-though in this case the separate estate of the ironmongers might have proved against the joint estate, if the debt had accrued by a dealing in their trade as ironmongers, yet they could not prove, inasmuch as the separate debt had accrued, not by a dealing as ironmongers, but by the loan of money." Ibid.

When his lordship thus limited the proof to claims arising from dealings in trade articles, and at the same time excluded claims equally equitable and just, and which must, necessarily, be regarded in final settlement between the partners, it is plain he had no conception that firms would become, in later days, a sort of equitable corporations.

In *Ex parte Cook*, Lord Brougham applied the rule to a case where P. as sole trader in London, had sold goods and loaned money to his firm in the country. The proof was allowed, as to the goods ; but allowed, for the money loaned, only upon the surplus after payment of firm debts. Coll. § 1004.

Here, again, there was an entire innocence of any perception that the true ground of decision was upon the individuality of firms, as civil persons distinct from the partners.

Sir John Leach said : " As a general rule, one partner cannot prove a personal debt against the joint firm, because the credi-tors of the joint firm are his creditors, and he would be taking from his own creditors what ought to be first applied in payment of their debts. But where a firm of two or more partners carry on a distinct trade, the creditors of the larger firm are not the creditors of the smaller firm ; and consequently, when the firm of two or more prove against the larger firm, they do not prove against their own creditors. Upon this reasoning, I cannot but still doubt whether the smaller firm of two or more is not in all cases entitled to prove against the larger firm, and whether it

can make a difference that the debt due the smaller firm is in respect of a dealing in the way of their distinct trade, or in respect of any other dealing with the larger firm." Coll. § 1005.

This may, perhaps, be regarded as another exception; but if taken as a statement of the true ground on which the second exception should rest, it is conclusive against a case like the present. Why did it never occur to Sir John to ground the doctrine upon the impersonation of firms?

Mr. Collyer states, as the general rule to be gathered from the decisions, "that where one or more members of a firm carry on a distinct trade, proof will be admitted between the estates of the general and the particular firm, *pari passu* with the creditors, in all cases where the debt has arisen from goods furnished by one firm to the other, in a manner as if they had been utterly unconnected in trade; but that, except in the case of bankers, this rule will not be applicable where the debt has arisen only from money advanced by one firm to the other." Coll. § 1004; Story, Part. § 394.

Under this exception, a firm may prove against a partner engaged in separate trade, *Ex parte St. Barbe*, 11 Ves. R. 414; and, as we have seen, a partner against the firm. "The case of two or more partners carrying on a distinct trade is the same as that of one partner carrying on a distinct trade." Coll. § 1003, 1004.

Note the peculiar limitations of this exception. There must be a dealing between distinct houses of trade, in the trade articles, but there need not be two distinct firms. A partner, as separate trader, may prove and come in competition with his own firm creditors, for trade articles furnished, but for no other demand, save in certain cases of fraud. Claims for money loaned, advances made, notes and acceptances given, &c., by the one firm to the other, are wholly rejected; although all other creditors, whether firms or individuals, are admitted to dividends, as of course, without any such distinction. One may prove against his firm, and his firm against him; but they may owe each other thousands, and yet be excluded because their claims are not for trade articles. Neither a mere indebtedness, nor the fact of firm and firm, nor both, will suffice. So far is it

from the truth that the rule rests on some peculiar attributes of partnership firms, as the counsel seem to suppose, that Lord Eldon declared there is no distinction under it, " between the case of one separate trader and the case of two individuals who are separate traders in partnership." Coll. § 1003.

He declared, it is not a mere question between firm and firm, " but whether this is to be considered a transaction between trade and trade." Coll. § 1003; Gow, 319, et seq.

At an earlier day he was inclined to discountenance these complex claims. In *Ex parte Bonbonus,* where proof of such a debt was claimed, he said: " there is considerable difficulty in supporting this species of paper. In *Mainwaring* v. *Newman,* upon such a transfer of paper it was held that no action would lie. Finding it, however, treated as a ground of dividend, I shall not do right in disturbing it." 8 Ves. R. 545.

In another case, where a partner, a separate trader, had purchased goods of his firm, and his copartners offered to prove, the court said : " the case is no more than this; a sole trader buys articles of himself and partners, you must surely prove for that, however, it may be arranged in account afterwards." *Ex parte Hesham,* 1 Montagu, notes, 59.

The purchase was not regarded as made by the debtor partner, from the firm, as a legal entity, at all; but " of himself and partners."

And it is plain that in no case would there have been any distinction between trade claims and other claims, if the decision had turned on the peculiarities of partnership firms.

We have seen that the assignee takes all the property and rights of the bankrupt, including as well those not provable, under the rule in *Ex parte Johns,* as those which are. All demands of the bankrupt pass to him, without regard to the question whether they are transactions between trades; he holds all by one and the same common title; and has the same remedies by action that the bankrupt would have had if no fiat had issued. Coll. § 856. But there are two classes of demands that may vest in him; one arising from dealings between trade and trade, in trade articles, and the other arising in any other lawful manner. It is obvious that the right of the bankrupt, as against

his copartners, to collect demands of either class is precisely the same. Where, then, is the difference between the two classes? It is simply in the matter of proving for dividends. If it so happens that the commission does not include the debtor firm, there will be no opportunity for proving against its estate, and the fact that the claim arose between trade and trade will be wholly immaterial. Take the case of *Ex parte Sillitoe* and suppose the commission had been against the minor firm alone; the question of claims between trade and trade could not have arisen; and the assignee would have been compelled, whether the demand was a trade claim or not, to call on the other members of the larger firm for a final settlement of its affairs; and in the accounting, the demand in favor of the minor firm would have been allowed, and such sum paid to him as his principals were found entitled to on the final settlement. If it be a case between trade and trade, and there be opportunity for proving, the claim is proved and shares in the estate; and if it be not of that kind, it is simply postponed until the separate or firm creditors, as the case may be, are paid. The one class are claims against the estate, and the other claims against the surplus, which involves the necessity of a final account and settlement.

If there was no estate to be proved against, and also when the estate was exhausted, it is plain that it could make no difference whatever, whether the demand was a trade claim or not; and in such a case the rights of the assignee, and the liabilities of the parties indebted would be the same, precisely, on either class of claims.

Lord King declared the general rule, to which this exception was made, "a resolution of convenience." Coll. § 920; and Judge Story considered the rule unfounded in reason or justice. Story, Part. § 377. Both rule and exception are purely artificial, and afford no authority for the pretext that these balances passed to Sill, the assignee, as debts due and collectable by suit, from Buckner, Stanton, and the estate of Hamer.

If we regarded the opinions of Lord Eldon in *Ex parte Reeve* or the decision in *Ex parte Adams*, this case could not be within the rule in *Ex parte Johns*; besides the bill fails utterly to show that these balances originated, at all, from any dealings in arti-

cles of trade, between trade and trade; and for aught that appears, they may be no more trade claims than was the demand in *Ex parte Sillitoe.*

Moreover, if we consider the rule in *Ex parte Johns* as establishing a right to a full recovery between firms having a common partner, or, as claimed by counsel, where the same persons compose both firms, it must be taken with all its restrictions, and as a rule limiting the right to trade claims. In this view, that case is a full authority to show that no liability arises on an indebtedness between such firms, except it arose from a dealing in trade articles.

But there is a right and a liability in all cases of indebtedness between firms, having a common partner.

If firm A. & B. owes firm A., B. & C., the rights and liabilities of the partners not being equal, A. & B. must pay to C. his share of the demand. And, as Lord Eldon has said, "the same equity which exists among partners, if they all remain solvent, must be the equity which prevails among them when they become bankrupt." Coll. § 986.

If this be true, it is obvious that if firm A., B. & C. owed firm A. & B., and the latter became bankrupt, its assignee could recover from C. but his due proportion, — one third of the debt.

In a case in Massachusetts, where the members of a minor firm were members of a larger firm, and the former was indebted to the latter, it was held that the larger firm, if solvent, could not be permitted to prove against the estate of the minor firm, in competition with its creditors, except by so framing the order as to give to the creditors of the partners in the minor firm the share of those partners in the larger firm; but that, if both firms were insolvent, the proof might be allowed; "so far as to distribute the assets, as if the firms had in truth been separate." The court said: "the two firms having carried on distinct branches of business, and kept distinct accounts, debiting and crediting each other, and having severally obtained credit according to their supposed capacities, means, and success, the treating them as distinct concerns for the purpose of a distribution of their assets among their respective creditors, would

Buckner and Stanton *v.* Calcote.

seem to afford as equitable a rule as the state of such a complicated relation would admit." *Scudder* v. *Crocker*, 1 Cush. R. 368.

Here the firms were treated as distinct, for the mere purpose of distributing assets. And the right of proof was dependent on the insolvency of both firms. Mr. Gow states the rule in the *Ex parte Johns* class of cases to apply only where "both firms become bankrupt." Gow, 318.

It is not to be noted that, under the English system, there must be an act of bankruptcy, before a commission can issue; and it issues only against persons who have committed such an act. The issuance of the fiat depends upon an act done, and not on the actual insolvency of the party. Hence, persons entirely solvent, may be forced into bankruptcy; and the fact that a partner is a bankrupt, does not prove the insolvency of his firm. Where there is a common partner, the minor firm may be bankrupt, and the larger one continue solvent, but not *e converso*. The bankruptcy of the larger firm involves all its members, and all their estates, joint and separate. Hence, where it is stated that a partner has been permitted to prove against his firm, or the minor firm against the larger, the fact always is that the proof is made on behalf of the estate of such partner or minor firm, for the benefit of his or its creditors. And it may be said, generally, that the proof is between estates; and Mr. Collyer so heads his chapter. Coll. p. 819.

Consider the operation of the rule, in the case of firms A. & B., and A. B. & C., both in bankruptcy, but the latter solvent, and a creditor of the former. Suppose the case of separate trades and the debt to be within the rule. The estate of A., B. & C. proves against the estate of A. & B. in competition with its creditors. So soon as the firm debts of A., B. & C. are paid, and the accounts of the partners adjusted, the surplus belongs to the three partners, individually, and is to be applied accordingly. The share of each goes to his separate estate, to be administered as such by the assignee. Part of the apparent assets of A. & B. are thus transferred to A., B. & C. to pay debts of that firm; and the surplus goes to the three separate estates to pay the private debts; and if there still be a

surplus, C. takes his share, for all his debts are paid; and the share of A. & B. goes into the estate of firm A. & B. to pay its debts, &c. It is obvious that the rule is purely artificial, and regards a matter of administration merely. We have shown that it does not apply to cases where, as here, the same parties are creditor and debtor, as to the claim; but it is wholly immaterial whether we admit or deny that such claim could be so proved; since the rule does not relate to suits nor to settlements between partners.

Upon the whole matter, therefore, it is plainly manifest, that the rule in *Ex parte Johns* cannot avail the complainant. It is a mere rule for administration of assets. It applies only in cases of indebtedness between partners and firms, or between a lesser firm and a larger firm, which includes some or all the members of the lesser firm. It neither affects equities nor rights between the partners, nor their liabilities *inter se*. It does not regard any peculiarities of firms, as constituting them legal entities distinct from the partners; nor depend on any such fallacy at all, but is governed by, and strictly limited to the fact of dealings in articles of trade, between trade and trade. And the learned counsel must abandon that class of cases, or show that a business or trade, — a pursuit in life, is " an ideal person " capable of suit, — that navigation and commerce can be debtor and creditor, and can owe and sue each other in a court of chancery.

III. These balances, whether assets or not, never passed to the assignee in bankruptcy. Complainant has no interest in them, and no right to question the certificates of discharge.

The bill rests this part of the case wholly upon the supposition that the assets of Buckner, Stanton & Co., passed, by mere operation of law, upon the decree on the separate petition of Buckner, and vested in Sill. There is no pretence of any administration of the assets in court, or any proceedings by the court on the subject; save the decree declaring Buckner a bankrupt, and the subsequent order of sale.

The averments on this subject, are as follows: The bill avers that Buckner and Stanton filed with their petitions " schedules of their indebtedness, and inventories of their effects, both indi-

vidually, and as members of said three firms, showing both their individual indebtedness and effects, and the partnership indebtedness and effects of each of said firms." That Buckner was decreed a bankrupt, and Sill was appointed his assignee, and that "thereby all the property of every name and nature, whether real, personal, or mixed, of the said Buckner, and the said Buckner, Stanton & Co., were by operation of law, from the time of said decree of bankruptcy divested out of said Buckner and said Buckner, Stanton & Co., and vested in the said Sill the assignee," &c.

"That among the effects and estate of Buckner, Stanton & Co., surrendered and vested in the said Sill, assignee as aforesaid, by the said Buckner after the aforesaid decree, were two claims, being balances of account," &c.

That "afterwards on the 9th day of May, A. D. 1844, on the petition of the said Sill, after due proceedings for that purpose, an order of sale was made by said United States district court, in pursuance of said act of congress, directing and ordering the sale of all the assets, real and personal, not then before sold or compromised, of the said Buckner, and Buckner, Stanton & Co., surrendered by the said Buckner, and set forth in the inventory of the assets of said Buckner, Stanton & Co., annexed to the petition of said Buckner, among which assets, were the two claims, or balances of accounts."

The pith of the averments is, — the petition, with schedules and inventories; the decree of bankruptcy, and appointment of an assignee; the assumed legal consequence that the assets of the firm were thereby surrendered, and were vested in the assignee, and a general order of sale, and sale accordingly.

The pleaders seem to have supposed the application of Buckner was within the fourteenth section of the act of congress, regulating proceedings where one partner or the firm become bankrupt. But that section applies only to existing partnerships, and not to firms dissolved; and its provisions are inapplicable to such a case. *Aikin* v. *Oakey*, 10 Rob. 410. The petition of Buckner did not carry the firm or its assets into bankruptcy, but only his separate estate, including his individual interest in those assets; and the courts of Louisiana de-

clare that interest to be, as here and in England, his share of the surplus remaining after the payment of the firm debts, and an adjustment of the accounts between the partners.

" The real and actual interest of each partner in such partnership stock, is the net balance which will be coming to him, after payment of all the partnership debts, and a just settlement of the account between himself and his partner." *Peck* v. *Fisher*, 7 Cush. 389; *Filley* v. *Phelps*, 18 Conn. 300; *United States* v. *Hock*, 8 Pet. 275.

The effect of the separate petition of Buckner, was similar to that of a separate commission in bankruptcy. " A separate commission being a statute execution against both separate and joint estate, the assignees take under it all the separate property of the bankrupt, and all his interest in the joint property; the extent of which interest is exactly the same as that which vests in a separate creditor of one partner by a judgment at law, taking execution against the partnership effects. In the case of an execution, the sheriff, though he may seize the whole of the joint property, can sell only an undivided moiety; and the vendee becomes, *quoad* the interest of the indebted partner, tenant in common with the solvent partner, taking only the undivided share of the debtor, subject to all the rights of the other, and to the accounts to be taken between them as partners. So, in the case of bankruptcy, the assignees under a separate commission, can affect the joint property no further than the bankrupt himself; they have no right to change the possession, or to make any specific division of the effects; they take only such undivided share or interest as the bankrupt himself had, and in the same manner as he had it, that is, subject to all the rights and liens of the other partner, and they are entitled to only that balance which is ascertained to be due to the bankrupt, after the partnership debts and the claims of the solvent partner are satisfied, and a division is made of the surplus." Gow, 326, 327.

Where a partner becomes bankrupt, " only his private property and his interest in the funds of the company pass to his assignees." *Harrison* v. *Sterry*, 5 Cranch, 302; *Ex parte Ruffin*, 6 Ves. 126; *Sims* v. *Ross*, 8 S. & M. 561.

" It is clearly established as a general principle of law, that if one partner becomes a bankrupt, his assignees can obtain no share of the partnership effects, until they first satisfy all that is due from him to the partnership." *Holderness* v. *Shackels*, 15 E. C. L. 317.

The assignee of one partner takes but his share in the surplus " after a settlement of the accounts." *Rodriguez* v. *Heffer-man*, 5 Johns. Ch. R. 428; 2 Spence, Eq. 212, 213; 1 Story, Eq. § 1039, 1228, 1411; *Brown* v. *Heathcote*, 1 Atk. 160–162; *Mitford* v. *Mitford*, 9 Ves. 87, 100.

It has been long established that the assignee does not stand as a purchaser, nor in so favorable position as a creditor. 2 Story, R. 495.

Now what was the individual interest of Buckner in the assets of the firm ? The charge is, that all the firms and all the partners were insolvent. Upon a final settlement of their affairs, each partner would take nothing ; there was no surplus, nothing for division between them.

The rule is, that such effects only in which the bankrupt has a beneficial interest, pass to his assignees. *Winch* v. *Kelley*, 1 Durn. & E. (620,) 356.

" If the firm is insolvent, the assignee of one partner has no interest " by the assignment. *Coe* v. *Whitbeck*, 11 Paige, 42; 8 U. S. Dig. 45, § 44.

Where a partner in an insolvent firm assigned all his interest in the assets, it was held he " had no interest which could in equity be assigned." *Havens* v. *Hussey*, 5 Paige, 32; *Ex parte Hill*, 5 Bos. & Pull. 192, n.

As the separate assignee of Buckner had no interest in the firm assets, except to a share of the surplus after paying all debts, and the firm was insolvent, it is obvious that he could take nothing, and so had no right to, or interest in those assets.

If it be urged that he took, of necessity, we answer, no; there was ample remedy for creditors of the dissolved firm, under the laws of Louisiana, but not under the act of congress.

But these considerations, applicable to cases of partnership everywhere, and conclusive as they are, do not present the full strength of the case for the defendants.

The firm of Buckner, Stanton & Co., was located in New Orleans, and the question of the rights and liabilities of the parties, under the circumstances, upon these balances of account, is to be determined with reference to the laws of Louisiana.

Prior to the date of the proceedings in bankruptcy, these several firms had been dissolved by the death of Hamer. In that State, as here, a partnership ceases on the death of a partner. *Simmons* v. *Parker*, 4 Martin, N. S. 206; *Cane* v. *Battle*, 3 Ann. 642.

After his demise, there was no longer a pretence to indulge fancies of ideal corporations; and, if the " civil person " ever held the firm assets, they passed, upon its dissolution, to others. These accounts ceased to be " quasi corporate assets," and became the individual property of Buckner, Stanton, and the representatives of Hamer, subject to the rights of the firm creditors.

Under the laws of Louisiana, " the moment the partnership is dissolved by the death of one of the partners, the survivors and the heirs of the deceased become joint-tenants of the property belonging to the partnership." *Shipman* v. *Hickman*, 9 Rob. R. 150, 151; *Turner* v. *Collins*, 1 Martin, N. S. R. 371; *Simmons* v. *Parker*, 4 Ib. 207.

Such was the condition of affairs in New Orleans at and prior to the proceedings in bankruptcy. Buckner, Stanton, and the representatives of Hamer owned the balances of account, if indeed a property could be had in them. They were the creditors to whom these balances were due — the debtors from whom they were due. As joint owners, each of the three was entitled to demand a third of the amount due; whilst, as joint debtors, each owed the same proportion. If they attempted to enforce collection, each must have united in the suit as jointly entitled; and they must have sued themselves as the parties jointly liable.

In that city there is a maxim among jurists, that where each partner owes the firm, " one account necessarily extinguishes the other, *pro tanto*." *Armstead* v. *Spring*, 1 Rob. R. 569; and it is plain to see what would have been the fate of such litigants there.

In that State these rules apply:

On the death of a partner, the survivor cannot sue for or collect the firm dues, without joining the representatives of the deceased, or giving bond and obtaining authority from the court of probates. *Crozier* v. *Hodge*, 3 La. R. 358, 359; *Flower* v. *O'Connor*, 7 Ib. 197; *Lockhart* v. *Harrell*, 6 Ann. R. 532.

Such survivor cannot release a debt due the firm. *Bookout* v. *Anderson*, 2 Ann. R. 248.

He cannot sell the assets or use the name of the firm. *Cane* v. *Battle*, 3 Ann. R. 642.

His power to alienate ceases. *Simmons* v. *Parker*, 4 Mart. N. S. R. 207.

The heirs of the deceased have a right to participate with the survivor in the liquidation. *Norris' Heirs* v. *Ogden's Executor*, 11 Mart. R. 460.

These rules have been enforced in a case in this respect, the counterpart of the case at bar. Turner & Woodruff were partners, and after the dissolution of the firm, the latter, who was liquidating partner, petitioned, "both individually and as a member of the firm," and was decreed a bankrupt under the act of congress. Aiken "purchased the whole assets, and all the right and title of the firm of Turner & Woodruff, at marshal's sale, under the decree of the bankrupt court."

It was decided that Woodruff "had no power to dispose of the assets except in discharge of the liabilities of the firm; that the firm having been dissolved, the case was not within the fourteenth section of the bankrupt act;" that "the interest which vested in the assignee of Woodruff was precisely such as he had when he went into bankruptcy;" and that "Aikin acquired, under the sale, only the interest vested in the assignee," and was not entitled to collect. *Aikin* v. *Oakey*, 10 Rob. R. 410.

The nature of the interest of a partner, in such a case, is clearly defined. While the partnership is existing, it has been held, that the members are entitled to but "the residuum which may be left from the entire partnership property, after the obligations of the partnership are discharged." *Smith* v. *McMicken*, 3 Ann. R. 319.

42*

" A partner has no action against another, except to make him account, until a final settlement takes place; and then for the balance that appears due, and no right to be paid until all claims against the partnership are discharged." *Faurie* v. *Millaudon*, 3 Mart. N. S. R. 478.

" A partner is not accountable for any transaction, nor any number of transactions, but for the balance only, which, after a general settlement of accounts, may appear due." *Baudres Synd* v. *Laurent*, 2 La. R. 451; *Jeandron* v. *Bondreaux*, 1 Rob. R. 383.

He has no remedy for advances, or for profits, &c., "until a final settlement takes place." *Camblat* v. *Tuperey*, 2 Ann. R. 10, 90, 142.

Where one partner gave to the other a note, with surety to enable him to carry on the business, it was held, that no suit could be maintained upon it, "until a final settlement of the partnership was made, and then only for the balance ascertained to be due according to the well settled rules of partnership." *Johnson* v. *Downs*, 3 Ann. R. 590; *Johnson* v. *Marshall*, 4 Rob. R. 160, 161.

These decisions are clear to show the fallacy of the pretence that a firm in Louisiana is a sort of " civil person," a quasi corporation holding the property over the partners; for there is no pretence to say that a stockholder may not there, as elsewhere, sue it for a debt due him from the corporation. But there are direct authorities proving that the partners own the property.

" Partners are joint owners of the property belonging to the partnership." *Johnson* v. *Brandt*, 10 Mart. R. 640.

" The stock, or common fund, is held by the partners *pro indiviso*." *Millaudon* v. *N. O. & Carrollton Railroad*, 3 Rob. R. 506.

Note the parity:

" The right of the separate creditor under the execution depends upon the interest each partner has in the corpus of the joint property. With respect to that, we are of opinion that the corpus of the partnership effects is joint property; and neither separately has any thing in that corpus; but the interest

Buckner and Stanton *v.* Calcote.

of each is only his share of what remains, after the partnership accounts are taken." *Taylor* v. *Fields*, 4 Ves. R. 396.

" The partners themselves are clearly joint-tenants in all the stock and all the effects, seized *per my et per tout.*" *West* v. *Ship*, 1 Ves. sen. R. 241; Coll. § 123; Gow, 46; 3 Louis. Cond. R. 688.

Judge Story says they are " joint owners and possessors of all the capital, stock, funds, and effects belonging to the partnership." Story, Part. § 91.

And this, his declaration, is a full reply to the argument founded on that section in his Equity Jurisprudence, where he says, a court of equity will administer justice between firms having a common partner, precisely " as if " they were corporations. The learned author explains his meaning fully, in another place. He does not pretend that the firms are entities, or capable of suit; but he says, " In equity there is no difficulty in one partner suing the other partners; " " one partner is entitled to sue all the other partners," &c. Story, Part. § 221, n. 1, 222.

In Scotland, the firm is held as " a separate person," and the consequence is, that the individual partners are regarded as sureties of the company, and not liable, in the first instance, to suits on the firm contracts. See remarks of Mr. Bell; Story, Part. § 221, n. 1.

Where there is an indebtedness between firm and partner, or firm and firm having a common partner, suit therefor must demand, as it necessarily involves, the final adjustment of " all the concerns of both firms," or of the firm as the case may be. 1 Story, Eq. § 680; *Simrall* v. *O'Bannons*, 7 B. Mon. R. 608.

These cases show the nature and extent of the interest of both Buckner and Stanton, in the assets of Buckner, Stanton & Co., at the date of proceedings in bankruptcy. They were not sole holders of them; nor had they any individual interest in them, for their personal interest applied only to the residuum after the debts were paid, and the bill avers the firm was utterly insolvent. What interest in these assets passed to Sill, the assignee of Buckner, under these circumstances? The third section of the statute declares, that " all the property and rights of property, of every name and nature, and whether real, personal, or mixed,

of every bankrupt," shall vest under the decree, and by mere operation of law, in his assignee; and that such assignee "shall be vested with all the rights, titles, powers, and authorities to sell, manage, and dispose of the same, and to sue for and defend the same, . . . . as fully, to all intents and purposes, as if the same were vested in, or might be exercised by, such bankrupt before or at the time of his bankruptcy."

It is plain, that under the laws of Louisiana, Buckner could not, alone and without the assent of Stanton and the representatives of Hamer, sue for, or collect, or sell, or release the assets; and could, at most, but transfer his individual interest in them, his right to a share of the residuum after payment of the firm debts; and that, consequently, his surrender in bankruptcy vested in Sill, his assignee, no right to the assets, except the right to a share of such residuum.

But the case shows that there could be no residuum; that there would be nothing from the firm assets that the assignee of Buckner could take to administer as his separate estate; that nothing passed under the assignment.

It may be said that all this matter is *res adjudicata;* that the order of sale is conclusive evidence of the right of Sill to sell all and every part of these balances; but the pretence is unfounded.

1. The order, as recited in the bill, was general in its terms. There was no special designation or description, but only a general reference to "the assets real and personal" of Buckner and Buckner, Stanton & Co., "surrendered" by Buckner, and set forth in the inventory. The only surrender alleged is, the filing an inventory of personal and firm assets; and the order did not profess to dispose of the interests of the other partners, nor of the firm creditors. It was *ex parte,* and we are bound to presume there was no attempt by the court to exceed its power; and this order must be held as a mere direction to sell such interest, without declaring its extent, as was vested in the assignee.

2. It was limited to "assets real and personal." There have been grave doubts if the court could order a sale of choses in action at all; but it would seem clear that a mere general

order to sell "assets real and personal," did not embrace balances of account.

3. An order to sell the entirety of these balances could have been made only upon the supposition that the case was within the fourteenth section of the act; and we cannot assume that the court thus ordered a sale of debts which would be barred by its own certificate of discharge to the debtors.

4. The order, in so far as it extended beyond the rights of Buckner, was void. The other parties in interest were neither before the court, nor subject to its jurisdiction; and it could not impair their rights.

5. The case of *Aikin* v. *Oakey*, 10 Rob. 410, is conclusive against this pretence; and so is the late decision by this court in *Foute* v. *Donald*.

This court has decided that no debts passed to trustees appointed under the statutes regulating the proceedings against the banks, except such debts as they were entitled to collect for the benefit of creditors. *Bacon* v. *Cohea*, 12 S. & M. 524.

In a case where a partner assigned "all his interest in and to the property, goods, wares, merchandise, and debts," belonging to his firm, it was held that a debt he owed the firm, did not pass. *Van Scoter* v. *Lefferts*, 11 Barb. 142. So, a firm, in Louisiana, cannot assign a debt due by a partner. 6 Martin, N. S. 655.

Cases before cited demonstrate, and the rule is clearly settled, that the assignee in bankruptcy takes precisely the place of the bankrupt, and is "in no better condition in regard to his effects;" and "the purchaser at the sale of the assignee occupies the same position." *Anderson* v. *Miller*, 7 S. & M. 590.

It is also clear that the assignee takes only the estate and rights of the bankrupt, as they existed at date of the decree in bankruptcy; he has no claim to or interest in the future acquisitions of the bankrupt.

Wherefore, he could not have sued, as Calcote does, to vacate the certificates and reach the after acquisitions of the defendants. The law vested in Sill as assignee all the then existing assets of his principal, the bankrupt, and he could have had no object to sue and vacate the certificate, except to reach his

future acquisitions. It is an important question, material to be explained by counsel for complainant, and they are bound to show how it is that Sill, who had no such right of suit, was empowered to sell and vest in Oakey a right to sue and impeach the certificates — a right to sue and reach the future acquisitions of the bankrupt.

To conclude this part of the subject, consider the position of complainant. He contends that, under the proceedings upon the petition of Buckner, these balances became vested in Sill, who sold them to Oakey, who sold them to complainant. The act of congress declared that the assets should vest in the assignee, precisely as the bankrupt held them — that the assignee might maintain such suits as the bankrupt might have maintained. This court has lately decided that he takes only the rights of the bankrupt, and not those of his creditors — thus the assignee cannot, generally, avoid fraudulent conveyances made by the bankrupt, though the creditors may. *Porter* v. *Montgomery.*

So where a purchaser from an assignee in bankruptcy, sought to vacate a fraudulent sale made by the bankrupt, it was held that, as he was suing, as Calcote sues, not as a creditor or for creditors, his claim was "in no respect superior to the right of the bankrupt," and that he could not maintain the suit. *Baker* v. *Vining*, 30 Maine, 125.

So in a case where Fletcher had sold land, on credit, to Green, who sold to J. C. & W. C. Collins and took their notes in payment, and became bankrupt, and McKiernan purchased the notes at the assignee's sale of his effects, and then sought to avoid Fletcher's vendors' lien on the land, and subject it to pay the notes. The court held, " the vendor's (Fletcher) privilege was good against Green without registry. The plaintiff who stands before us as the transferree of Green's right in the notes of J. C. & W. C. Collins, by judicial purchase, has no greater rights than Green. He represents Green, and the claim to cancel the privilege of Fletcher is as unfounded as if made by Green himself." *McKiernan* v. *Fletcher*, 2 Ann. 438. See, also, *Talcott* v. *Dudly*, 4 Scam. 435; *Strong* v. *Clawson*, 5 Gilm. 349; 14 Ala. 449.

Now, the complaint here is, that the defendants were guilty of a fraud in law, in giving preferences at a time when they and the estate of Hamer held and owned these balances; and the question is, can complainant who claims to hold, by mesne assignments from them, all the interest of the defendants in these balances, insist on that fraud.

It is a rule that one, a party to, or consenting to, a fraud, and one not injured by it, shall not be relieved upon it; nor can a party, in such a case, by assigning his interest, give a right of action to another; for the assignee but takes the place of his assignor. Cases before cited, and *Carroll* v. *Potter*, 1 Walker (Mich.), 355; *Warbuton* v. *Aiken*, 1 McLean, 460.

A creditor privy to acts of bankruptcy cannot take advantage of them. *Ex parte Bourne*, 16 Ves. 147; *Bamford* v. *Brown*, 2 Durn. & E. 594, note; *Lope* v. *Hocking*, 14 E. C. L. 22.

It follows that this complaint must be disregarded, if the original parties, Buckner & Stanton, could not, if suing to collect these balances, set up the alleged frauds. The acts complained of as frauds, were all done prior to the petitions in bankruptcy, and whilst Buckner, Stanton & Co., according to the theory of the bill, held and owned these claims; and, so far as concerns these demands, the acts of fraud were an attempt to cheat themselves! There can be no pretence to say they could be relieved on any such grounds; and it is equally clear that neither the assignee in bankruptcy, nor any claiming under him, can impeach the certificates for such a cause.

An assignee in bankruptcy has no interest in, and cannot, as such, be affected by, and has no authority to impeach the certificate of discharge granted to his principal. Nor can he create such a right by transfer of his claims.

It were a rare absurdity, if the certificate, which annihilates the debts of the bankrupt, should operate in like manner upon, and utterly destroy the assets surrendered by him for the benefit of his creditors. Yet the theory of this bill is, that this million and odd of so called assets would have been so annihilated, but for the certain acts by which it is said the certificate itself is avoided.

But the climax of proceedings in bankruptcy conducted upon

the theory of complainant is witnessed in the result of an un-successful attempt to obtain a valid discharge — it doubles the debts of the bankrupt. He not only continues liable for all debts owed by his firm to third parties, but becomes liable for all that the partners jointly owed the firm.

IV. Preferences are no cause to avoid the certificates.

The gravamen of the bill is preferences given by defendants to certain creditors, contrary to the second section of the act; and it is obvious that this case must fail if the certificates of discharge cannot be avoided on that ground.

We deny that they may be so impeached, and assert that such preferences, notwithstanding a certificate of discharge, otherwise unobjectionable, is a valid final discharge of the party to whom it is granted.

Prior to this statute, acts of preference were not unlawful. They were sanctioned by courts, and, in many cases, declared to be founded on high considerations of duty and honor.

It is true this law denounces them as frauds upon it and void, but it is beyond legislative power to clothe them with the turpi-tude and moral guilt of intentional fraud. Acts termed con-structive frauds, or frauds in law, whether declared by statute or raised by implication of courts, often result from worthy motives; they are denounced solely because repugnant to some policy of law, and, whatever be the phraseology employed, are not in fact frauds, but only unlawful.

In this instance, the very sentence of the statute which de-clares such preferences " a fraud " upon it, explains the mean-ing of the lawgiver so to be, for it defines the preferences there-by inhibited to be, just what we contend they must be — not fraudulent preferences, but " unlawful preferences," — prefer-ences contrary to policy, but not necessarily against conscience and honor. Among the acts thus prohibited, are payments of honest debts and indemnities to innocent indorsers and sureties —*bonâ fide* transactions honestly done, and which cannot be fraudulent, in a moral sense, nor even unlawful, except when against some provision or policy of positive law.

Apart from the bankrupt law, the acts complained of were perfectly lawful and fair, and it is for complainant to show that

they are so denounced by that law as to be a cause to avoid a full and formal certificate of discharge granted to the bankrupt who has paid a just and honest debt, contrary to the statute.

We insist that the fraud for which a certificate, once formally granted, may be impeached, must be a fraud in fact, and not a mere fraud in law. 2d. That the party to commit such fraud is the person actually before the court as a bankrupt. 3d. That the time of the fraud committed must be of a date pending the proceedings in bankruptcy.

Such seems to be a fair and plain exposition of the matter at issue, and it covers wholly the apparent policy of the law in the premises. It has regard to times and circumstances, to both grammar and logic, whilst it avoids the stultification of the law-giver. And it is sanctioned by authority. *N. Am. Fire Ins. Co.* v. *Graham*, 5 Sand. Ch. R. 197.

Decisions opposed to this view, may undoubtedly be produced; but not one exhibiting a critical reading of the statute, or having regard to the tenses used in the particular sections under controversy, as a mode to indicate the intent of the law-giver.

It may be pretended that the bill charges wilful concealments of property, as well as preferences; but there is no substantial charge to that effect. There is, first, a general charge of preferences made, and then the bill proceeds, " by way of more particular specification," to set forth each case in detail. Virtually all the firm assets were pledged to pay the firm debts, which greatly exceeded their amount. An estate pledged for more than its value is not regarded in bankruptcy. 1 Montagu, Part. 148; *Ex parte Hill*, 5 Bos. & Pull. R. 191.

Upon this question, as to preferences and concealments, the argument becomes conclusive against complainant, if it be true, as his counsel insist, that the assets of the firm were not vested in the individual partners, but in a sort of quasi corporation, " a civil person," existing over the partners, and holding all the property. They aver that " the civil person," and not the members, owned the property; and if this be so, it is impossible to hold that either Buckner or Stanton violated the law, by giving the property of that other being to its creditors or sureties, or to

others, or by concealing such property.   The inhibitions of the statute relates to the property of the bankrupt, and not to his use or concealment of the property of others.   It declares that the assignee may recover money or property, unlawfully paid or transferred, and hold it "as part of the assets of said bankrupt;" and he can hold nothing as such assets, but the property and rights of the bankrupt.   As the bill shows the firm was "hopelessly insolvent," there is no pretence to say the defendants had any residuary interest, and, therefore, in transferring or concealing any of the property of that "civil person," they bestowed or concealed nothing belonging to themselves.   Nay, this theory impeaches the title of complainant, and he has no more title than could be acquired by a sale of the property of a corporation as assets surrendered by a bankrupt stockholder.

Of what avail, then, is the fanciful argument that these balances did not belong to the partners, but to an ideal being set up by contract between them, as the manager and owner of the property !

V. Defendants are not estopped to deny that these balances are no debt against them; nor is that matter *res adjudicata.*

It is said, that as defendants rendered these balances in their inventories, under oath, as debts due by the Mississippi firms, whereby Oakey was induced to purchase them, they are now precluded to deny the fact that they are liable upon them. The claim is, that defendants are thus precluded by an estoppel *in pais.*

The rule in this sort of estoppel is, that a party having made a statement with intent to induce others to act upon it as true, shall not, after others have acted on faith of the truth of such statement, be permitted to deny it to their prejudice.   2 Phill. Ev. (Cowen & Hill,) 200.

But even in such cases the party is not precluded, if he obtained no advantage, and the other party was not prejudiced by such statement.   2 Phill. Ev. (Cowen & Hill,) 201, 209; 2 Smith, Lead. Cases, 514, 519, 525, 561, et seq.; 6 Cush. R. 213, 214.

The petitions of defendants showed that Buckner, Stanton, and Hamer, who was then deceased, were sole members of said

three firms, and that a certain balance of account was due to one of the firms from the others respectively; and those balances were set down in their schedules of debts and their inventories of assets.

In the schedules of debts due from Stanton, Buckner & Co., and of those due from M. B. Hamer & Co., the petitioners appeared as debtors, with Hamer, for these balances. Whilst, in the inventory of the assets of Buckner, Stanton & Co., they appeared, with Hamer, as creditors for those same balances. If they stated that, as members of the Mississippi firms, they owed these balances, they also stated that they were the Louisiana firm to whom those balances were due; and that, in truth and in fact, those balances were due to and due from the same persons.

They thus set forth all the facts for the information of all concerned. They declared, in substance and effect, for such was the conclusion of law upon their statement, that these claims were thus due to and due from the same persons, that the balances were merely nominal, and that, in fact, there was nothing due or collectable upon them.

There was no intent to mislead any one. No man was misled, no one could have been misled, by the statement. They showed just what the bill shows, in regard to those balances; and every man had the very facts upon which to form an opinion, that are now presented to this court for its opinion on this point. The very point of objection is, that taking the facts set forth in these petitions, schedules, and inventories, as they are detailed in the bill, these balances were not debts, in law or equity.

It was incumbent on all persons acting on those statements to draw proper legal conclusions at their peril. No one is estopped by an assertion as to a rule of law. 2 Phill. Ev. (Cowen & Hill,) 211, 212; *Halls* v. *Thompson*, 1 S. & M. R. 443.

If a man tells me that his wife is indebted to him in the amount of a note made by her to him during the marriage, and so induces me to take it, I am bound to know, as matter of law, that she does not and cannot owe him upon such a demand;

and he is not estopped to deny the indebtedness. If these defendants had stated, in their petitions, that a minor owed them the amount of his note made in Mississippi, the world would be bound to know it was a mistake, and that a minor could not be so indebted.

But those statements were not made with intent to induce any one to buy these balances as debts collectable from the defendants. On the contrary, as the bill shows, they sought a discharge from all their debts, and especially " from the debts of said insolvent firms," from these balances; if so be, they were liable upon them as well as other debts. A discharge in bankruptcy annihilates all debts due from the bankrupt, and provable under the statute. *Reichman* v. *Cornell*, 1 Comstock, R. 506; *Rice* v. *Maxwell*, 13 S. & M. R. 290; *White* v. *Cushing*, 30 Maine R. 269; *Payne* v. *Eden*, 3 Caines' Cas. 217.

We have the fact sworn to by complainant, that Oakey did not purchase these claims under the belief that defendants were liable upon them; and it is plain that complainant was not deluded in this respect.

If the district court ever authorized them to be sold, it is manifest they were not sold as such liabilities. It was known to the court that, as between the partners, there was no liability whatever upon these balances; it had granted Buckner a full discharge from all his debts, including his liability upon these; and we cannot suppose the court so derelict of law and duty as to put up at public sale the very debts extinguished by its formal certificate. To suppose the court ordered a sale of these balances as valid debts against Buckner, is the very climax of absurdity. But the order of sale was general, and if it extended to them, it had the like scope against Buckner as against the others.

If these balances were ordered to sale, it is plain to see why the order was made, and what interest was sold. The district judge may have been of like opinion with Judge Daniel, that these balances were a medium for dividends against the assets of the Mississippi firms; and if so, he might order them to be sold for that purpose. That is the only ground on which a sale could have been ordered; and its gross impolicy is apparent in

Buckner and Stanton *v.* Calcote.

the fact that its sure effect was to bring one purchasing at a nominal sum into direct competition with the creditors.

To create an estoppel of judgment, the fact relied on must have been necessary to uphold it, and must have been directly in issue and decided. *Farriman* v. *Bacon*, 8 Conn. 418. The former decision must be upon the same point. *Cleaton* v. *Chambliss*, 6 Rand. 86. The matter of fact or right relied on must have been in issue. *Shafer* v. *Stonebreaker*, 4 Gill & J. 345.

A judgment cannot be used for one party, when an opposite decision would not have been evidence for the other, upon the same question. *Phillips* v. *Thompson*, 3 Stew. & Port. 369. Could the decree of non-allowance, in *Ex parte Sillitoe*, be used as proof that the other partners in the banking firm were not liable for their proportionate shares ?

But suppose this whole matter was adjudicated. It bound only those who were parties to the controversy. It did not bind Buckner, who was not a party to it, nor before, nor subject to the jurisdiction of the district court here. It did not bind Stanton, for he had received his final discharge, and was out of court in 1843 ; and this pretended judgment was not rendered until 1845. There is no pretence that either were cited to appear, or appeared, to the petition of Oakey. For every purpose of this suit, the alleged adjudication considered as a decision involving the liability of the defendants, was *coram non judice* and void. Estoppels are not favored, and nothing will be presumed or inferred to sustain them. *Crandall* v. *Gallup*, 12 Conn. 365.

The district court did not attempt to decide, and had no jurisdiction to declare the defendants personally liable to Oakey upon these balances.

VI. The holders of all the claims sued on, having proved their demands, and received dividends thereon from the estate in bankruptcy, were barred of all right to sue.

The 5th section of the statute declares in most general terms, that " no creditor," proving his demands, " shall be allowed to maintain any suit at law or in equity therefor, but shall be deemed thereby to have waived all right of action and suit against such bankrupt; and all proceedings already commenced,

43*

and all unsatisfied judgments already obtained thereon, shall be deemed to be surrendered thereby." The English act contained a similar provision, and also provided for a certificate of discharge; and it has been decided under it, that the fact of proving might be pleaded in bar of a subsequent suit. *Read* v. *Sowerby*, 3 Maule & Sel. 78; *Adames* v. *Bridger*, 21 E. C. L. 303; *Ex parte Lobbon*, 17 Ves. 334; 1 Harr. Dig. 888; 2 Ves. & Beames, 253.

But the argument is that this section is to have a very restricted application; that its words, " all creditors," and " no creditor or other person," mean something very different from the same words in other sections of the law, and must be construed to mean only foreign creditors and fiduciary creditors, — those unaffected by the certificate of discharge. The language is too broad for such restrictions, and another difficulty arising from any attempt at such a limitation, is the fact that the right to dividends must be restricted in like manner. If those words mean only foreign and fiduciary creditors, then none others are entitled to dividends.

It is also said that such waiver of right of suit and surrender of judgments is only conditional and dependent upon the grant of a valid certificate of discharge. But the act has no such provision; it nowhere provides that the waiver or surrender may be revoked upon any contingency whatever. It carefully provides for impeachment of the certificate, which is the act of the court, and precludes those who do not come in and prove; but it leaves the parties proving to the consequences of their voluntary acts of waiver or surrender. *Humphrey* v. *Swett*, 31 Maine, 192; *Haxton* v. *Corse*, 4 Edw. 585. It is manifest that those who oppose this view are constrained to repeal 'a most important part of the law. The decision of Chancellor Walworth (2 Barb. Chan. 506) will best explain our meaning. He curtails and interpolates to suit his theory, and then decides the case by enforcing, contrary to his theory the fact of a surrender by the proving. See Eden, B. L. 115, 117. The supreme court has declared the rule for the exposition of this law as follows: " Every section, provision, and clause of the statute shall be expounded by a reference to every other; and if possible, every

clause and provision shall avail, and have the effect contemplated by the legislature.    One portion of a statute shall not be construed to annul or destroy what has been clearly granted by another.    The most general and absolute terms of one section may be qualified and limited by conditions and exceptions contained in another, so that all may stand together." *Peck* v. *Jenness*, 7 How. U. S. 623.

VII.    The bill shows the purchase by complainant to be void for maintenance.

These claims were manifestly purchased for the sole purpose of instituting this suit to vacate, on the ground of fraud, the certificates of discharge granted to the defendants some twelve years before.    If the certificates are valid, those claims are extinguished, and the obvious purpose of this bill is to litigate the alleged frauds.

The charge is that his vendors believed they had no claim against defendants, and the sale to Calcote was as clearly a sale of a naked right to litigate a fraud, as it would have been if, after judgments had been rendered for defendants in suits brought on these claims by the assignors, the complainant had purchased the right to vacate such judgments for fraud in obtaining them.    It is as vain to say the certificates are voidable, and so the original claims are in force, as it would be to urge that the judgments were voidable, and so the debts not extinguished.    All are extinct, if the alleged fraud be not successfully litigated.

The rule on this subject is very plain and well settled.    A party may purchase a chose in action, as he may purchase lands or personalty; but he cannot lawfully purchase a mere right to litigate with regard to either.    It matters not to what the purchase may relate; if it be substantially a purchase of a lawsuit, as the only apparent means to enjoy the fruits of the purchase, the law condemns it.    Of this purchase none can gainsay the assertion we make in the language of a learned chancellor, "it was actually dealing for a suit in chancery."    *Baley* v. *Terrell*, 2 Ball & Beat. 182 (362) ;  *Ward* v. *Van Bokkelen*, 2 Paige, 296, 297 ;  *Hoyt* v. *Thompson*, 3 Sandf. 433;  *Prosser* v. *Edmunds*, cited

in *Cook* v *Field*, 69 E. C. L. 470; *Arden* v. *Patterson*, 5 J. Ch. 44; *Rust* v. *Lane*, 4 Litt. 413; *Key* v. *Vattier*, 1 Ohio, 58; 2 Story, Eq. § 1040; Adams, Eq. 54; 3 Cowen, 648; *Sessions* v. *Reynolds*, 7 S. & M. 130; 11 Ib. 422.

If counsel will insist that Calcote purchased something else, we are content; but then he cannot be heard to allege frauds against his assignors. This follows, as of course, from the authorities above cited. See particularly, *Warsham* v. *Medham*, 4 Ga. 284.

The certificates are voidable, not void. The act provides that they may be "impeached;" and they are valid until successfully assailed in the manner prescribed. *Anderson* v. *Roberts*, 18 Johns. 528; *Oriental Bank* v. *Haskins*, 3 Met. 332; 3 Cranch, 300.

VIII. This suit is barred by limitation.

As to Stanton the case is clear, if the pretence that counsel will make in answer to the last objection be taken as the fact. If the bill be founded on an alleged fraud, with averment by way of excuse, showing its recent discovery, we rely on the fact of maintenances; and if it be not, then the bar by limitation applies. There is no escape from the dilemma.

What is the case? It is averred that defendants, whilst owners of these balances, and some ten years before complainant had any interest in them, perpetrated the frauds, on which alone is placed the right of recovery over the certificates. Complainant claims under, and stands in the place and stead of the alleged perpetrators of the fraud; and he claims through Sill, who was privy to them, he being a preferred creditor. His assignors, the defendants, knew all the facts, and Sill was not ignorant. How then shall a plea of ignorance avail this assignee? Did not the statute begin to run against Sill from the date of his title; or rather as it had begun before, did it not continue to run on?

The bill shows that these were stated accounts before the bankruptcies, and the statute began to run. It is a general rule, stated to be without exception, that nothing, save some proviso by statute, will stop the running of the statute, when once it has begun; and the courts' have, therefore, held that in cases of

fraud there was a new cause of action on which the party sued in equity. 2 Scho. & Lef. 632, 635; 2 Danl. Chan. Prac. 737. And it is plain that such a cause of action could not be assigned.

But it is clear that allegations of fraud will not defeat the bar of the statute in equity, except where the bill goes on the fact of fraud as the ground of relief; in such cases the statute begins to run from the discovery of the fraud. Ignorance of the cause of action is the saving excuse, but it cannot be made here if the accounts are the causes of action. 3 Peere Will. 144. The pith of the arguments to avoid champerty and limitations is this: neither complainant nor his immediate assignors knew, until recently, that defendants had no defence to bar a recovery upon these accounts; but when was it ever before heard in equity that such an ignorance would suffice ? *Rice* v. *Burt*, 4 Cush. 208; 26 Eng. Chan. 541.

As to Buckner, the bill does not show a case against him, which is within the statute; and a demurrer lies. 2 Scho. & Lef. 638.

IX. The account of Montgomery and Boyd is not a cause for equitable relief. Complainant has remedy, and must sue at law in the names of his assignors. *Ontario Bank* v. *Munford*, 2 Barb. Ch. 615; *Carter* v. *United Ins. Co.* 1 J. Ch. 463; *Hammond* v. *Messenger*, 9 Sim. 327; *Mosely* v. *Boush*, 4 Rand. 392; *Adair* v. *Winchester*, 7 Gill & J. 114; *Smiley* v. *Bell*, Mart. & Yerg. 378; *Bacon* v. *Cohea*, 12 S. & M. 516.

*J. Winchester*, on the same side.

This was a bill filed by a party privy to the bankrupt proceedings of Buckner and of Stanton to set aside the decrees and certificates of discharge.

The decrees and certificates have all the force and effect of ordinary decrees of a court of equity, and are conclusive upon the parties here, if the matters now here, sought to be relitigated, had been litigated at the time of the hearing before the bankrupt courts for the grant of said decrees and discharge. *Chadwick* v. *Stanett*, 27 Maine, R. 143; *In re Comstock*, 5 Law Rep. 165; *In re Tibbetts*, Ib. 265; *Everett* v. *Derby*, Ib. 227; *Humphries* v. *Swett*, 31 Maine R. 194; *Haxton* v. *Corse*, 2 Barb.

Ch. R. 530; *Shawham* v. *Whewitt*, 7 How. U. S. 643; *Ex parte Christe*, 3 Ib. 317; *Wales* v. *Lyon*, 2 Mich. R. 281.

Second. The doctrine of interest, *reipublicæ ut sit finis litium*, applies to this case; and the chancery court of Mississippi has no power or authority to revise or set aside these proceedings of the district courts of United States, — courts of exclusive jurisdiction, and deriving their authority from an entirely independent and distinct source, — not even if the decrees had been obtained by fraud, which is not the charge here. *Marriott* v. *Hampton*, 7 T. R. 266; *Greathead* v. *Bromley*, Ib. 451; *Clark* v. *Capron*, 2 Vesey, Jr. 666; *Bateman* v. *Willoe*, 1 Sch. & Lef. 204.

It is not an exception to this rule, that the party was prevented from showing the facts in the former suit, either from accident, mistake, surprise, or even from the fraud of the defendant (which is not alleged in this case). *Prudhum* v. *Phillips*, 2 Ambl. 763; *Phillips* v. *Hunter*, 2 H. Bl. 410–415; *Kennedy* v. *Earl of Cassilis*, 2 Swanst. 326; *Tarleton* v. *Tarleton*, 4 M. & S. 21; *Homer* v. *Fish*, 1 Pick. 440; *McRea* v. *Mattoon*, 13 Ib. 57; *Smith* v. *Lewis*, 3 Johns. R. 168; *Ex parte Cowen*, 3 B. & A. 123; *Sinclair* v. *Smyth*, 1 Brev. 403; 1 McLean, 450.

Third. If the court would entertain jurisdiction, it would not, for mere unlawful preferences, now, at this late day, recall, set aside, and annul these certificates. 5 Sandf. R. 204.

Fourth. If the certificates were set aside, the plaintiff could only claim under the decrees of bankruptcy, which would be only his *pro rata* share of the property of the bankrupts at the time of the decrees of bankruptcy against them; and for that purpose the bill is defective, for want of proper parties, plaintiff and defendants. *Haxton* v. *Corse*, 2 Barb. Ch. R. 528; *Ex parte Newhall*, 2 Story, R. 363; *Fisher* v. *Currier*, 7 Met. R. 427.

Fifth. The assignment to plaintiff did not even carry the right to a *pro rata* of the property alleged to have been fraudulently conveyed under the 2d section of the act. *Warsham* v. *Brown*, 4 Geo. R. 286; *Commonwealth* v. *Fuqua*, 3 Litt. 43.

Sixth. This is a bill to reach the future acquisitions of the bankrupts. Before that can be done, the decrees of bankruptcy have to be set aside. The claims are merged in those decrees.

They are decrees *in rem*, and cannot be the foundation of a personal decree against the bankrupt, which is contrary to the whole policy of the act, its object, and the express language of the 5th section. The decree of bankruptcy is in favor of the creditors; it is a summary remedy for them; and the relief to the creditor and the discharge of the debtor are commensurate and coextensive. *Twiss* v. *Massey*, 1 Atk. 67; *Ex parte Williamson*, Ib. 83; *Ex parte Plummer*, Ib. 104; *Ex parte Groome*, Ib. 119, 152, 153; *White* v. *Cushing*, 30 Maine, 269; Eden on Bankruptcy, 115–117; 2 Hovenden on Fraud, 456; *Read* v. *Sowerby*, 3 M. & S. 80.

These points, on demurrer, cover the case made by the bill, as I understand it. But counsel say, "permit us to garble the case, take out certain portions of it, and impose such parts of the case upon the court as the true and genuine case, and we can show a right to relief."

The points raised outside of the case, and the only case which could have been made, and is made by the bill, I shall leave where counsel of complainant have placed them, without discussion.

Messrs. *Sharkey* and *Withers*, for appellants, also argued the case orally, and filed an elaborate brief, which never came to the hands of the reporter.

*George Eustis*, on the same side.

*L. M. Day*, *F. Anderson*, *Wm. Yerger*, and *S. S. Boyd*, for appellee, made the following points in their argument:

1. The claims assigned to complainant by Oakey, and Montgomery & Boyd are valid claims against defendants.

It is admitted by the defendants that Montgomery & Boyd did, at one time, have a valid claim against them, as charged in the bill; that claim consisted of an open account, and was a legal demand which they might have enforced at law.

Oakey derived his claims from the assignee in the matter of the bankruptcy of Buckner. The bill states, and the demurrer admits, that the three firms were entirely separate and distinct

from each other, and kept their business, books, and accounts accordingly; that said three firms and the individual members thereof were insolvent; and that Buckner and Stanton went into bankruptcy as individuals, and as members of said firms, under an understanding and agreement for that purpose.

Upon his bankruptcy, and the bankruptcy of his firm of Buckner, Stanton & Co., in Louisiana, Buckner rendered in his schedule of the assets of said firm on oath. Among these assets, as so much property of the firm of Buckner, Stanton & Co., he returned the stated accounts due from Stanton, Buckner & Co. and M. B. Hamer & Co. to said firm of Buckner, Stanton & Co.

As such they passed, with his other assets, to Sill, his assignee, and were sold, by the order of the court, for the benefit of the creditors of the firm of Buckner, Stanton & Co. Under such circumstances, Oakey was induced to become the purchaser, and afterwards assigned to the complainant. Upon his bankruptcy, and that of his firms of Stanton, Buckner & Co. and M. B. Hamer & Co., in Mississippi, Stanton rendered in schedules of the debts and liabilities of said firms, on oath. Among these debts, as liabilities against these firms, and the respective persons composing the same, and entitled to a *pro rata* share of dividends, he rendered in the said claims or stated accounts due from Stanton, Buckner & Co. and M. B. Hamer & Co. to Buckner, Stanton & Co., and which were sold, in pursuance of the order of the district court in Louisiana, by Sill, the assignee, to Oakey, and by him assigned to complainant.

Upon such a state of facts charged in the bill, and admitted by the demurrer, it is impossible that Buckner and Stanton should be permitted to deny the validity and amount of said indebtedness; for, let it be borne in mind, that this is not a contest between themselves; it is, in effect, nothing more nor less than the claim of the creditors of the firm of Buckner, Stanton & Co. to subject all the assets of said bankrupt firm to the satisfaction of their debts. Buckner and Stanton both having returned said claims, under oath, as assets of the firm of Buckner, Stanton & Co., and allowed the same to be sold as such,

for the benefit of the creditors of said firm, are for ever estopped from questioning or denying the same.

They have sworn that the Mississippi houses were indebted in said balances to the New Orleans house, and are thereby for ever concluded from denying said indebtedness as to third parties. The bankrupt law itself for ever concludes them; the 4th section of that act, 5 U. S. Stat. 444, provides, that if any applicant for the benefit of said act " admit a false or fictitious debt against his estate, he shall not be entitled to any such discharge or certificate."

This, if there were no other authority, would for ever conclude and estop the defendants from denying the validity and amount of said indebtedness. To allow them now to deny the same, would be nothing more nor less than to permit them to show they have been guilty of wilful and corrupt perjury; of wilfully and corruptly admitting false and fictitious debts against the Mississippi firms; and above all, of wilfully violating the act of congress, and committing a fraud upon the court and upon the rights of creditors and innocent third parties. They cannot then be heard to say these claims are not valid. Their own acts forbid it; justice and right forbid it, and the terms of the bankrupt act itself forbid that they should be allowed to deny their own sworn admissions of record. They voluntarily made their records in the bankrupt courts, under oath, and they must now be held to the truth of the same, and to all the legal and equitable consequences flowing from their own voluntary conduct, as far as innocent third parties are concerned.

The authorities on this subject are too full, complete, and unanswerable, to leave any room whatever for even a doubt.

In the *Philadelphia, Wilmington, and Baltimore Railroad Co.* v. *Howard*, 13 How. U. S. R. 308, the Supreme Court of the United States held, that where the corporation had defeated a former suit by different parties, by setting up the contract sued on in the present action, the company was estopped from denying the contract sued on to be the contract of the company. *Polhill* v. *Walter*, 3 B. & Ad. 114; *Lobdell* v. *Baker*, 1 Met. 201; *Fishmongers' Co.* v. *Robertson*, 44 Eng. C. L. R. 110;

*Wiles* v. *Woodward,* 5 Exch. R. (by Welsby, Thurlstone & Gordon), 557.

The parties here are held estopped and concluded by their own admissions of record; statements and admissions, too, which the bankrupt act prohibited them from making, if untrue, under the penalty of being refused their discharges and certificates. " For if there be a recital in a deed," said the court, in *Inskeep* v. *Shields et al.* 4 Harrington's R. 345, 347, " there is a solemn engagement by the parties to the deed, that the facts are as ·they are recited," and this is binding on parties and privies.

In Virginia, where A., the holder of a promissory note of B., being about to transfer it to C., for valuable consideration, and this being known to B., the maker, he promises to pay the debt to C., who is induced by that promise to take the note ; in a suit in the name of A., for the use of C., upon the note, the maker pleads the general issue, and on the trial thereof, B. offers proof that he had paid the contents of the note to A., before the transfer thereof to C., and to repel that defence, C. offers proof of B.'s promise to pay the debt to him. Held, this evidence to repel the defence of payment was admissible, and B.'s promise to pay the debt to C., estopped him from alleging payment to A. before the assignment. *Davies' Administrator* v. *Thomas,* 5 Leigh, 1.

In *Hamer, appellant,* v. *Johnson,* 5 How. Miss. R. 698, where a party about to purchase a promissory note, went to the maker to ascertain if he would be safe in so doing, and was answered that the note was good ; that there was no difficulty about it, and that it would be paid at maturity ; it was held, that the maker could not set up a failure of consideration, as against an innocent holder receiving the note upon such promise, although the maker was ignorant of such failure of consideration at the time he gave the assurance of payment.

In delivering the opinion of the court in the above case, Chief Justice Sharkey says: " In several of our sister States this question has undergone judicial consideration, and if these decisions are not repugnant to principle, they must, of course, have great weight in settling the present case."

The case of *Carnes, for the use of Olden* v. *Field and Harlan*, 2 Yeates, 541, was, in every essential particular, precisely like the case at bar, and the court said: "When the obligor represents the money thereon as justly due, to a person desirous of taking the assignment, and engages to pay the same, in faith and confidence, whereof the assignment is procured, the former takes on himself the risk of the adequacy of consideration, and the fairness of the original transaction, and relinquishes any objections he might otherwise have on these grounds.

"In the case of *McMullin, for the use of Rudy*, v. *Wemer*, 16 Serg. & R. 18, the same question was again before the supreme court of Pennsylvania, and it was held that if the obligor promises to pay the bond to one who is about to take an assignment, in consequence whereof the assignment is made, he is bound by such promise, although he might be ignorant at the time that the consideration had failed. By the same court this question was decided a third time in the same way. 1 Penn. R. 24. These repeated adjudications give strength and force to the position, for it must be regarded as having been well considered.

"The courts of Virginia have recognized this doctrine to its fullest extent. In the case of *Buckner, trustee*, v. *Smith et al.* 1 Wash. R. 296, an assurance of payment to one who was about to take an assignment of a bond, was held to be binding, although the bond had been given for a gaming consideration, and was absolutely void by statute.

"In the case of *Hoomis* v. *Smock*, 1 Wash. R. 389, it was admitted, as a general principle, that the assignee could not stand in a better situation than the assignor; but it was also said that 'if an innocent man should be induced by the obligor to become a purchaser of the bond, it would be a deceit upon him, and he ought not to be subjected to the same equity to which the obligor was entitled against the obligee.'

"This question was again before the court of appeals of Virginia, in the case of *Lomax* v. *Picket*, and underwent a full investigation; and the want of knowledge on the part of the payer, of the failure of consideration at the time he gave the assurances of payment, was held to be an immaterial circum-

stance. The principle on which these cases were decided, is distinctly recognized in *Watson* v. *McLaren*, 17 Wend. R. 557, and in 4 Monroe. These decisions may, therefore, all be considered as having been made directly on the point here presented, and they seem to comport with the principles of justice. In morals there can be no hardship in compelling him to bear the loss who has been the cause of it." 5 How. 721–723.

And again, in speaking of the subject of inquiries of the maker, Chief Justice Sharkey says: "If he states that the money will be paid, this is calculated to inspire confidence, and justice requires that such representation shall estop him from resisting payment on the ground of failure of consideration." 5 How. 723. And again he says: "We are referred to the language held by Judge Story in the first volume of his Treatise on Equity Jurisprudence, and it applies with great force to the case. He says: 'If a representation is made to another person going to deal in a matter of interest, upon the faith of that representation, the former shall make that representation good, if he knows it to be false.' 'And,' he adds, 'whether the party thus misrepresenting a fact, knew it to be false, or made the assertion without knowing whether it were true or false, is wholly immaterial; for the affirmation of what one does not know, or believe to be true, is equally in morals and law, as unjustifiable as the affirmation of what is known to be positively false. And even if the party innocently represents a fact by mistake, it is equally conclusive, for it operates as a surprise and imposition on the other party.' If these remarks be consistent with equity, then whether Hamer knew the consideration had failed or not, makes no difference. It was his duty to inquire into the title of Davis before he gave the notes. The omission to do so, was the first act of negligence, and the representation made to Pierce, was in relation to a matter about which it was Hamer's business to be informed, and his statement was calculated to impose upon Pierce. Hamer undertook to make a statement in relation to his own liability, to one who was about to purchase it, and the purchase having been made on the faith of that statement, he is bound in good faith to make it good. It is a rule at law and in equity, that whenever a loss must fall upon

one of two innocent persons, it must be borne by the one who has been most negligent." 5 How. 723, 724.

Now the defendants are clearly embraced and concluded by the principles of these decisions. They both returned these claims, under oath, as valid claims. They both allowed them to be sold as assets for the benefit of the creditors of the New Orleans house. By thus acting, they said to the court and all the world, that said claims were valid and subsisting claims. They declared them such under oath in their bankrupt proceedings. It was their business to be informed about the matter, and they cannot now, as to third parties, who have acted on the faith of their own sworn representations and admissions, be allowed to deny or say said admissions are not true.

In *Pinckard* v. *Sears*, 33 Eng. Com. Law R. 115, 117, Lord Denman, Ch. J., in delivering the opinion of the court, uses this strong and emphatic language :

" But the rule of law is clear, that where one, by his words or conduct, wilfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time."

In *Gregg* v. *Wells*, 37 Eng. C. L. R. 54, it was held, that if the owner of goods stand by, and voluntarily allow another to treat them as his own, whereby a third person is induced to purchase them *bonâ fide*, he cannot recover them from the purchaser.

In this case, Lord Denman, Ch. J., thought the principle of *Pinckard* v. *Sears*, might be stated more broadly than it is there laid down. He said : " A party who negligently or culpably stands by and allows another to contract on the faith and understanding of a fact which he can contradict, cannot afterwards dispute the fact, in the action against the person whom he has himself assisted in deceiving."

And advantage may be taken of matter in estoppel or demurrer, where the same appears on the record. 49 Eng. C. L. R. 993.

In *Polhill* v. *Walter*, 23 Eng. C. L. R. 38, A., who lived in the

44 *

same house with the drawer of a bill, on being assured by one of the payees of the same, that the bill was perfectly regular, was induced, on the bill being presented for acceptance in the absence of the drawer, to write on the bill an acceptance as by the procuration of the drawee.

A wilful falsehood of such a nature, was contended to be, in the legal sense of the word, a fraud; and for this position was cited the case of *Foster* v. *Charles*, 6 Bing. R. 396; 7 Ib. 105, which was twice under the consideration of the court of common pleas, and to which may be added the recent case of *Corbet* v. *Brown*, 8 Bing. R. 33. The principle of these cases applies to the present case.

· A party must be taken to intend the necessary consequences of his own acts, and this, though there is no fraudulent intent. 11 Eng. L. & Eq. R. 502; 1 Met. R. 200, 201.

The principle of these cases would seem to be conclusive of the one at bar. By going voluntarily into bankruptcy, there was imposed upon the defendants, by the very terms of the bankrupt act itself, the duty of disclosing the truth. All applicants for the benefit of that act, were required to set forth under oath a true and correct list and statement of their effects and liabilities.

That act also provides, that if a party admit a false or fictitious debt against himself, that such false admission shall disentitle him to his certificate. Now the defendants are clearly embraced within this rule. They both, as we have shown, returned these claims under oath, as valid debts. Having done this, they cannot now be heard to say they are not real debts. To allow them to do so, would be to allow them to show their own fraud and falsehood, fraud upon the law, fraud upon the rights of their creditors, fraud upon the court, and fraud upon third parties.

·" Admissions," says Professor Greenleaf, " which have been acted upon by others, are conclusive against the party making them, in all cases between him and the person whose conduct he has thus influenced. It is of no importance whether they were made in express language to the person himself, or implied from the open and general conduct of the party. For in

the latter case, the implied declaration may be considered as addressed to every one in particular, who may have occasion to act upon it.    In such cases, the party is estopped, on grounds of public policy and good faith, from repudiating his own representations."    1 Gr. Ev. § 207; 12 S. & M. 654.

And, says this learned author, "It makes no difference in the operation of this rule, whether the thing admitted was true or false, it being the fact that it has been acted upon, that renders it conclusive."    1 Gr. Ev. § 208; 5 Denio, R. 154, 157, 158.

If it is a case of innocent mistake, still, if it has been acted upon by another, it is conclusive in his favor.    As when the supposed maker of a forged note, innocently paid it to a *bonâ fide* holder, he shall be estopped to recover back the money. *Salem Bank* v. *Gloucester Bank,* 17 Mass. R. 1, 27.

Thus, also, where a ship-owner, whose ship had been seized as forfeited for breach of the revenue law, applied to the secretary of the treasury for a remission of the forfeiture, on the ground that it was incurred by the master ignorantly and without fraud, and upon making oath to the applications, in the usual course, the ship was given up; he was not permitted afterwards to gainsay it, and prove the misconduct of the master, in an action by the latter against the owner, for his wages on the same voyage, even by showing that the fraud has subsequently come to his knowledge.    *Freeman* v. *Walker,* 6 Greenl. R. 68.

The courts in New York are equally strong and explicit on this subject.

In the *Trustees of the First Incorporated Presbyterian Congregation in Salem* v. *Williams,* 9 Wend. R. 148, Sutherland, J., in delivering the opinion of the court, says: "The only question in this case is, whether the defendant was concluded by his admission made when the declaration was served, that there was not sufficient property on the premises liable to distress, to countervail the arrears of rent.    I am clearly of opinion that he was estopped by that admission, from controverting the fact upon the trial.    The plaintiff had a right to rely upon it, and the defendant ought not to be permitted to defeat the plaintiff's

Buckner and Stanton *v.* Calcote.

action by showing that what he then said was false, and thereby reap an advantage from his own wrong and falsehood."

So, declaring a note to be good to one about to purchase it, or standing by in silence when it is transferred for consideration, is an estoppel *in pais* against a debtor. *Watson's Executors* v. *McLean,* 17 Wend. R. 527.

In this case, at p. 563, 564, the court says: " Such a declaration, nay, even standing by in silence and seeing a chose in action assigned for consideration, is an estoppel *in pais* against a debtor." *Buchanan* v. *Taylor,* Addis. R. 155 ; *Ludwick* v. *Croll,* 2 Yeates, R. 464 ; *Carnes* v. *Field,* Ib. 551 ; *Weaver* v. *Mc Corcle,* 14 Serg. & Rawle, R. 304 ; *McMullen* v. *Wenner,* 16 Ib. 18 ; *Morrison's Administrator* v. *Beckwith,* 4 Monroe, R. 73.

" Even a defence that a bond was given to secure a gambling debt, was in one case held to be cut off by the obligor's admission of its validity to a proposed assignee, no stronger in its terms than the one here proved by Frye. *Davison* v. *Franklin,* 1 Barn. & Adolph. R. 142.

" Thus being validated, it must stand good for its face, the whole note described in it; and for that it passed, if for any part, to the plaintiff."

In *Wendell* v. *Van Rensselaer,* 1 Johns. Ch. R. 352, Chancellor Kent uses this strong and forcible language: " There is no principle better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares that if one man, knowingly, though he does it passively, by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by this equitable estoppel."

The same doctrine was again affirmed in 6 Johns. Ch. R. 167, 168; and in 1 Green, Ch. R. 434, 435, Chancellor Pennington gives his unqualified approbation to the above rule, as laid down by Chancellor Kent.

Mr. Justice Story is equally clear and forcible on this doctrine of estoppel. 1 Story, Eq. § 385, 387.

In 10 Wheat. 343, 344, Judge Story held that in respect to persons equally innocent, when one is bound to know and act upon his own knowledge, there seems to be no reason to change the loss from the former to the latter, and "there is nothing unconscientious in retaining the sum received from the bank, in payment of notes, which its own acts have assumed to be genuine."

And Mr. Justice Washington in the case of *Lessee of Cooper* v. *Galbraith,* 3 W. C. C. R. 546, which was an ejectment by a purchaser at a sheriff's sale, against the defendant in the execution, *held,* that the defendant and those claiming under him were estopped by the sheriff's deed to deny the title of the plaintiff. That the deed of the sheriff had the same force and effect against the defendant as though it were his own deed, the sheriff being considered as his agent, appointed by law to make the conveyance, and that the receipt of the money by the creditor in the execution, was the same thing as if it had been received by the party himself, being applied by law to the payment of his debts.

The principle of this case, with the foregoing authorities, must for ever conclude and estop defendants from denying the validity of the claims assigned by Oakey to complainant.

For Buckner and Stanton having each gone voluntarily into bankruptcy, and having returned said claims, under oath, as assets of the New Orleans house, and allowed the same to be sold as such, by the assignee, in pursuance of the order of the district court, it must be regarded as a sale made by themselves; because the assignee, like a sheriff, is the agent appointed by law for that purpose. They, too, have taken the benefit of the sale; for the money arising from the sale was applied to the payment of the debts of the New Orleans firm, which is the same as if they had personally received the money.

In *Lile* v. *Hopkins,* 12 S. & M. 209, 302, this court has held that, "in every sale of a chattel, there is an implied warranty of its existence, and that the vendor has title to it. So, in every assignment of an instrument, even not negotiable, the assignor impliedly warrants that the instrument is valid, and the obligor liable to pay it."

So in Louisiana, the vendor of a debt, or incorporeal right, warrants its existence at the time of the transfer, though no warranty is mentioned, and that it exists such as the parties understood it. 2 Annual R. 880.

Under all the circumstances, then, these defendants are concluded and estopped by their own voluntary and sworn admissions of record from disputing the amount and validity of these claims. For, if they were not in fact valid claims, (which we by no means intend to admit,) their own voluntary and sworn admissions have made them such. But for their acts and admissions said claims would not have been sold. Third parties had a right to rely on their sworn acts and admissions. By these acts and admissions of record, they proclaimed to all the world that these claims were valid and substantive claims for the benefit of creditors. As such, they were sold by the order and decree of the bankrupt court, and the proceeds distributed among the creditors of the New Orleans house.

On no principle of justice or morals, then, can they be permitted to deny their validity.

2. These claims are *res judicata,* by the order and judgment of the circuit court of the United States.

The bill charges, and the demurrer admits, that these claims were allowed as valid claims by Mr. Justice Daniel, of the supreme court of the United States, sitting in the circuit court in and for the southern district of Mississippi; and Oakey, the assignor, was adjudged and decreed to be a creditor of the firms of Stanton, Buckner & Co. and M. B. Hamer & Co., and as such entitled to a *pro rata* share in the distribution of the effects of said firms in bankruptcy. The bill further charges, and the demurrer admits, that said judgment of the circuit court aforesaid still stands unreversed, unsatisfied, unappealed from, and in full force and effect.

It is, therefore, emphatically *res judicata,* and conclusive upon all other tribunals. For, having been proved, and allowed by the said circuit court, which had exclusive jurisdiction in the premises, its judgment must be regarded as final.

It is no longer, then, an open question, that these claims were provable in bankruptcy; and if so, it follows as an inevi-

table conclusion, that they must be so regarded in all other courts, and their validity firmly and unquestionably established.

" The commissioners," says Mr. Cooke, " have no authority to expunge the proof of a debt, after they have once admitted it, unless it be done with the consent of the creditor ; and as long as it remains on the proceedings it must be considered as a debt." Cooke, Bank. Law, 136.

This judgment, therefore, we submit is conclusive as to the validity and amount of the claims of Oakey, the assignor of complainant. It is the judgment of a court of competent and exclusive jurisdiction, and from whose judgments in the matter the supreme court of the United States has held there is no appeal. 3 How. S. C. R. 292, 317.

Its judgments, then, must be regarded as conclusive of the matter.

In *Griffith, Adm'r, appellant,* v. *Vertner and wife,* 5 How. (Miss.) Rep. 737, 738, Chief Justice Sharkey says : " The judgment of a court of competent jurisdiction, directly made, is binding on parties and privies, except for fraud, which is not here charged. And this rule applies, as well to the orphans or probate courts in this State, as to other courts. If then the county court of Adams county had jurisdiction of the subject-matter, and of the persons, and exercised it by making a final adjudication, directly on the question sought to be examined by this bill, its judgment cannot be opened by bill for that purpose, or questioned collaterally."

" The court, then, which passed on these accounts, had, undoubtedly, jurisdiction ; and if it exercised it by making a final adjudication, its judgment must be conclusive."

And in concluding the opinion in the above case, p. 741, the Chief Justice says : " Another ground taken in support of the relief prayed is, that the error occurred by mistake. Although mistake is a subject of equity jurisdiction, yet it is not every mistake that equity will relieve against. The mistakes which may be corrected, occur mostly in matters *in pais,* in the execution of instruments, or the defective execution of powers, &c.

But where there has been an adjudication by a court of competent jurisdiction, neither mistake in law or in fact can be corrected by original proceeding. If this could be done, litigation would be interminable. Hence, the general rule is, equity will not relieve against the negligence or inattention of the parties, in a court of law. 1 Maddock, 77. The mistake here complained of is one which the complainant was instrumental in causing. It arose, if at all, in a matter with which he is supposed to have been perfectly cognizant, and for the correction of which there was a plain and easy remedy at law.

"But supposing that she was ignorant of the errors in the account, still it amounts to nothing more than a case of negligence. It was her business to be informed, and if she omitted it, she must abide the consequences."

How much more, then, should the defendants be concluded in this case? They went voluntarily into bankruptcy; they voluntarily returned said claims, on oath, as valid claims; they have been allowed and adjudged as valid claims, by the circuit court of the United States in Mississippi; and the defendants having initiated the bankrupt proceedings, and being entitled to any surplus that might remain after their creditors were paid in full, are clearly and conclusively bound by this judgment.

The courts in other States are equally strong on this subject.

In *Etheridge* v. *Osborne*, 12 Wend. R. 399, it is held that a verdict and judgment thereon, on a fact or title distinctly put in issue, may be pleaded by way of estoppel, in another action between the same parties or their privies, in respect of the same fact or title.

Mr. Justice Sutherland, at p. 403, says: "So far as the subject-matter in controversy has been once adjudicated on, the parties are concluded by it. *Outram* v. *Morewood*, 3 East, R. 346; 3 Cow. R. 120; 3 Wend. R. 32; 6 Ib. 288; *Duchess of Kingston's* case, 11 State Trials, 261; 1 Phil. Ev. 223."

A judgment of a court of competent jurisdiction, cannot be impeached collaterally in another court. *Hawley* v. *Maucius*, 7 J. Ch. R. 174.

A judgment at law may be impeached in equity, on the

ground of fraud, but never for irregularity; the latter is the province only of a court of law.  *Shottenkirk* v. *Wheeler*, 3 Johns. Ch. R. 275; *De Reimer* v. *De Cautillon*, 4 Ib. 85.

A judgment cannot be impeached, nor its consideration inquired into, except for fraud.  *French* v. *Shotwell*, 6 Johns. Ch. R. 235.

A court of equity cannot relieve against a judgment at law, merely on the ground that it was erroneous, even though the plaintiff at law was not entitled to recover.  *Turpin* v. *Thomas*, 2 Hen. & Munf. 139; 9 Paige, 137.

Parties and privies to a decree or judgment are bound thereby, and cannot rediscuss the same matter in another suit. *Lyon* v. *Peck*, 9 Yerg. 469; *Allin* v. *Hull*, 4 A. K. Marsh. 526.

In chancery, a judgment recovered in a court of law is considered as binding upon the real parties in the suit, although not the nominal parties on the record.  1 Paige, 41.

The merits of a decree cannot be collaterally called in question; it must be by a direct proceeding for that purpose.  *Garner* v. *Strode*, 5 Litt. 314.

And this, though the decree pleaded as a bar was entered on the merits by mistake, when it was only intended to be a dismission for the want of prosecution; for as long as it stands in full force, its effects cannot be avoided.  Ib.

A decision of a court of competent jurisdiction, on a point at issue before it, can only be reviewed in the regular course of appeal.  The decision of a court of peculiar and exclusive jurisdiction is conclusive on all other courts.  *Gelston* v. *Hoyt*, 1 Johns. Ch. R. 543; 7 How. S. C. R. 762; 2 Ib. 58.

These authorities must put this matter for ever at rest.  It is emphatically *res judicata* as far as the validity and amount of the claims and the title of Oakey was concerned.

3. But even were defendants not estopped to deny the validity and amount of said claims, and even were they not *res judicata*, by reason of the order and judgment of the circuit court of the United States, as shown above, still they must be regarded as valid and substantial claims in favor of the creditors of the New Orleans firm of Buckner, Stanton & Co.

In entering on the discussion of this branch of the case, it is

important to observe the marked distinction between the rights of the creditors of a firm, and that of the partners *inter se.* It will also be of the highest importance to observe and note the marked and striking difference between a partnership in Mississippi and Louisiana, and especially the wide difference between the rights of partnership creditors in said States.

The rights of partners, as such, are one thing, and the rights of creditors of the partnership are a very different thing. And if these differences and distinctions be observed, we hazard nothing in saying in advance, that it will free the question from all difficulty, and the argument on this point amount to a complete demonstration. It is said, as these several firms were composed of the same members, the relation of debtor and creditor could not exist between them. Such, indeed, is the strict rule of the common law, which held that no action would lie by a member of the firm against the firm, on account of any dealing between them, because in such suit all the partners must join and be joined; and no person can maintain a suit against himself, or against himself and others. The objection is at law a complete bar to the action. Even after the death of the partner or partners belonging to the two firms, no action upon any contract or mutual dealing *ex contractu* could be maintained at law by the survivor of one firm against those of the other; for, in a legal sense, there never was any subsisting contract between the firms, as a partner cannot contract with himself. 1 Story, Eq. 6th ed. 781, § 679; 6 Taunt. R. 597; 2 Bos. & Pul. R. 120.

But the rule in equity and in the civil law of Louisiana is different. In equity, all contracts and dealings between such firms, of a moral and legal nature, are deemed obligatory, though void at law. Courts of equity, in all such cases, look behind the forms of the transaction to their substance, and treat the different firms, for the purposes of substantial justice, exactly as if they were composed of strangers, or were in fact corporate companies. 1 Story, Eq. 6th ed. 781, § 679; 3 How. Miss. R. 356.

It is an established principle of the law of partnership, that the joint estate is liable, in the first place, to pay the firm debts,

and the separate estate to pay the separate debts. Such was the rule established in England for the distribution of effects in bankruptcy. Collyer on Part. 740, § 880, 3d Am. ed.; 3 Vesey, 242; Story, Part. § 376.

The same principle was incorporated into the bankrupt act of 1841. 5 U. S. Stat. 448, § 14.

Hence it has been held, that where the same parties carried on two distinct trades, at different places in the same country, though of the same nature, and under different styles and firm names, the concerns being kept totally distinct and regular accounts opened between the houses, and in general both concerns were conducted as if they had been composed of different and distinct persons, it was held that on the bankruptcy of one firm, that the other could prove against the joint estate of the bankrupt firm. *Ex parte Johns,* Cooke's Bank. Law, 509–511, 7th ed.; Carey on Part. 240; Coll. on Part. § 1001, 1002 et seq., p. 825, 826.

Such was the rule, even in England, as we will show, hereafter, more at length.

But the firm of Buckner, Stanton & Co. was situated in Louisiana, and its powers and capacities as a firm, and the rights of its creditors, are materially different there, from partnerships existing in those States where the rules of the common law are in force.

By the principles of the Roman law, the law of France, the law of Scotland, and the law of Louisiana, "a firm is treated, in its aggregate capacity, as having an independent existence — somewhat like a *quasi* corporation; and the firm may sue and be sued by a single partner, without any repugnancy, exactly as a member of a corporation may sue and be sued by the corporation itself." Story on Part. 3d ed. 221, n. 2.

The partnership is held in law as a separate person, capable of maintaining the relation of debtor and creditor. As a separate person, the company is known and recognized in obligations and contracts by its separate name or firm as its personal appellation. 2 Bell, Com. 5th ed. 619, 620; Story on Part. § 221, n. 2.

In 3 Robinson, R. 505, 506, Judge Bullard, in delivering the

opinion of the supreme court of Louisiana, says: " Such are the principles which apply, as among the stockholders themselves, as between Millaudon and his copartners. They are the elementary principles of the law of partnership, stripped of all technical phraseology, and are to be found in the various authors who have treated on the subject. Some of them have been referred to by the counsel of Millaudon. Pothier considers it of the essence of the contract of partnership, that the partners should propose to make profits, in which each shall participate in proportion to what he has brought into the concern. He considers each as a debtor to the partnership for what he had promised to bring in. It results from this principle, as a necessary corollary, that if one partner has brought in more than the others, he is a creditor of the partnership for the difference." Pothier, De Société, No. 12.

" It is true that all the funds paid in, and all the property acquired from partnership stock, and as it relates to creditors, stand as a pledge for payment of all liabilities to the public.

" 'Each partner,' says Judge Story in his Treatise on Partnership, ' has a specific lien on the present and future property of the partnership, not only for the debts and liabilities due to third persons, but also for his own amount or share of the capital, stock, and funds, and for all moneys advanced by him for the use of the firm, and also for all debts due to him for moneys abstracted by any partner from such stock and funds beyond his share.' § 97.

" The language of Bell in his Commentaries on the Scottish law, which sprang from the same fountain with our own, is very pithy and cogent on the subject.

" ' The property of the company is common, held *pro indiviso* by all the partners as a stock, and in trust, responsible for the debts of the concern, and subject, after the debts are paid, to division among the partners according to their agreement. This is a great point in the doctrine of partnership, and important consequences are deducible from it. The common stock includes all lands, houses, ships, leases, commodities, money; whatever is contributed by the partners to the company uses. It comprehends, also, whatever is created by the joint exertions

of the company, or acquired in the course of their capital, skill, and industry. All this, by the operation of law, and the nature and effect of the contract, becomes common property; is held by all the partners jointly, for the use of the partnership, and is directly answerable as stock for the payment of its debts. This stock or common fund, is held by all the partners *pro indiviso.* This *pro indiviso* right implies, as between the partners themselves, a right of retention in each partner over the stock, for any advances which he may have made to the company, or for any debt due by the company, for which he may be made responsible. It also implies, in relation to the public at large, creditors of the company, a trust in the several partners, as joint trustees, in the first place, of the debts of the company.'" 2 Bell, 613.

In *Smith* v. *McMicken*, 3 Annual R. 322, the supreme court of Louisiana says: "The partnership once formed and put into action, becomes, in contemplation of law, a moral being, distinct from the persons who compose it. It is a civil person, which has its peculiar rights and attributes. *Une personne fictive et morale séparée des associés. Fictæ cujusdam personæ vicem obtinet.* See the authorities cited in Troplong on Part. § 68, &c.

Hence, therefore, the partners are not the owners of the partnership property. The ideal being thus recognized by a fiction of law, is the owner; it has a right to control and administer the property, to enable it to fulfil its legal duties and obligations; and the respective parties who associated themselves for the purposes of participating in the profits which may accrue, are not the owners of the property itself, but of the residuum which may be left from the entire partnership property, after the obligations of the partnership are discharged.

This distinction between the partnership as an abstract ideal being, and the persons who compose it, is illustrated by rules so familiar that it would be an unnecessary waste of time to argue in their defence. Thus the failure of the partnership does not involve the failure of its members. The creditor of a partner, who is at the same time the debtor of the partnership, would not, when sued by the partnership, be permitted to plead the

45*

debt due to him by the former in compensation. So a member of the partnership sued by his individual creditor, could not plead in compensation a debt due by his creditor to the firm. *Ward* v. *Brandt*, 11 Mart. 331; *Terran* v. *DeLastra*, 2 La. 326; Pardessus, part. 4, tit. 1, ch. 1, § 3. So it has been held in France, that the wife's tacit mortgage does not attach upon real estate belonging to the firm. Dalloz, Hypothêque, p. 166.

" The partnership assets are a trust fund for the partnership creditors, who are to be paid before the respective partners, and by consequence their creditors can receive any thing."

In *Ward* v. *Brandt et al.*, 11 Mart. R. 425, Judge Porter says: " We learn that contracts signed ' Such a one & Co.' gives the property to the partnership, although the purchase may have been made out of the moneys of one of the partners."

Judge Story, also, in his Treatise on Bills of Exchange, § 59, says: " In France a bill drawn by one firm upon another firm, composed in whole or in part of the same persons, would be deemed a valid bill; for the firms are treated as distinct, artificial persons."

Such being the undoubted law of Louisiana, as we have seen above, the validity of the claims sold to Oakey, and assigned to complainant, are placed beyond all doubt.

In that State the law is well settled, that a partner may be a debtor to the firm. 3 Rob. R. 505; 11 Mart. R. 431; 6 Ib. (N. S.) 84. See Coll. Part. § 326.

And a partner may also be a creditor. 3 Rob. R. 505; 5 Mart. (N. S.) R. 629, 631; 6 Ib. (N. S.) 84.

It is, therefore, clear that the claims or balances of account due from M. B. Hamer & Co., and Stanton, Buckner & Co., of Mississippi, to the firm of Buckner, Stanton & Co., of New Orleans, were assets for the benefit of the latter firm, and as such passed to the assignee in bankruptcy.

The authorities are numerous, that on the dissolution of a partnership, the debts must be paid before there can be a division among the partners, for the partnership property does not belong to any of the partners separately, but is a common pledge for the payment of the debts of the firm. *Ward* v. *Brandt*, 11 Mart. R. 427; 5 Mart. (N. S.) 567; Ib. 626; 18 La. R. 505; 2 Ann. 142.

It follows, then, that all the partnership property, of every nature and description, must be applied to the payment of the partnership debts.

In 5 Mart. (N. S.) R. 568, the supreme court of Louisiana says: " The property acquired by the partnership of Baulos and Cavaroc, does not belong to either of the partners separately, but remains a common stock and pledge for the payment of the debts of the firm, in preference to any claims against the parties individually."

In *Smith* v. *McMicken*, 3 Ann. R. 322, the same court says: " The partnership assets are a trust fund for the partnership creditors, who are to be paid before the respective partners; and, by consequence, their creditors can receive any thing."

So firmly is this principle ingrafted on the law of partnership in Louisiana, that one partner cannot sue his copartner for sums paid or advanced on account of the partnership, or funds placed in it, or for profits made or losses incurred during its continuance, until the final settlement of the partnership, and then only for the balance which may be due. *Drumgoole* v. *Gardner*, 10 Mart. 433; *Mead* v. *Curry*, 8 Ib. (N. S.) 281; 2 La. R. 451; 1 Rob. 383; 2 Ib. 453; 4 Ib. 157; Ib. 445; 2 Ann. 10; 4 Ib. 354; 3 Ib. 590.

When the property of a partnership is not more than sufficient to pay the partnership debts, no part of it can be legally applied to the payment of the separate debts of either of the partners. 10 La. R. 348.

Partnership property must be applied to the payment of partnership debts, in preference to those of the individual partners. Civil Code, Art. 2794; 12 La. R. 370; 13 Ib. 279; 2 Rob. 453; 11 Ib. 130; 2 Ann. 87; Ib. 810; *Flower* v. *Creditors*, 3 Ann. 189; Ib. 322.

And this is the reason why one partner cannot sue his copartner in Louisiana.

On this subject, the supreme court in 8 La. R. 267, says: " The claim of the plaintiff to be paid whatever sum might be due him, could not be urged before a liquidation and settlement of the partnership concerns; but nothing prevents him from doing it simultaneously with that of a final settlement; although

what is due to him, must depend on a sufficiency being left after the liquidation of the partnership."

Indeed, so highly are the partnership creditors favored in Louisiana, that they have not only a lien and privilege given them by positive law, on all the partnership property for the payment of their debts, but, after exhausting all the partnership property, they are allowed to come in and share equally with the separate and individual creditors, in the distribution of the separate property of the partners. *Flower et al.* v. *Their Creditors*, 3 Ann. R. 189–192.

At common law, the partnership creditors have no lien on the partnership property for the payment of their debts. But their right to have the partnership property applied to the payment of their debts, is worked out through the equity of the partners to have the partnership property applied to the payment and extinction of the partnership debts. 1 Freeman, Ch. R. 299, 308, 309; *Ruffin, Ex parte*, 6 Ves. R. 119, note a., Coll. Part. sect. 894, p. 790, and note a.

Here, then, we find a great difference between the law of partnership in Louisiana and Mississippi and the other States, where the common law prevails. The rights of creditors are more highly respected, and more thoroughly guarded in the former than in any of the latter.

So sacred is the rule in Louisiana, in favor of partnership creditors, that a partner who is a creditor of the partnership, will be entitled to a preference, out of partnership assets, after payment of the other partnership creditors, over an individual creditor, by attachment of one of the partners. 5 Mart. (N. S.) 626, 631.

The first step, therefore, in settling the affairs of a partnership is the payment of the partnership creditors, and for this purpose all partnership property of every nature is bound and liable. *Claiborne* v. *Creditors*, 18 La. R. 505.

No portion, then, of the assets of the New Orleans firm could be reached or made liable, in any manner, for the private or individual debts of any of its members, until all of its creditors were paid in full.

This position is very forcibly stated and illustrated in the

case of the *United States* v. *Hock et al.* 8 Pet. R. 271. In that case one of the partners was indebted to the general government, which sought (under an act of congress which provided in all cases of insolvency, &c., the debt or debts due the United States should be first satisfied, &c.) to subject a part of the partnership property to the payment of its debt.

Mr. Bell, in his Commentaries on the Scottish Law, (which, as we have seen in 3 Rob. R. 506, the supreme court of Louisiana considered as springing from the same fountain as that of their own jurisprudence,) speaks so appositely on this subject, that we deem his remarks worthy of profound consideration, and of being quoted at length. He says : " The property of the company is common, held *pro indiviso* by all the partners as stock and in trust, responsible for the debts of the concern and subject, after the debts are paid, to division among the partners according to their agreement. This is a great point in the doctrine of partnership, and important consequences are deducible from it."

" The common stock includes all lands, houses, ships, leases, commodities, money ; whatever is contributed by the partners to the company uses. It comprehends, also, whatever is created by the joint exertions of the company, or acquired in the course of the employment of their capital, skill, and industry. All this, by the operation of law, and the nature and effect of the contract, becomes common property, is held by all the partners jointly for the uses of the partnership, and is directly answerable as stock for the payment of its debts. The stock or common fund is held by the partners *pro indiviso*. This *pro indiviso* right implies, as between the partners themselves, a right of retention in each partner over the stock, for any advances which he may have made to the company, or for any debt due by the company, for which he may be made liable. It also implies, in relation to the public at large, creditors of the company, a trust in the several partners, as joint trustees for the payment, in the first place, of the company debts. And on this point rests,

1. The preference which the creditors of the company have over the company funds ; none of the partners, nor any one in

their right, as individual creditors or otherwise, being entitled to more than the reversion after the purposes of the trust are fulfilled."

"And 2. The peculiarity that heritable subjects belonging to and held by a company, are considered, not as heritable in succession, but as movable, consisting of the *jus crediti* only."

3. In this respect, the contract of partnership has the effect of a direct conveyance of property to the company, of whatever is engaged to be given, or, by clear evidence is contributed to the uses of the company, by any of the partners to whom it belongs. "Where the question is between the parties and their representatives, as to what shall be considered as the estate of the company, but without involving any competition with third parties, whatever falls under the fair construction of the contract, will, as a personal right, belong to the company and its creditors." 2 Bell, Com. 612, 613.

This same learned author says : "If a partner fail to advance his stipulated share of stock, he is a debtor to the company. If he advance beyond his share, he is a creditor of the company, entitled to demand his debt from the common fund, but barred from competing against the company's creditors." 2 Bell, Com. 646, 4.

The supreme court of Louisiana has repeatedly ruled in accordance with the views and law, as laid down by Mr. Bell in his Commentaries, as above quoted.

*Claiborne et al.* v. *Their Creditors*, 13 La. R. 281; 18 Ib. 504; 10 Mart. 640; 11 Ib. 427; 5 Ib. (N. S.) 568.

"The creditors must be paid first, and they have by law, a right of preference or privilege on the partnership estate for that purpose." *Idem*, Art. 2794; 8 Mart. (N. S.) 606.

These repeated decisions having been made in a case where only a part of the partners had become insolvent, must be regarded as doubly conclusive, when the firm, as in this case, was insolvent.

Whatever, then, was due to the New Orleans firm belonged to its firm creditors, to the entire exclusion of the private creditors of its individual members.

The debts then due it from each of the Mississippi firms, be-

longed to the creditors of the New Orleans firm. And although the creditors of each of the Mississippi firms would be the private creditors of the individual members of the New Orleans firm, yet they could not reach any part or portion of its property, as a firm, until all its firm creditors were paid. 3 Ann. R. 322; 18 La. R. 505; 5 Mart. (N. S.) 631, and authorities above cited.

The only remedy for the creditors of the Mississippi firms, had the New Orleans firm been solvent, would be to seize the residuary interest of its individual members, in which case they would only have secured whatever might have been due to the respective individual members, after payment of the partnership debts. 3 Ann. R. 322; 8 Pet. R. 275.

For, not having any contract or debt against the New Orleans firm, they could not, on any principle, be considered as creditors of the same. Their firm contracts were in the name and style of the Mississippi firms. They must then look to those firms, and to those firms only, and the individuals composing the same, for payment. They can have nothing to do whatever with any other firm or firms, as such, even if some or all of the individual members are also members or partners in a different firm. Such is the undoubted law of Louisiana, and the universal rule in equity, in relation to partnership effects.

Now we have seen that in Louisiana a partner may sustain the relation of debtor and creditor to the partnership. But, so sedulously are the rights of partnership creditors guarded and protected, that he is not allowed to appropriate or withdraw any part or portion of the partnership property, in satisfaction of his own debt, until all the partnership creditors are paid in full.

Even if he have paid in double the amount of any of the other members, he cannot withdraw any portion of the funds or claim to be reimbursed, until all the partnership creditors are paid. 3 Rob. 505, 506.

So, on the other hand, if he is a debtor, this, like any other debt, is assets for the benefit of the creditors of the firm.

In *Ward* v. *Brandt et al.'s Syndics*, 11 Mart. R. 431, Mr. Justice Porter, in delivering the opinion of the court, says: "By the statement of facts, it appears that J. Brandt and H. Foster owe to J. Brandt & Co. a large sum of money. That debt, like

every other due the partnership, passed to the creditors of the firm, in consequence of a forced surrender being ordered, and they or their agents have alone the right to receive it." See also 2 Kinnies' Law Comp. 313, 314, 317.

Here, then, we have an additional authority to that of the able and unanswerable opinion, above referred to, of Mr. Justice Daniel, that these claims, due from the Mississippi houses to the New Orleans house, were assets for the benefit of the creditors of the latter, and, as such, passed to the assignee in bankruptcy in Louisiana. For, as each of the partners of the Mississippi firms are, by the laws of this State, jointly and severally liable for the debts of those firms, it follows that the liability of those firms to the New Orleans firm was a several liability of each of the individual members of the Mississippi firms to the New Orleans firm, and, as such, passed to the creditors of the latter firm, on its bankruptcy. The cases of *Morris et al.* v. *Hillyer et al.* 7 How. Miss. R. 61–66 ; *Nutt* v. *Hunt,* 4 S. & M. 703; *Keerl* v. *Bridgers,* 10 Ib. 612, are full to the point, that the contracts and liabilities of copartners are joint and several ; and any one or more of the partners may be sued, and is liable for the whole indebtedness. The case of *Calvet's Ex'rs* v. *Markham et al.* 3 How. Miss. R. 355, 356, is also full to the point that these claims, as far as the rights of creditors are concerned, are substantial and valid claims.

The rule in bankruptcy, is that of an equitable as well as a legal jurisdiction, and an equitable as well as a legal claim may be proved. Cook's Bank. Law, 137; Coll. Part. 849, § 982.

It would, therefore, seem very clear, independent of all authority, that whether we determine the character of these claims by the laws of Louisiana or Mississippi, they must be regarded as substantial claims in favor of the rights of creditors; and, therefore, provable in bankruptcy. For, in the former State, we have seen they are legal claims, and even in the latter State they would be considered equitable claims in favor of creditors.

But the law is now well settled, that where there are two or more distinct firms, composed in whole or in part of the same individual members, and there are distinct dealings between said firms, and both become bankrupt, the one being indebted to the

other in respect of such dealings, in such a case, proof may be made of the debt in the same manner as if the dealings had been among strangers. Cooke's Bank. Law, 257, 258, 509–511; Coll. Part. § 1001, 1002, p. 988; Cary on Part. 3 Law Lib. 240; Story on Part. § 394; *Ex parte Hargreaves*, 1 Cox, 440; 3 Ves. & B. 34; *Ex parte St. Barbe*, 11 Ves. 413.

And lest the cases of *Ex parte Salitœ* and *Ex parte Cook*, cited in Coll. Part. § 1003, 1004, should be relied on as holding a different doctrine, it is proper to observe that the above doctrine is expressly admitted in both of these cases. In the first it is expressly admitted that the estate of the ironmongers might have proved against the joint estate, if the debt had accrued by a dealing in their trade, as ironmongers, and the sole ground of the objection to the proof was, that " the separate debt had accrued, not by a dealing as ironmongers, but by loans of money." Coll. Part. p. 864.

This distinction, however, was afterwards so much modified by Lord Brougham, that it must be considered as overruled.

In the case of *Ex parte Cook*, W. P. carried on the business of a linen draper in London, and was also engaged in the same business with his brother E. P. in the country, the business being conducted in the name of E. P. The London firm of W. P. supplied goods to the country firm, such dealings being wholly distinct, and the same as if the London firm had dealt with any other purchaser.

On a separate commission against the London firm, and a joint one against the country firm, " the question was, whether the sum of £635, due from the estate of the country firm to that of W. P., for goods supplied and moneys advanced, should be proved against the former estate. Lord Brougham ordered the whole debt to be proved, and dividends to be paid upon the goods sold, *pari passu* with the other creditors ; and for the money advanced, a dividend to be paid out of the surplus, after payment of the general creditors." Coll. Part. 865.

Now what is the principle of the doctrine of reputed ownership?

That principle is, that where goods and chattels, by the consent of the true owner, are in the order and disposition of the

bankrupt, as the reputed owner thereof, at the time of his bankruptcy, they shall pass to his assignees, and be distributable among his creditors, in opposition to the claims of the true owner. Coll. Part. 728, § 883, n. 4; Ib. 786, n. 3; Story, Part. § 397.

And says Judge Story, in speaking on this subject: "This inquiry is equally as applicable to cases of property owned by partners, as it is to property belonging to particular individuals." Story, Part. § 397.

This same author, § 399, continues: "It has been well observed, that it is the principle of discountenancing fictitious credit, and its concomitant frauds, which the statute enforces. Indeed, there can be no other just ground upon which one man's debts are to be paid out of the property of another. In furtherance of this principle, it has uniformly been held, that such a possession as is calculated to give a delusive credit, is a reputed possession within the meaning of the statute." "From the reputed ownership, false credit arises; from that false credit arises mischief; and to that mischief the remedy of the statute applies."

Mr. Justice Story also says: "With respect to the description of property affected by the statute, it is settled that no distinction exists between debts due to the partnership and other property; for, notwithstanding debts are not assignable at law, yet they are still within scope of the statute." Story, Part. § 403.

Indeed, so far is this principle carried, that if a new firm be constituted of some of the members of the old firm, and the whole stock in trade of the old firm be delivered over to the new firm, and they be allowed to appear to the world as apparent owners of it, and afterwards become bankrupt, in such case all the effects of the old firm found in specie, in the property taken under the commission, will vest absolutely in the assignees, notwithstanding there may be outstanding debts of the old firm. Story, Part. § 401.

Such, then, being the principle of the doctrine of reputed ownership, it must be apparent to any one, that is in perfect harmony, and the highest authority in support of the views and opinions of Sir John Leach, as given above. These views of

Sir John Leach are also approved and sanctioned by the court of review in England.   Coll. Part. 866, note 1.

We may then well say, in the language of Mr. Collyer: "But it is to be remarked, that the exception to the general rule of proof, which has been allowed with regard to debts arising from distinct trading, is founded on a universal principle, which if adopted in one case, ought also to be adopted in another.   This principle is the same as that which suggested the doctrine of reputed ownership."   Coll. Part. 866.

In note 2 to the above extract, Mr. Collyer says : " The same principle would have warranted the double proof in *Ex parte Moult*, ante, § 970, had not a positive rule in bankruptcy intervened."

But in addition to all this, the authorities are numerous and full to the point, that the claims due from the Mississippi firms to the New Orleans firm, were valid claims in favor of the rights of the creditors of the latter firm, and were provable in bankruptcy ; because the creditors of the New Orleans firm were not the creditors of the Mississippi firm; nor were the creditors of the Mississippi firm creditors of the New Orleans firm.

It is laid down in a work of the highest authority, that " where persons in trade have been connected in various partnerships, and a joint commission taken out against them all, an order has been made for keeping distinct accounts of the different partnerships, as well as the separate estates of each partner." Cooke's Bank. Law, 257; *Ex parte Marlin*, 2 Bro. Ch. R. 15.

" Where several persons are partners in trade, and some of them carry on a distinct trade, and in such character deal with and become creditors of the other firm, and a joint commission issues, proof may be made for such debt, as if they had dealt with strangers."   *Ex parte Johns et al.*, Cooke's Bank. Law, 509–511.

Now as the case of *Ex parte Johns* is a great case, not only because Lord Eldon, in *Ex parte St. Barbe*, 11 Ves. R. 413, says he abides by the decision in this case, but because the same identical persons were engaged in the same identical busi-

ness in different firm names at different places, we will give the case entire.

The effects possessed by each house, must be considered as their distinct property, and the produce divided amongst the creditors of the respective houses, in the same manner as if the firm had consisted of different persons. Cooke's Bank. Law, 509–511, 7th ed.; Coll. Part. 862, § 1002.

So in a more modern case, A., B., C., D. & E., carried on business as bankers, at York, in copartnership. A., B., C. & D., carried on a distinct trade, in copartnership, as bankers, at Wakefield. Debts being due from the latter firm to the former, in respect of their banking transactions, and a commission of bankruptcy having issued against the firm at York, proof was allowed by the estate of the York firm against that of the Wakefield firm. Coll. Part. 863, § 1002. See, also, Ib. 854, § 988; Ib. 865.

In this country, and especially according to the law of partnership in Louisiana, there can be no question but that these claims were assets of the New Orleans firm, for the benefit of the creditors of the same, and passed as such to the assignee, and were consequently provable in bankruptcy.

The decision of Judge Sprague, in the foregoing case, in which he allowed the double proof, is, on principle, a high authority.

So in this case the creditors of the New Orleans firm were entitled to the benefit of the form of the liability of the Mississippi firms, and this gave to the creditors of the former the right of proof against the latter, and would, moreover, warrant proof also, according to the principles of the decision in Massachusetts, against the separate estate of each of the individual members, who, as we have seen above, are liable in their individual capacities for the debts of the firm.

In the well-considered case of *Ward* v. *Brandt et al's Syndics,* 11 Mart. R. 429, the supreme court of Louisiana says: "It is contended that as assignee of the partnerships in Kentucky, of E. P. Johnson & Co. and Wards & Johnson, the appellant has a right to prove, and be paid the debt contracted with those

houses, although some of their members were also partners in the house of J. Brandt & Co.; and in this position we concur. It has already been decided that the private debt of one partner cannot be set off against that due the partnership. 1 Mart. R. 25; 4 Ib. 378. Yet this is what is attempted here. The firm of Brandt & Co. owes E. P. Johnson & Co., and they resist payment, because some of the partners of the latter owe the former, or rather, are responsible for their debts."

To this overwhelming weight of authority we would invite the special attention of the court to the able and unanswerable opinion of Mr. Justice Daniel, of the supreme court of the United States, on these very claims which, on being contested in the district court, were adjourned into the circuit court, and their validity fully established.

II. The assignment to complainant is not void for champerty and maintenance according to the law, as now understood and enforced on this subject, even if ever in force in this State.

It is said the complainant cannot maintain his suit, because his purchase was illegal, being the purchase of a mere right to maintain a suit, and objectionable for maintenance and champerty. This objection is surely not tenable in this State, in which the right and power of the owner of any debt, legal or equitable demand arising *ex contractu*, to assign it before or after suit, has been recognized by the judicial tribunals without any restriction.

The bill avers that the assignments were made by writing, under seal, for valuable consideration. What amount of consideration was paid, its value or extent, if it was not illegal, is of no concern to the defendants ; it is a matter with which they can have nothing to do. If they owed the debt to the assignors, they are bound to pay it to the assignee, even if the assignment were voluntary, provided it was not illegal. 3 S. & M. R. 438; *Kekewich* v. *Manning*, 12 Eng. L. & Eq. R. 120; *Hildreth* v. *Sands*, 2 Johns. Ch. R. 49, 50, and which was unanimously affirmed by the court of errors in 14 Johns. R.

Was it illegal? It is said to be champertous, because it was of a mere right which the assignee could only recover by suit.

It is certainly true, that in the old books of the common law, it was laid down, that for avoiding maintenance, a chose in action could not be granted or assigned over to another, though at what particular period this doctrine, which had relation originally only to landed estates, was first adjudged to apply to the assignment of a mere personal chattel not in possession, is entirely unknown.   2 Wood. 388.

After much objection to this rule, as unfounded in reason, it was at last resolved by all the judges of England, in *Moulsdale* v. *Birchall*, 2 Black. R. 820, that the assignment of a debt, though the debt assigned is uncertain, is a good consideration for a promise.   *Masters* v. *Miller*, 4 Term R. 303, 304.

And this ruling of the English judges is now universally acquiesced in.

" Accordingly," says Judge Story, 2 Eq. § 1048 *a*, " the doctrine of the common law, as to champerty and maintenance, is to be understood with proper limitations and qualifications, and cannot be applied to a person having an interest, or believing that he has an interest in the subject in dispute, and *bonâ fide* acting in the suit; for he may lawfully assist in the defence or maintenance of that suit."

*Hunten* v. *Daniel*, 30 Eng. Ch. R. 420, is equally strong, if not stronger, than Judge Story, on this subject.

But this doctrine of the common law is long since exploded, and was never recognized by courts of equity, who looked upon it as too absurd for them to adopt, and therefore acted in direct opposition to it.   4 Term R. 204; 2 Story, Eq. § 1039, 1040, 1040 *b*; 3 Harring. R. 215, 216; 3 Cow. R. 645, 646.

In *Masters* v. *Miller*, 4 Term R. 203, 204, Judge Buller uses this strong and forcible language: — " It is laid down in our old books, that for avoiding maintenance, a chose in action cannot be assigned or granted over to another.   Co. Lit. 214 *a*, 266 *a*; 2 Roll. 45, 1. 40.   The good-sense of that rule seems to me to be very questionable; and in early, as well as modern times, it has been so explained away, that it remains at most only an objection to the form of the action in any case.

" In 2 Roll. Ab. 45, 46, it is admitted, that an obligation or other deed may be granted, so that the writing passes; but it is

said the grantee cannot sue for it in his own name. If a third person be permitted to acquire the interest in a thing, whether he is to bring the action in his own name, or in the name of the grantor, does not seem to me to affect the question of maintenance. It is curious, and not altogether useless, to see how the doctrine of maintenance has from time to time been received in Westminster Hall. At one time, not only he who laid out money to assist another in his cause, but he that by his friendship or interest saved him an expense which he would otherwise be put to, was held guilty of maintenance. Bro.‑ tit. Maintenance, 7, 14, 17, &c.

" Nay, if he officiously gave evidence, it was maintenance; so that he must have subpœna, or suppress the truth. That such doctrine, repugnant to every honest feeling of the human heart, should be soon laid aside, must be expected. Accordingly, a variety of exceptions were soon made; and amongst others, it was held, that if a person has any interest in the thing in dispute, though on contingency only, he may lawfully maintain an action on it. 2 Roll. Ab. 115.

" But in the midst of all these doctrines on maintenance, there was one case, in which the courts of law allowed of an assignment of a chose in action, and that was in the case of the crown; for the courts did not feel themselves bold enough to tie up the property of the crown, or to prevent that from being transferred. 3 Leon. 198; 2 Cro. 180.

" Courts of equity, from the earliest times, thought the doctrine too absurd for them to adopt, and, therefore, they always acted in direct opposition to it; and we shall soon see that courts of law also altered their language very much.

" In 12 Mod. 554, the court speaks of an assignment of an apprentice, or of an assignment of a bond, as things which are good between the parties, and to which they must give their sanction, and act upon.

" So an assignment of a chose in action has always been held a good consideration for a promise. It was so in Roll. Ab. 29, Sid. 212, and T. Jones, 222; and, lastly, by all the judges of England, in *Moulsdale* v. *Birchall,* 2 Black. 820, though the debt assigned was uncertain. After these cases, we may ven-

ture to say, that the maxim was a bad one, and that it proceeded on a foundation which fails."

These views of Judge Buller were adopted and quoted with approbation by the supreme court of Delaware, in a most learned and well-considered opinion, in the great case of *Bayard* v. *McLean*, 3 Harring. R. 208–222, and which was most elaborately discussed by the ablest counsel on either side.

And the same doctrine will be found forcibly and unanswerably laid down in the unanimous opinion of the court of errors, in New York, in *Tallhimer* v. *Brinckerhoff*, 3 Cow. R. 643–649, and overruling the same case in 20 Johns. R.

It is true, a court of equity will not sustain an assignment of a bare right to file a bill in equity, for a fraud committed upon the assignor, nor for a mere right of action for a personal tort. 2 St. Eq. 1040 *g*.

The reason given by this same learned author, 1 Eq. Jur. § 184, n. 1, is, that the ascertainment of damages is peculiarly the province of a jury; and a court of law is as competent as a court of equity to give relief to the injured party. The true distinction is, that damages, by way of *solutium* for a tort, are not assignable; but rights of action for damages, for a wrong or injury to the property or estate of a party, are assignable, and pass to the assignee in bankruptcy. *Stanton* v. *Collier*, 22 Eng. L. & Eq. R. 373, 377, 378; 13 M. & W. 571; 18 Conn. 522, 528, 535; 20 Ib. 98, 527; 12 M. & W. 618.

So, a plaintiff on the record in an action of trespass *de bonis asportatis*, may assign his interest in the damages sought by the suit. *North* v. *Turner*, 9 Serg. & Rawle, 244; Gibson, J., Ib. 248, 249.

A cause of action for a wrong, though not strictly a chose in action, may be equitably assigned. 23 Maine R. 196, 200.

It is said, where an equitable interest is assigned, in order to give the assignee a *locus standi in judicio* in a court of equity, the party assigning such right, must have some substantial possession, and some capability of personal enjoyment, and not a mere naked right to overset a legal instrument. 2 St. Eq. 1040 *g*.

But the mere fact that the debt or estate assigned, may be disputed by the debtor or the party in privity with the grantor, will not vitiate the assignment. In equity, the creditor has a right to dispose of his own property as he may choose, and to require the debt to be paid to such person as he may think proper, without consultation with the debtor, who holds the debt subject to the rights of the creditor. 2 Story, Eq. 1057; *Baker* v. *Whiting,* 3 Sumner, R. 475, 481–484; 21 Eng. L. & Eq. R. 568.

A party may purchase by assignment, the whole interest of another, in a contract or security, or other property which is in litigation, provided there be nothing in the contract which savors of maintenance; that is, provided he does not undertake to pay any costs, or make any advances beyond the mere support of the exclusive interest which he has acquired. 2 Story, Eq. § 1050; *Harrington* v. *Long,* 2 Myl. & Keene, 592; 3 Cow. R. 623; 3 Sum. R. 475–484.

A *cestui que trust* may lawfully dispose of his trust estate, notwithstanding his title is contested by the trustee — for the latter can never disseize the former of the trust estate, but so long as it continues, the possession of the trustee is the possession of the *cestui que trust;* nor can the mere fact that the debtor denies the debt, deprive the creditor of the right to sell or dispose of the debt. He holds the debt subject to the rights of the creditor, and by merely disputing it, cannot take away those rights. A controverted trust may be assigned as between the parties in privity of estate or law. The doctrine of champerty and maintenance, only applies to adverse and independent titles among strangers. 3 Sum. R. 175–484; *Wood* v. *Griffith,* 1 Swanst. 56, 57; 2 Story, Eq. 1050, 1051.

" The true distinction," says Judge Story, " will, perhaps, be found to be, that the doctrine of maintenance and champerty, and buying pretended titles, applies only to cases where there is an adverse right claimed under an independent title not in privity with that of the assignor or seller, and not under a disputed right claimed in privity, or under a trust for the assignor or seller." 2 Story, Eq. 1048, note 5, p. 431, 6th ed.

The case of *Prosser* v. *Edmonds* was a mere naked right to

set aside a conveyance for fraud, (69 Eng. Com. L. R. 469, per Lord Campbell,) where no right existed independent of the fraud; but where the commission of the fraud and no right of property or claim *ex contractu* alone gave the party the right of action. 2 Story, Eq. 1050, n. 2.

It should be noted of this case that it was one relating to real estate, and therefore not at all like the present case which is but the assignment of a chose in action. So of most of the cases cited on the other side.

The case in 4 Geo. R., is very similar in principle to that of *Prosser* v. *Edmonds* and wholly unlike the case at bar. That was a case where the assignee filed his bill for the purpose solely of recovering damages for a fraud, and not for the purpose of enforcing his rights under the assignment; for the court expressly says the bill is not filed to set aside the fraudulent transfer so as to subject the property to the payment of the debt due the assignee, but to recover damages merely for the fraud, and the concluding part of the opinion clearly shows that if the bill had been filed to set aside the fraudulent transfer and subject the property to the payment of the debts, that it would have been sustained.

The case in 2 Paige, R. 289, was decided upon the statute of New York, and in that case the property was held adversely by a stranger, not claiming in privity, and is similar to *Prosser* v. *Edmonds*.

Indeed this last authority is decidedly in our favor. At page 297 the Chancellor says: " I am aware that this statute has been construed strictly ; and that it does not extend to the fair and *bonâ fide* purchase of a chose in action in the ordinary course of trade or business, or for the purpose of securing payment of an antecedent debt."

The principle of the case of *Wood* v. *Dowes*, 18 Ves., is entirely refuted and overthrown, in a most masterly and learned opinion by the Supreme Court of Delaware in *Bayard* v. *Mc-Lane*, 3 Harring. Rep. 208, 217–222, and to which we would solicit the particular attention of the court. See also 2 Story, Eq. § 1050. 3 Cow. 648.

*Stevens* v. *Bagwell*, 15 Ves. 139, was an assignment of part

only of the subject of a suit then depending, the assignees being bound in a bond for the cost of suit, and was therefore held void for champerty.   This was on the ground that no interest vested in the prize before condemnation.   Until that event the whole interest is in the crown, and the rights of the captors in the mean time are considered as resting on mere bounty.   Ib. note *a*.   In 2 Story, Eq. 1040 f, n.   Lord Brougham, it appears, considers that when once they are vested, the bounty may be sold or assigned.   It is, then, no authority against us.

*Powell* v. *Knowler*, 2 Atk. 226, is similar.   By the Master of the Rolls: " Taking the whole articles together, it seems to me to be an agreement only for a part of the estate to be recovered," and is therefore no authority against us.

The case of *Arden* v. *Patterson*, 5 J. Ch. Judge Story says, was properly decided with reference to the relation of the parties, (attorney and client,) but if it should be thought to lay down the more general doctrine that a purchase cannot absolutely be made of a chose in action or other matter in controversy, it is not reconcilable with the other cases.   2 Story, Eq. § 1050, note 1.

The case in 3 Cow. R. 643–649, which was subsequent, fully sustains Judge Story.

In *Bayard* v. *McLane*, 3 Harring. R. 213, 214, the court says of this case also : " The bill was filed by the assignees to set aside the assignment to Patterson as fraudulent, and to have the benefit of the verdict for De Peyster's creditors.   The whole transaction, as to the attorney, was of course declared to be fraudulent and void, and it can scarcely be necessary to compare such a case with a *bonâ fide* contract between counsel and client, the one to render service in conducting a cause, and the other to pay for such service out of the proceeds or avails of such suit."

Even after a suit is instituted for a debt, the creditor may assign his interest in it.   2 Story, Eq. § 1054.

For the mere assignment of the subject of a suit or right of action is not maintenance.   2 McCord, Ch. 392, 393, 4 Strob. Eq. 211; *Harrington* v. *Long*, 8 Eng. Ch. R. 140.

And this is believed to be the first instance in this State

where the right of the creditor to assign his debt has ever been denied.

The authorities are, however, too overwhelming and conclusive against such a position.

For, as is well said by Mr. Justice Buller in *Masters* v. *Miller*, 4 Term R. 205, the " circulation and the transfer of property are the life and soul of trade, and must not be checked in any instance." And Mr. Justice Blackstone, also, 2 Com. 288, has well said: " Experience hath shown that property best answers the purposes of civil life, especially in commercial countries, when its transfer and circulation are totally free and unrestricted."

In *Bayard* v. *McLane*, 3 Harring. R. 220, the supreme court of Delaware, in a masterly and elaborate opinion says: " In this country, whose boast is of equal rights ; in this trading community, whose laws facilitate and promote the change of property, with all its incidents of bargains and lawsuits, public policy, so far from restraining litigants and throwing obstacles in the way of obtaining justice, tends directly the other way." See Ib. 219.

Accordingly it is held, all choses in action may be assigned in equity. Parsons, Ch. J. in *Dix* v. *Cable*, 4 Mass. 508 ; Sewell, C. J. in *Browne* v. *Maine Bank*, 11 Ib. 153, 157 ; *Wheeler* v. *Wheeler*, 9 Cow. 34 ; Morton, J. in *Eastman* v. *Wright*, 6 Pick. 316, 322 ; *Welch* v. *Mandeville*, 2 Wheat. 233, 236 ; *Corker* v. *Craig*, 1 W. C. C. 424 ; 8 Wheat. 268.

So a contingent debt may be assigned in equity. *Crocker* v. *Whitney*, 10 Mass. 316, 319.

So book debts or accounts are assignable. *Dix* v. *Cobb*, 4 Mass. 508 ; *Norris* v. *Douglass*, 2 South. 817 ; *Woodbridge* v. *Perkins*, 3 Day, 364.

So of an unliquidated balance of accounts. *Crocker* v. *Whitney*, 10 Mass. 316.

And all valid rights *ad rem* and *in re*. Story, J., in *Comeygans* v. *Vasse*, 1 Pet. 193.

Possibilities, coupled with an interest, are assignable. Story, J., *Comeygans* v. *Vasse*, 1 Pet. 193 ; Wilde, J., in *Bigelow* v. *Wilson*, 1 Pick. 485, 492, 493 ; 3 J. J. Mar. 13 ; 1 Mad. Ch. 437.

All choses in action may be assigned in equity, and the

Buckner and Stanton *v.* Calcote.

assignee has an equitable right enforceable at law in the assignor's name, whose release or bankruptcy will not defeat it. *Dix* v. *Cobb*, 4 Mass. 511 ; *Parker* v. *Grant*, 11 Ib. 157, n.; *Wheeler* v. *Wheeler*, 9 Cow. 34 ; *Eastman* v. *Wright*, 6 Pick. 316; *Welch* v. *Mandeville*, 1 Wheat. 236 ; 25 Maine R. 9.

A judgment may be assigned by parol or writing without seal. *Ford* v. *Stuart*, 19 J. R. 342; 8 Rob. (La.) R. 259.

The law will protect an assignee's equitable interest in a chose in action, when the assignment is *bonâ fide* and for a valuable consideration, against all persons having notice of the trust. *Briggs* v. *Dorr*, 19 J. R. 95; 12 Ib. 343 ; *Wardell* v. *Eden*, 2 J. Cas. 121; *Jones* v. *Witter*, 13 Mass. 304; 8 Ib. 466 ; 1 W. C. C. 424.

And a court of equity will judicially notice the fact that courts of law protect the rights of assignees, suing in the name of the assignor. 1 Paige, Ch. 41.

Indeed, all interests are assignable, and the rights of the assignee will be protected.

Contingent interests and expectancies are assignable. Per Wilde, J., in *Bigelow* v. *Wilson*, 1 Pick. 485, 493; *Mitchell* v. *Winslow*, 2 Story, 630 ; 69 Eng. Com. L. R. 459, 473–475 ; 3 J. J. Mar. 13.

A thing existing in expectation, and not *in esse*, may be assigned ; as a right to a distributive share in the profits of a voyage not yet commenced. *Gardner* v. *Hoey*, 18 Pick. 168.

Interests in actions pending and undetermined, — such as an award, report, or judgment, which might be recovered in a suit pending. 4 Comst. 211.

In *Jackson* v. *Losee*, 4 Sandf. Ch. 381, a right of action in replevin was held assignable.

So judgments and executions and decrees in equity. 15 Mass. 481; 11 Ib. 153; 4 Litt. 435; 6 S. & R. 440; 23 Missis. 375.

In *Comeygans et al.* v. *Vasse*, 1 Pet. R. 193, 213–221, the supreme court of the United States considered even *spes recuperandi* of damages for an illegal capture as an interest capable of assignment, and passed to the assignee in bankruptcy.

So a right to recover usury is assignable. 3 J. J. Mar. 13.

So a book debt, or chose in action, may be assigned by mere

words, without writing, so as to pass an equitable interest which will be protected, even in courts of law. *Spafford* v. *Page*, 15 Vt. R. 490; *Porter* v. *Bullord*, 26 Maine R. 448.

In 26 Maine R. 448–452, the court well says: "Symbolical delivery of personal property, so situated that an actual delivery could not be made, has been regarded as sufficient. The assignee of a judgment or of a book debt may, upon the same principle, be enabled to establish his rights, without proof of an actual delivery. For a delivery of a transcript of them would not prove a delivery of the debt or judgment. It would only prove the delivery of something indicative of their existence, and of the intention of the parties. Other evidence showing that the transfer has been completed, might be sufficient." In *Parsons* v. *Dickinson*, 11 Pick. 354, the court says: "Now it is very clear that the sale, as between the vendor and vendee, was good before delivery." "If the property is not present at the time of the sale, to be actually delivered, and if there is no symbolical delivery, yet the thing sold belongs to the vendee, and the price to the vendor."

And a sale in Louisiana (Oakey's purchase having been made there, as stated in the bill) is complete as soon as there exists an agreement for the object and the price, though the object be not delivered nor the price paid. Civil Code, arts. 2414, 2431. 1 Rob. R. 26; 2 Ib. 92; 3 Ib. 331; 11 Ib. 349; 12 Ib. 51, 474.

In *Bell* v. *The L. & N. W. Railway Co.* 21 Eng. L. & Eq. R. 568, the court says: "That a debt or other chose in action may be assigned in equity without any concurrence on the part of the debtor, and that no particular words are necessary for that purpose, have been settled by a long series of decisions."

"For a creditor has a property in a chose in action against his debtor. 2 Bl. Com. 464, 4. And any contract, in short, whereby a determinate sum of money becomes due to any person, and is not paid, but remains in action merely, is a contract of debt." Ib. and note 36.

In *Mitchell* v. *Winslow*, 2 Story, R. 630, Mr. Justice Story held, that courts of equity support assignments, not only of choses in action, but of contingent interests and expectancies, and also of things which have no present actual potential exist-

Buckner and Stanton *v.* Calcote.

ence, but rest in mere possibility.  See 2 Story, Eq. § 1040. " Every chose in action is a right of property, assignable in equity if not at law."  Ib. per Story, J.

These numerous decisions show, that every variety of interest in choses in action, expectancies, possibilities, mere *spes recuperandi* for wrongs, actions for damages, interests in suits pending and undetermined, book accounts (which is our case), and many other interests, are all assignable.

" The appropriate remedy," says Chancellor Walworth, " of the complainant in this court, where he wishes to contest the validity of the defendant's discharge, subsequent to the decree, and to obtain satisfaction of the decree out of subsequently acquired property, is to file a supplemental bill, stating the obtaining of the decree, the alleged or pretended discharge of the defendant, under the bankrupt act, subsequent to such decree, and the fraud of the defendant which renders the alleged discharge invalid ; and praying that the decree may be carried into full effect against the defendant and his property, notwithstanding his pretended discharge."  *Alcott* v. *Avery*, 1 Barb. Ch. R. 347, 352.  See also 18 Ohio R. 412, 413 ; 9 Geo. R. 9, 14.

The discharge in bankruptcy when obtained *bonâ fide* has been held by this court to annihilate the debt, and a case in 3 Caines, R. 318, is cited as authority for the same.  Subsequent decisions in New York, have held a different doctrine.  2 Sandf. R. 113 ; 2 Ib. Ch. R. 494, 525, 526.

And many other courts in this country and in England, have held that such is not the effect of even a *bonâ fide* discharge. *Earle* v. *Oliver*, 2 Exch. R. (by Welsby, Hurlstone & Gordon) 89 ; 8 B. Mon. 8–11 ; 7 Cush. R. 462 ; 18 Verm. R. 448.

In *Earle* v. *Oliver*, 2 Exch. R. 89, the court says : " Debts so barred, are unquestionably a sufficient consideration for every promise, absolute or qualified, qualified or conditional to pay."

But a discharge obtained through fraud and in violation of the bankrupt act is in fact a nullity, it is absolutely void, and is of no avail in any court for any purpose in favor of the debtor, and whenever the fraud is shown, interposes no obstacle to the right of the creditor to recover upon his original demand or cause of action.  5 U. S. Stat. 442, 443, sects. 2 and 4 ; Robt.

Frauds, 520; 3 Dess. R. 269, 270; *Sims* v. *Slacum*, 3 Cranch, R. 307; 8 Iredell, R. 142; 11 Humph. R. 289; 8 Alab. R. 848; 1 Dall. R. 380; 1 Binney, R. 263; 3 Har. and J. 13; 6 Ib. 82; 5 Binn. R. 247.

As to all third parties, however, and those who have acquired rights under the proceedings in bankruptcy, they are to be regarded as valid. Per Marshall, C. J., in *Sims* v. *Slacum*, 3 Cranch, R. 306, 307.

So even of a judgment that is reversed, all rights acquired under the same by third parties, are valid and will be protected. 6 Pet. R. 8, and numerous others. *In re Cheney*, 5 Law Reporter, (May No. 1842,) 19, Judge Story held that whether the bankrupt obtains a discharge or not, the property passes to the assignee and is distributable among his creditors. See also 2 Story, R. 312, 315; 7 Met. R. 427.

The decree in bankruptcy is in its nature and effect a proceeding *in rem*, and in such cases the rule is well settled that the sentence is conclusive with respect to the thing itself, and operates a complete change of property; by such sentence the right of the former owner is lost and a complete title given to the person who claims under the decree. *Williams* v. *Armroyd*, 7 Cranch, R. 423; *Ross* v. *Himby*, 4 Cranch, R. 221.

So foreign judgments *in rem*, with respect to personal property, are held to be conclusive in cases where the court had jurisdiction, so that the same question may not be again litigated. *Williams* v. *Armroyd*, 7 Cranch, R. 433; *Crondson* v. *Leonard*, 4 Cranch, R. 434; *Rose* v. *Himley*, 4 Cranch, R. 141; 4 Ib. 185, 293; 3 Ib. 458; The Mary, 9 Cranch, R. 126; The Gran-Para, 7 Wheat. R. 471.

Any one of the acts or things which are prohibited, and which would be sufficient to prevent a party from obtaining a discharge, will be sufficient to render a discharge a nullity. 1 Denio, R. 75, 332, 519; 1 Cushing, R. 564; 8 Met. R. 75; 9 Ib. 434, 438–440; 2 Story, R. 349; 9 Geo. R. 14; 2 How. S. C. R. 209; 18 Ohio R. 411; 6 B. Mon. R. 534, 535; 4 Cush. R. 529; 7 Ib. 341; 16 Ohio R. 122; 1 Rich. R. 374; 8 Alab. R. 848; *Wearing* v. *Smith*, 58 Eng. C. L. R. 1023; 2 Barb. Ch. R. 531.

And if a judgment is void it is the same thing as though it had never been rendered.   11 S. & M. 464.

This court, too, in 8 S. & M. 519, says: " A void judgment may be disregarded even collaterally, and that is the proper course; and that was done in the case of *Carleton* v. *Osgood,* 6 How. 285."

This court, in the case of *Turner & Co.* v. *Brown,* 3 S. & Mar. R. 437, 438, says: "This suit was brought by John C. Turner & Co. for the use of Robert Edrington, administrator, on a promissory note for $919, made by defendant.   During the trial, a witness was permitted to state that he had heard Edrington, the assignee, say that he had given Turner & Co. $125, in Brandon money, for the note.   The plaintiff objected to the admission of such testimony, but the objection was overruled.   This was error.   As between the assignee and the maker, it was immaterial what was paid for the note.   The price he paid did not diminish the defendant's liability.   She contracted to pay so much, and by the assignment, the assignee became entitled to the amount of the note.   As between the assignee and the assignor, the question might be different."

On every view, then, of this part of the case, it is perfectly clear that complainant is entitled to recover the whole amount of the claims sued on.

III. The court of chancery has jurisdiction.

It is a universal rule, that where a remedy is more full and complete in equity than at law, equity has jurisdiction.  1 How. Miss. R. 562, 563; 14 How. S. C. R. 29.

In cases of fraud, too, equity has jurisdiction, notwithstanding the party has a remedy at law.   1 Story, Eq. § 184, 185; 12 Alab. R. 97, 99, and authorities cited; Daniels, Ch. Pr. 611; 19 Conn. R. 421, 433, 434.

Even a judgment at law may be impeached in chancery for fraud.  1 J. Ch. 401; 3 Ib. 280; 6 Ib. 235; 2 Hen. & Munf. 139; 2 Munf. 253.

In *Van Metre* v. *Jones,* 1 Green, (N. J.) Ch. R. 520, Mr. Chancellor Vroom in an able and elaborate opinion, held that a court of chancery will exercise the power of setting aside

47*

judgments and decrees of any court foreign or domestic, for fraud.

The same doctrine was recently laid down by the house of lords, in the case of *Bowen* v. *Evans*, 2 House Lords Ca. 257, and that high tribunal held, that in cases of fraud, equity had jurisdiction, and that it made no difference by what machinery the fraud had been perpetrated, whether by a decree in equity or a judgment at law, or otherwise.

And this court, also, has held that the power to vacate a judgment order or decree, on account of fraud, has uniformly been held to pertain to a court of chancery. 23 Miss. R. 454; 7 How. 96, 201; 3 S. & Mar. 302–304.

" The power to vacate or set aside a judgment or decree under such circumstances, is an original power pertaining to a court of equity." 23 Miss. R. 454; 4 Rand. 312; 18 Ohio, 413.

But, as already shown, Oakey only obtained an equitable right by his purchase from the assignee in bankruptcy. And it is expressly decided by this court, in *Wilson* v. *McElroy*, 2 S. & Mar. 241, that a purchaser of a non-negotiable instrument or chose in action, at an assignee's sale, only acquires an equity. And this is the only right which Oakey assigned to Calcote. This right never could have been enforced at law, but in the name of the assignee in bankruptcy, even if it could in his name; but the bill alleges that he is dead, and no other assignee is in existence, and above all, the bankrupt law provides that he shall not sue after two years; there was, then, no one in existence in whose name a suit at law could have been instituted, if complainant did not have an inherent right to go into equity. This fact gives jurisdiction to a court of chancery. Story, Eq. Pl. § 91, 96; 4 S. & Mar. 707; 1 A. K. Mar. 508; *Bacon* v. *Cohea*, 12 S. & Mar. 516.

And, moreover, it has been expressly held by the supreme court of Maine, that the limitation of two years in sect. 8 of the bankrupt act, applies to an action in the name of the assignee, though brought wholly for the benefit of a third party. *Pike* v. *Lowell*, 32 Me. R. 245.

It has, however, also been held in Louisiana and Ohio, that

this limitation does not apply to a purchaser at an assignee's sale, or to a creditor. 6 Annual R. 587, 588; 18 Ohio R. 414.

The law, then, being clear, that even if there were an assignee *in esse*, no suit could be brought in his name for the benefit of complainant.

His only remedy, then, is equity; and the case of *Bacon* v. *Cohea*, 12 S. & Mar. 516, is full to the point, and fully warrants complainant in seeking his remedy in equity.

But the rule of law is well settled, that Calcote, as assignee, has a right to maintain this suit in equity, independent of the special facts set forth. The principle is universal, that the assignee of a chose in action, except it be of negotiable paper, only obtains an equitable interest therein. This right he may enforce through the medium of a court of equity in his own name, and obtain payment of the debt directly against the debtor, and he is not bound to sue at law in the name of the party holding the legal title. 2 Story, Eq. § 1057; 4 Mason's R. 16; 3 Paige, 466; 2 Ib. 287; 5 Ib. 539.

Commenting on this principle, Judge Story says, that there are some modern cases which seem to militate against this rule, but they are opposed to the majority of cases in America. 2 Story, Eq. 1057. And they certainly are opposed to principle, for, as before shown, and counsel on the other side have intimated that, at common law, assignments of choses in action were illegal, and the assignee obtained no right which he could enforce at law at all. His only remedy was in equity, which then had exclusive jurisdiction to enforce his rights. Subsequently, courts of law permitted him to use the name of the assignor, and thus aided and protected his rights.

But this did not oust the jurisdiction which a court of equity originally had over the subject-matter; the remedies thereby became concurrent, but no principle is more universally recognized, than that where a court of equity originally had jurisdiction over a subject, that jurisdiction is not taken away, because courts of law afterwards have a like jurisdiction conferred by statute, or see fit to assume it *ex mero motu.* 1 Story, Eq. § 80; 23 Miss. (1 Cush.) R. 90; 4 Cowen, R. 717, 727, 728.

Calcote's right to sue in his own name on his equitable title,

we therefore consider unquestionable, independent of the special circumstances which would confer it, even if there had been no original jurisdiction of the cause in a court of equity.

The assignee of a chose in action may seek his remedy thereon in chancery, in his own name. Thus the assignee of a bond for a conveyance of land may bring a bill in his own name, against the obligor for specific performance. *Ensign* v. *Kellogg,* 4 Pick. 1.

All the authorities, however, are agreed, that where the assignor's remedy was in equity, or where he had a right to go into equity, the assignee may also go into equity, for he succeeds to all the rights and remedies of the assignor.

The assignors are not necessary parties, where they have parted with their whole interest, and have no interest in the matter in controversy, and against whom no relief or discovery is asked. 1 S. & Mar. Ch. R. 67; Story, Eq. Pl. § 153, *et sequitur.*

Now we have seen Oakey only acquired an equity, and as he assigned and transferred all his interest, on no principle could he be a necessary party.

But these accounts having been made between firms composed of the same members could only have been enforced between the original parties in this State through the medium of a court of chancery. It was, then, in its inception, (according to the principles of our law,) an equitable claim. As such, it went into the hands of the assignee, and was by him sold to Oakey. A court of equity would, therefore, have jurisdiction over it as an equitable demand, even if there were not special circumstances stated giving it jurisdiction. 3 How. Miss. R. 355, 356.

It is upon this equitable demand that we base complainant's bill. And it is upon this equitable claim as succeeding to all the rights of the creditors of the New Orleans firm he asks a decree.

This bill is not brought to impeach a judgment for fraud, though, as will fully appear from the above authorities, a court of equity will sustain a bill solely for that purpose.

This court, too, in *Niles* v. *Anderson,* 5 How. Miss. R. 386,

through Chief Justice Sharkey, says: "Any act, however sol-
emn, even though it be a judgment of a court of competent
jurisdiction, may be set aside if procured by fraud." See also
cases cited by Clayton, p. 336.

Fraud vitiates every thing into which it enters. It is like the
deadly and noxious simoom of arid and desert climes. It pros-
trates all before its contaminating touch, and leaves death only
and destruction in its train. No act, however solemn, no agree-
ment, however sacred, can resist its all-destroying power.

And, as we have shown above, all acts into which fraud en-
ters are nullities.

Neither a *bonâ fide* debt, nor an actual advance of money,
will sustain a security infected with fraud. Per Sandford,
Chancellor, 2 Sandf. Ch. R. 631.

Fraud vitiates all contracts into which it enters, whether ver-
bal, written, under seal, or of record; as well as the records and
judgments of courts. 3 Fost. N. H. R. 535.

"I know of no case," says Judge Story, "where fraud, if
established by competent proofs, is not sufficient to overthrow
any judgment or decree, however solemn may be its form and
promulgation." *Bradstreet, &c.,* v. *Neptune Ins. Co.* 3 Sum. R.
604.

And we have seen, too, that a discharge obtained in bank-
ruptcy is no discharge, and is treated as a nullity, whenever the
fraud is shown. It is no protection to the bankrupt, from a
cause of action existing prior to the discharge. And that pro-
found and immortal jurist (Chief Justice Marshall, "who, like
that great luminary of light, extinguishes in a flood of reful-
gence, the twinkling splendor of every inferior planet") has held
that even if the statute had made no provision for such a case,
that a party who had obtained a discharge by fraud, would not
be allowed to shelter and protect himself behind the same, from
a prior liability. *Sims* v. *Slacum,* 3 Cranch, R. 307, 308.

It cannot, then, be said with propriety, that we are seeking
by this proceeding, to impeach a judgment for fraud. We
seek to recover our debt; we seek to recover it over all illegal,
unfounded, and unconscientious defences.

And to this end, as shown above, we have a right to antici-
pate and surmount every unjust and inequitable defence which
the defendants may be supposed to set up and interpose.
Story's Eq. Pl. § 31, 677, 678; 1 Barb. Ch. R. 352. Per Wal-
worth, Chancellor.

Chancellor Desaussure, too, in *Lowe* v. *Blake*, 3 Dess. 269,
270, in relation to an insolvent discharge, uses this strong and
forcible language: "That in case there was any fraud or con-
cealment in obtaining this discharge, this court is not bound to
give effect to the discharge obtained in any other court. That
it is essential to the jurisdiction of this court to detect fraud,
and prevent its having its intended effect; and even formal
judgments at law cannot resist its all-searching power, and
when the frauds on which they have been obtained are exposed,
such judgments are decreed to be nullities." "If the discharge
was obtained by fraud or concealment, it was a mere nullity,
like every other judgment or sentence of a court obtained by
fraud or surreptitiously."

And to this may be added the decisions above referred to in
8 Iredell, R. 142; 11 Humph. R. 289; 9 Geo. R. 9, 14; 8 Ala.
R. 848; 15 Ib. 553, 554, in all of which it was held, that a dis-
charge obtained by fraud will be treated as a nullity, whenever
the fraud is shown, and that a discharge so obtained, is no bar
to a recovery on the original debt.

The discharges, then, of defendants being void, it was per-
fectly correct and proper for us, as shown above, to disregard
and treat them as nullities.

For, the remedy of the creditors is not by an application to
the bankrupt court for leave to impeach the discharge, but he
may reply the fraud, whenever the discharge is interposed as a
bar, and by so doing entirely destroy its effect. 8 Ala. R. 864;
8 Iredell, N. C. R. 142–144, and authorities above.

IV. The assignors of complainant have not waived their
rights of action against defendants, by coming in and proving
their claims, because of the frauds of defendants.

It is said the fifth section of the bankrupt act expressly pro-
vides, that "no creditor or other person coming in and proving

his claim or debt, shall be allowed to maintain any suit in law or equity therefor, but shall be deemed thereby to have waived all right of action and suit against such bankrupt."

Good faith and honesty must form not only the basis, but must characterize the entire proceedings. If these be wanting, the party commits a fraud on the law, and his discharge will be void.

In the case of *Peck et al.* v. *Jenness et al.* 7 How. (S. C.) R. 622, 623, the supreme court of the United States, in construing this act, after stating that the fourth section provided that the certificate when granted, was a discharge of all debts, and that it was contended, under this provision, that as the debt was discharged no judgment could be rendered, and that, consequently, the attachment based on the debt must fall with it, says: "This conclusion would be undoubtedly correct, if we construe this section of the act by itself, without regard to other provisions of the same act."

In *Jackson* v. *Collins*, 3 Cowen, R. 89, 96, the supreme court of New York says: "Whenever the intention of the makers of a statute can be discovered, it ought to be followed with reason and discretion in the construction of the statute, although such construction seem contrary to the letter of the statute. (Bac. Abr. tit. Stat. (1); 15 Johns. R. 380, per Ch. J. Thompson.)

"A thing which is within the letter of the statute, is not within the statute, unless it be within the intention of the makers. This position is fully established and illustrated by the cases cited on the part of the plaintiff."

To the same effect are the cases of *Minor* v. *Mechanics Bank of Alexandria*, 1 Pet. R. 64; *Wilkinson* v. *Leland*, 2 Ib. 662; 2 Har. & Johns. R. 167; 1 Green, R. 240.

In the case of *Ham* v. *Mc Claws*, 1 Bay, R. 93, the supreme court of South Carolina held, that statutes passed against the plain and obvious principles of common right and common reason, are null and void, as far as they are calculated to operate against these principles.

And in *Morrison* v. *Barksdale*, Harper, R. 101, it was also held, that if absurd consequences, or those manifestly against

common reason, arise collaterally out of a statute, it is void *pro tanto.*

A statute is to be construed so that it may have a reasonable effect, agreeably to the intention of the legislature. *Gore* v. *Brazier,* 3 Mass. R. 523; *Pease* v. *Whitney,* 5 Ib. 380; 7 Ib. 458; *Gibson* v. *Jenney,* 15 Ib. 205.

Statutes against frauds, when they operate upon the offence, are to be liberally construed so as to avoid the transaction. *Cumming* v. *Fryer,* Dudley, Geo. R. 182.

In *Beekman* v. *Wilson,* 9 Met. R. 438, the supreme court of Massachusetts, after saying that a creditor, whether he has or has not opposed a discharge, may impeach the same when it is granted, and that the purposes of the act are fulfilled by preserving to an honest debtor the benefit of a discharge.

And in *Morse* v. *City of Lowell,* 7 Met. R. 152, this same learned court held, that a party who had proved his claim, and who had been permitted to withdraw his proof, might sue the bankrupt.

Upon examining the bankrupt act it will be seen that there are several classes of cases to which the provisions of the fifth section were intended to apply, and which are perfectly consistent with the great leading objects of the legislature in that act, namely : The protection of the rights of creditors against fraudulent bankruptcies, and for a *pro rata* distribution of all the bankrupt's effects among all his creditors, where it could be done without interfering with rights previously vested. The first class of cases to which it will apply is that of fiduciary debts, from which the decree in bankruptcy, though obtained *bonâ fide,* does not discharge the debtor. In this case, if the creditor would elect to come in and prove his debt, and take a *pro rata* dividend of the bankrupt's effects, he will be held to his election, and will not be allowed to proceed personally against the bankrupt, or against any of the effects surrendered. *Chapman* v. *Forsyth,* 2 How. (S. C.) R. 202; 3 Law R. 259.

*Chapman* v. *Forsyth* is sustained by the supreme court of Ohio, in the case of *Suydam & Co.* v. *Walker et al.* 16 Ohio R. 122, which cites the same as an authority for the position that a discharge may be impeached for fraud.

Buckner and Stanton *v.* Calcote.

There is also a second class of cases to which the fifth section applies, namely, creditors whose liens are preserved by the proviso to the second section. Proof under the fifth section is a waiver of the lien; as the two rights, a share of the dividend, and an enforcement of the lien, would be inconsistent with the provisions of the fifth section. 23 Miss. (1 Cush. R.), 75; *Briggs* v. *Stevens,* Law Rep. (Oct. No. 1844), 281.

A third class of cases, to which it will apply, is that of foreign creditors, who, though not bound by the discharge in bankruptcy, would be estopped from claiming against it, if they accepted the provisions and benefits of the act, and the proceedings under the same. 7 Met. R. 152, 424, 430; 26 Wend. R. 54.

Again, proof under the fifth section would suspend the right of the creditor to proceed in any other court, while it was undecided whether a discharge should be granted or not; for until the discharge or proof before the commissioner, a creditor was at liberty to pursue his remedies in any court. 5 Law R. 163.

Chancellor Walworth, in a most elaborate and well considered opinion, in the case of *Haxtun* v. *Corse,* 2 Barb. Ch. R. 506, lays down the rule clearly and unequivocally, that proof before the commissioner will not deprive the party of his right to impeach the discharge for fraud, where he was ignorant of the fraud at the time the proof was made.

In the case of *Gupton* v. *Connor,* 11 Humph. R. 289, the supreme court of Tennessee, in a well-reasoned opinion, allowed a party who had unsuccessfully opposed a discharge to impeach the same after it was granted, and said: "If the fraud appear pending his suit against his creditor, no decree of discharge could be made. If it appear afterwards, its effect is to annul and destroy the discharge and certificate as though they had never been obtained."

In *Beekman* v. *Wilson,* 9 Met. R. 438, we have seen that the supreme court of Massachusetts have also held that a party who has opposed the discharge, may also impeach the same for fraud after it is granted. These authorities are, therefore, quite a sufficient answer to the case in 31 Maine R. 194.

It is well said by the court, in 7 Met. R. 155, " When the proceedings are instituted by the voluntary act of the bankrupt himself, they are uniformly regarded and treated in the act, as done for the benefit of the bankrupt.  The obvious, and perhaps the only benefit, is the discharge."  Indeed, when a defendant is ignorant of the facts which constitute his defence at law, pending the suit, equity will relieve against a judgment. 1 Har. Ch. R. 308 ; 1 Johns. Ch. R. 51.

The decision in Maine, then, cannot be law, for if it was, then no discharge whatever could be impeached, and yet the act itself expressly provides that a discharge may be impeached for fraud.  But in addition to the foregoing authorities, there are several others quite as conclusive, that a discharge may be impeached, and if obtained by fraud, will be treated as a nullity in all courts.

In the case of *State* v. *Bethune*, 8 Ired. N. C. R. 142, 143, Chief Justice Ruffin well says :—" Though it may be in the power of congress to discharge insolvents from their debts at their own instance, it was, we believe, a new principle in the law of bankruptcy, and so strongly tends to encourage men dishonestly to contract debts which they do not intend or mean to pay, as to make it highly proper, as far as possible, to guard the courts from imposition, and to protect creditors from fraud in obtaining discharges."

The same doctrine as we have seen above was laid down by the supreme court of Alabama, in an elaborate and well-considered opinion, in the case of *Mabry et al.* v. *Herndon*, 8 Ala. 848.

We have also seen, that Chief Justice Marshall, in the case of *Simms* v. *Slacum*, 3 Cranch, R. 307, 308, held that a discharge obtained by fraud would be no protection from a preëxisting liability.

Chancellor Dessaussure, too, in 3 Dess. 269, 270, as we have seen, held an insolvent discharge obtained by fraud to be a nullity, as to the party setting up the same.

In *Crocker et al.* v. *Stone et al.* 7 Cush. R. 341, it was held by the supreme court of Massachusetts, that no discharge in

insolvency was valid, even as against a creditor who proves his claim and is himself the assignee, unless the discharge is obtained in strict conformity to the law. See, also, 4 Ib. 529.

Indeed, all courts treat judgments obtained by fraud, or in violation of law, as void judgments. And a void judgment is no bar to a suit.

In *Coffee* v. *Planters Bank*, 11 S. & M. 464, this court, on the subject of void judgments, says: "But if the judgment quashing the bond is void, then the case stands as though it had not been rendered." And again, in *McComb* v. *Ellett*, 8 Ib. 510, the court says: "A void judgment may be disregarded, even collaterally, and that is the proper course; and that was done in the case of *Carleton* v. *Osgood*, 6 How. 285."

In the case of *Harrison* v. *The Corporation of Southampton*, 17 Eng. L. & Eq. R. 366, the court says: "The question before the court is, as to the admissibility in evidence of a sentence of an ecclesiastical court, of nullity of marriage. It was objected that, because it was obtained in a suit which was collusive, it ought not to be received as evidence, and ought to be treated as a nullity. There is no doubt that this would be so, if there was clear evidence that the suit was collusive, and that the sentence had been obtained fraudulently and improperly."

In *The Duchess of Kingston's case*, 2 Smith, Lead. Ca. 424, and which was unanimously approved in the house of lords, it is said: "Fraud is an extrinsic, collateral act, which vitiates the most solemn proceedings of courts of justice. Lord Coke says it avoids all judicial acts, ecclesiastical or temporal." And concludes as follows: "But, secondly, admitting such sentence to be conclusive upon such indictment, the counsel for the crown may be admitted to avoid the effect of such sentence, by proving the same to have been obtained by fraud or collusion."

And in the late case of *Bowen* v. *Evans*, 2 House of Lords Cases (by Cl. & F.), 257, the house of lords held, that if a fraud is proved, no lapse of time will protect the parties to it, or those claiming through them, against the jurisdiction of a court of equity; and in that case it is immaterial by what ma-

chinery or contrivance the fraudulent transactions may have been effected, whether by a decree in equity or judgment at law, or otherwise.

The discharges of defendants, then, having been obtained by fraud, are absolutely void, and they can claim no benefit or protection under the same from their liabilities.

V. The claims are not barred by the statute of limitations.

Courts of equity are not within the statute of limitations; but it has been invariably held that they will act in analogy and in obedience to those statutes, and apply them to the equitable remedies where the remedy at law in similar cases would be barred. Angell, Lim. ch. 3, § 1, p. 24.

But this general rule has been qualified by general exceptions.

1. The rule is not applicable to cases of direct trusts.

2. It will not be applied, where a fraud has been perpetrated, but from the discovery of the fraud. As courts of equity are not embraced by the statute, and only apply it in analogy to the remedy at law, they never permit it to be applied, when to do so would be inconsistent with the fixed and uniform principle upon which the foundations of equity jurisprudence are based, namely, that a party shall never avail himself of any advantage acquired by his own fraud, and which it would, therefore, be against conscience that he should insist upon. Angell on Lim. ch. 3, § 6, p. 28, 2d ed.

In *Livermore* v. *Johnson*, in this court, Chief Justice Smith says: " It has long been the settled rule in England, that when a party has been kept in ignorance of his rights by the fraud of the person sought to be charged, the statute shall not begin to run until after the fraud has been discovered. The reason assigned why the statute bar will not be applied in a court of equity in a case of that character, is, that it would be a violation of the principles of natural justice to permit a party to avail himself of lapse of time as a bar to the suit, who has by fraud kept concealed the rights of the complainant, and has thereby delayed him in the assertion of those rights. *Hoveden* v. *Lord Annesly*, 2 Sch. & Lef. R. 634. Such is, without doubt, the doctrine of courts of equity in this coun-

try. Story, Eq. 738; Lewin on Trust. 617; *Carter* v. *Murray*, 5 Johns. Ch. R. 522. And such, unquestionably, is the law in this country. Angell on Lim. (and the cases cited), p. 188." In *Hoveden* v. *Lord Annesly*, 2 Sch. & Lef. 634, Lord Redesdale, in his very able and elaborate judgment, says: " Fraud is a secret thing, and may remain undiscovered. During such time the statute of limitations should not operate, because, until dis- covery, the title to avoid it does not completely-arise." Again, in the same case, p. 634, " A court of equity is well warranted in avoiding the transaction, notwithstanding the statute of limi- tations, for pending the concealment of the fraud, the statute of limitations ought not in conscience to run, the conscience of the party being so affected that he ought not to be allowed to avail himself of the length of time; but after the discovery of the fact imputed as fraud, the party has a right to avail himself of the statute."

Judge Story says: " Courts of equity not only act in obe- dience and analogy to the statute of limitations in proper cases, but they also interpose in many cases to prevent the bar of the statutes, where it would be inequitable and unjust. Thus, for example, if a party has perpetrated a fraud which has not been discovered until the statutable bar may apply to it at law, courts of equity will interpose and remove the bar out of the way of the injured party. *A fortiori*, they will not allow such a bar to prevail, by mere analogy, to suits in equity, where it would be in furtherance of a manifest injustice." 2 St. Eq., § 1521. A like rule is laid down in Angell on Limitations, ch. 3, § 6, p. 28. See, also, on the distinction between the rule in courts of law and equity on this subject, Angell on Lim. p. 188, ch. 18, § 1.

In New York, this question has been carefully examined in the case of *Troup* v. *Smith*, 20 Johns. R. 45. In the opinion of the court, delivered by Chief Justice Spencer, it is said: " There is a marked and manifest distinction between a plea of the statutes of limitations in a court of law and a court of equity."

In Connecticut, also, this doctrine has been carefully and elaborately considered, and a like result was reached by the court. *Phalen* v. *Clark*, 19· Conn. R. 435.

48 *

The same rule is held on this subject in Virginia. 3 Leigh R. 732, 735, 738.

. So, also, in North Carolina, in *Thompson* v. *Blair*, 3 Murph. 593.

The same doctrine is established in Tennessee. 6 Yerg. 90.

In Kentucky, it is well settled, that in cases of fraud, the statute only begins to run from the discovery of the fraud. 3 J. J. Marsh. 15; 1 Ib. 40, 41; 3 Mon. 40; 4 J. J. Marsh. 77.

And in *Baker* v. *Dobyns*, 4 Dana, 226, where a bill was filed to set aside a fraudulent conveyance, and it did not appear when the fraud was discovered, it was held, nevertheless, that the statute was not a bar.

In Indiana, also, it is held, that in cases of fraud the statute of limitations does not begin to run until the fraud is discovered. 1 Blackf. R. 77.

In Georgia, cases of fraud form an implied exception to the statute of limitations, both at law and equity. 13 Geo. R. 371; 8 Ib. 511.

In Missouri, any concealment which prevents a creditor from bringing a suit, bars the statute of limitations. 9 Mis. 402.

In Pennsylvania, it was held, that where there is fraud, the statute does not run until the discovery of the fraud, nor necessarily from that time, when the party is ignorant that the facts constitute a fraud. *Ferris* v. *Henderson*, 12 Penn. (2 Jones), 49, 53, 54; 8 Watts, 12; 1 Ib. 401; 4 Yeates, 109.

In South Carolina, too, it is held that the statute of limitations, in cases of fraud, only runs from the discovery of the fraud. 1 McCord, Ch. 314; 4 Dess. 480; 3 Ib. 223.

The same doctrine is laid down in 2 Sum. R. 491, 551, 563; 1 Wood. & Minot, 111, 112; 3 Story, R. 740.

In the case of *Michod et al.* v. *Girod et al.*, 4 How. (S. C.) 561, the supreme court of the United States says: " There is no rule in equity which excludes the consideration of circumstances, and in a case of actual fraud, we believe no case can be found in which a court of equity has refused to give relief within the lifetime of either of the parties upon whom the fraud is proved, or within thirty years after it has been discovered,

or become known to the party whose rights are affected by it."

In the case of *Prevost* v. *Graty*, 6 Wheat. 497, 498, the supreme court of the United States uses equally forcible language : " The absence of the complainant from the State, and the late discovery of the fraud, fully account for the delay and apparent *laches* in prosecuting his claim." *Hallet et al.* v. *Collins*, 10 How. (S. C.) R. 174, 187.

Numerous other cases might be cited, but they would all resolve themselves, at last, into that universal principle of equity, that a party shall not derive any benefit in that court from his own wrong, and where by his own fraudulent concealments or misrepresentations he has induced a party to delay the assertion of his rights, a court of equity, whenever it otherwise obtains jurisdiction of the case, will not give him the benefit of a delay occasioned by his own fraudulent misrepresentations and concealments. See also, on this subject, 2 Story, Eq. § 1522 ; Cooper, Eq. Pl. ch. 5, p. 266 *et seq.* ; Mitford, Eq. by Jeremy, 237 ; 6 Ves. 73.

In no case of exclusive chancery jurisdiction, (and we have shown this to be such,) was it ever pretended that the statute of limitations would apply in cases of fraud, at least it would not run until from the period of the discovery of the fraud.

And even in those cases in which it has been held that the statute applies to a court of equity, as well as to a court of law, in a case of concurrent jurisdiction, it is expressly held that fraud is an exception to the statute.

In *Breckenridge* v. *Churchill*, 3 J. J. Mar. 15, the court says : " Where chancery and common law courts have concurrent jurisdiction, time is, generally, as inexorable a bar in chancery as at law. Fraud is an exception ; for, limitation to a bill for fraud will not commence till the discovery of fraud."

The same doctrine is held in South Carolina. 1 McCord, Ch. 314.

In *Sherwood* v. *Sutton*, 5 Mason, 143, Mr. Justice Story reviews the decisions at length, and held that fraud would avoid the statute both at law and in equity.

Judge Story, also, at p. 152, 153, 155, reviews the case of *Troup* v. *Smith*, 20 J. R. 34, and says the ground of that decision at law was, that the statute did not apply to courts of equity, and in which the party might have been relieved.

For, as Chancellor Kent has well said, length of time is no bar to a fraud in equity. *Marks* v. *Pell*, 1 J. Ch. R. 594.

And in *Blair* v. *Bromley*, 2 Ph. Ch. 354, 6 Har. Dig. 611, 612, in a suit against a partner who had no knowledge whatever of the transaction, and who derived no benefit from the fraud of his partner, in a matter within the scope of the partnership, and the partner who committed the fraud had become bankrupt, and the partnership had also been dissolved more than six years, it was, nevertheless, held that the statute of limitations would only run from the discovery of the fraud.

But it is said the original cause of action was in existence before the alleged fraud was committed, and therefore the statute ought to run, notwithstanding the subsequent fraud and concealment, and a case in 4 Cush. R. 208, is relied on.

That was an action at law, and the decision was made upon the statute, and is in no sense an authority for the position contended for, when applied to a court of equity, in which, as all the cases show, the defendant is not allowed the benefit of the statute, when the delay in the assertion of the plaintiff's rights was occasioned by the fraudulent misrepresentations and concealments of the party himself. For, in such cases it would be against conscience to give the defendant the benefit of a delay occasioned by his own frauds.

But, in the present case, so far as the rights of the complainant are derived from Oakey, it is a complete answer, to say that Oakey's right of action only accrued to him by the sale in bankruptcy; so that there was no time in which he could have sued on his claim, before the frauds and concealments of the defendants were committed.

The discharges in bankruptcy having been obtained by fraud, are absolute nullities; they afford no protection to the defendants, they have no rights under such a discharge, nor can they claim any benefit from it, for, as was well said by Roberts, in

his work on frauds : " A fraudulent estate is said, in the masculine language of the books, to be no estate in the judgment of the law." Robt. on Frauds, 520.

In the language of Chief Justice Kent, in *Sands* v. *Cadwise,* 4 J. R. 599, " It would not become a court of equity to take a single step to save harmless a party detected in a fraudulent combination to cheat. No right can be deduced from an act founded in actual fraud."

And we have also seen, that in a recent case the house of lords in England have held that no lapse of time will protect any of the parties to a fraud, or those claiming through them. *Bowen* v. *Evans,* 2 House of Lords Ca. 257.

But if the court should come to the conclusion, that the statute of limitations applies to this case, (a result which we can hardly conceive to be possible,) the defendant, Buckner, cannot avail himself of it, as he is alleged in the bill to have resided in the State of Louisiana, and to have been out of the State of Mississippi since the year eighteen hundred and forty-one, during which period of time the statute did not run in his favor, the time he was out of the State not being computed as a part of the time limited by the act. Hutch. Code, 830, § 11, act of 1844.

*Wm. Yerger,* on the same side, filed the following brief as to the power of the assignee in bankruptcy.

Upon the bankruptcy of Buckner, his separate property, and such parts of the partnership property as he was entitled to, passed to the assignee. 3 P. Wms. 23; 11 Vesey, R. 85.

It is an established rule in bankruptcy, that upon one partner becoming bankrupt, the whole of the partnership property is administered as if both were bankrupts. This is necessary in order to carry into effect the principle that joint property ought to be first applied to joint debts.

The assignees under the separate commission have a right to all the property of the firm, subject to the joint debts, and the claims of the other partner. This rule particularly applies where the partner against whom no commission has

issued is insolvent. 10 Ves. R. 94; 11 Ib. 84; 1 Ib. 236; *Ex parte Voguet,* 1 Atk. R. 132; 1 Cooke's Bank. Law, 247.

A similar rule has been adopted in the bankrupt law of 1841. Bank. Law, § 14.

Choses in action, debts, and other rights of action, belong to the surviving partner, who possesses the sole and exclusive right and remedy to reduce them into possession; though, when recovered, the survivors are regarded as trustees thereof, for the benefit of the partnership. The representatives of the deceased partner being entitled to share therein to the extent of the interest which the deceased partner had in the same. Story on Partnership, § 346.'

In this respect, choses in action and debts differ from property and effects in possession, which, on the dissolution of a firm, belong to the personal representatives of the deceased and the survivors as tenants in common. Ib.

The case of *Shipman* v. *Hickman,* 9 Robinson, La. R., was decided in reference to a chose in action, taken after the death of the partner, for goods in possession of the partnerhip at the time of his decease.

A sale by the assignee under a separate commission, will vest title to the partnership property in the assignee, who may by sale vest title in a purchaser. 6 La. Ann. R. 587; *McLean, assignee,* v. *Johnson et al.,* 1 Western Law Journal, 189, 190; 5 Law Rep. 217, 221, 318, 498.

Under a separate bankruptcy, the assignee becomes a tenant in common with the solvent partners or their representatives, and held the bankrupt's undivided share of the partnership from the time of the act of bankruptcy, subject to the rights of the solvent partners, and where the assignees have got possession of the partnership funds, the solvent partners cannot call them out of their hands. Collyer on Part. § 853; 5 Johns. Ch. R. 60, 70; 5 Law Rep. 498.

The decision in *Aikin* v. *Oakey et al.,* so far as it militates against these views, is not sustained by authority, but is in direct conflict with the English and American cases. 10 Robin. La. R. 410.

Mr. Justice HANDY delivered the opinion of the court.

This was a bill filed in the superior court of chancery by the appellee against the appellants, to recover a very large sum of money, exceeding a million of dollars, and to that end, to set aside and annul the certificates of discharge granted to the appellants as bankrupts under the act of congress of 1841. The material facts stated in the bill are, in substance, as follows : —

That the appellants and M. B. Hamer in the years 1841 and 1842, and for several years anterior, were partners in the commercial business in New Orleans, where Buckner resided, under the name and firm of Buckner, Stanton & Co., — in Natchez, under the name and firm of Stanton, Buckner & Co., Stanton being the resident partner there, — and at Yazoo City, where Hamer resided, under the firm of M. B. Hamer & Co., Buckner, Stanton, and Hamer being the only members of the three firms; that they carried on their commercial business and partnership trade at each of the places named, and that the three firms were entirely distinct and separate from each other, and kept their business books and accounts accordingly ; that in the year 1841, the three firms, and each of the individual members became hopelessly insolvent, but continued to transact their partnership business under their firm names, at the three places, up to the time of the bankruptcy of Buckner and Stanton, though Hamer died in April, 1842 ; that Stanton filed his petition in bankruptcy on 21st July, 1842, in the district court U. S. in Mississippi, was declared a bankrupt in November, 1842, and in February, 1843, was finally discharged from all his debts, both as an individual and as a member of the three firms ; that on the 18th July, 1842, Buckner filed his petition as a bankrupt, in the district court U. S. in Louisiana, was so declared in September, 1842, and in December, 1842, obtained his final discharge in like manner as Stanton had done ; that these proceedings were taken by them in concert, it being understood between them that the firms were insolvent and bankrupt, and that it was necessary in order to their future business, that they should each obtain a discharge from his debts as an individual and as a member of the firms, the latter indebtedness being the princi-

pal, if not the sole cause of their insolvency; that Joseph Sill was appointed assignee in bankruptcy of Buckner, and thereby became vested with all the property and rights of property of Buckner, and Buckner, Stanton & Co. by operation of law; that among the effects of Buckner, Stanton & Co. vested in the assignee, in pursuance of the understanding between Buckner and Stanton, express or implied, that they would apply to be discharged as bankrupts, were two claims, being balances of accounts due the firm of Buckner, Stanton & Co., one from Stanton, Buckner & Co. for about $254,987.21, and the other from M. B. Hamer & Co. for about $392,463.92; which debts were returned in the bankrupt schedule of Stanton as a part of his indebtedness, and these debts were surrendered by Buckner in his schedule, with the knowledge and approbation of Stanton; that on the 9th May, 1844, the district court U. S. in Louisiana ordered a sale of the assets of Buckner and of Buckner, Stanton & Co., surrendered by Buckner in his inventory of the assets of that firm, amongst which were the two claims, which had been considered by the firms as stated accounts due the firm of Buckner, Stanton & Co.; and in June, 1844, Samuel W. Oakey became the purchaser of those claims at the sale made by the assignee, and in November, 1844, filed his petition in the district court U. S. in Mississippi, claiming to be a creditor of Stanton, and of the two firms of Stanton, Buckner & Co. and M. B. Hamer & Co., in virtue of his purchase, and praying to be allowed his *pro rata* share of the estates, — whereupon it was decreed and adjudged that Oakey was a creditor of said firms in Mississippi, and of Stanton, and entitled to his allowance, and he afterwards received his dividend accordingly; that Oakey afterwards and in March, 1854, transferred and assigned all his right, title, and interest in and to the balances and claims proved and allowed as aforesaid to the appellee.

The bill further states, that the firm of Stanton, Buckner & Co. was indebted to Montgomery & Boyd in the sum of $1,315.51, which debt was proved in the bankrupt court in Mississippi and a dividend received thereon, and was afterwards transferred to the appellee.

It further charges, that shortly before the appellants went into bankruptcy, and in contemplation thereof, they made sundry preferences of particular creditors by means of negotiations in bank and appropriations of their assets to that purpose, in violation of the bankrupt act and fraudulently, and also concealed and secreted a considerable amount of their assets and property of which they have ever since had the use and possession, which property and assets were fraudulently concealed and not returned in their schedules in bankruptcy; and that, therefore, the decrees discharging the appellants as bankrupts were obtained by fraud, and should be declared void.

The bill further states that the appellee and Oakey and Montgomery & Boyd had no notice of these fraudulent acts, nor of any facts calculated to put them on inquiry, but were in entire ignorance of the same until within eighteen months next before the filing of the bill, but since that time, they have used all diligence and every effort in their power to ferret out the frauds complained of.

To this bill a demurrer was filed, raising many objections to its sufficiency and relying on the statute of limitations as a defence. The demurrer was overruled in the court below, and from that decree this appeal is taken.

This case involves many important questions arising from the complex and peculiar state of facts presented in the record; and it has received from the court that careful investigation and consideration due to the large interests and the important legal principles involved, as well as to the distinguished ability and learning with which it has been argued by the counsel for the respective parties. We now proceed to state the conclusions to which we have come upon the principal points which are decisive of the merits of the case.

I. The first and most important question to be examined is, What right or claim against Buckner, or against Stanton or Stanton, Buckner & Co., passed to the assignee in New Orleans in virtue of the proceedings in bankruptcy there? What was its character, extent, and legal force? Whatever that claim was, it passed to the assignee in bankruptcy, and from him to Oakey and from Oakey to the complainant; but in being trans-

mitted through these several hands, it is plain that it could acquire no greater extent, as a debt, than it had when it passed to the original assignee.

First. As to Buckner individually, the right surrendered to the assignee was not a debt against him, but his individual property and rights of property and his interest in the assets of Buckner, Stanton & Co., including the balance due that firm from the Mississippi firms and his interest in those firms. It could not be considered as having greater force or effect than a claim due him and which vested in his assignee; nor could it possibly be converted into a claim against him which could be used to impeach his discharge, or otherwise be used as a debt against him, any more than a private assignment of his individual property or of his interest in the firm could have rendered the right so assigned a debt against him. It was the means appropriated by law to pay his old debts, and not the creation of a new liability. If he failed to return a true schedule of his property, rights, and assets, the assignee would have been competent to pursue them wherever they could be found, because they were all vested in him by the decree, whether specified in the schedule or not. But the assignee had no right to impeach his certificate, and to raise up a debt against him which did not exist when he was declared a bankrupt, and that founded upon the very assets which he had surrendered as the means of paying his debts. When the bankrupt delivered to the assignee his property and rights of property, he had no further claim upon him. His power was confined to the collection and appropriation of the debts due the bankrupt for the payment of debts against him. And it is manifest as he could assert no claim against the bankrupt on account of the debts surrendered by him, he could transfer no such right to any subsequent assignee or purchaser of the bankrupt's assets. This conclusion appears to be palpable beyond the possibility of successful controversy.

So far, then, as the bill seeks to render Buckner liable by any title of the complainant deduced from the assignee in virtue of Buckner's individual rights which passed under his bankruptcy, it is obvious that it cannot be maintained.

Secondly. Let us inquire what passed against the Mississippi

firms, or against Buckner and Stanton, or either of them, by the sale of the assignee in bankruptcy.    The bill is founded on the idea that the entire interest in the balances of account due the New Orleans firm by the Mississippi firms, vested in the assignee and was transferred to the complainant, and this presents a question of vital importance in the case.

The bill alleges in substance, on this point, that Buckner and Stanton severally made their applications, the former in Louisiana and the latter in Mississippi, each alleging that he had been unable to meet his debts, and that each filed schedules showing that he was largely indebted both individually and as a member of the three firms; that the applications and proceedings thereunder were made and had in concert with each other under an agreement and understanding to obtain their several discharges, on the understanding between them that the firms were insolvent and bankrupt, and that it was necessary in order to their future business, that they should obtain, each of them, discharges in bankruptcy from their individual indebtedness and from their indebtedness as members of said firms, the debts of the firms being the principal cause of their insolvency; that Buckner and Stanton were upon their petitions severally declared bankrupts, and each of them was " decreed and allowed a full discharge from all his debts and engagements ; " that one Sill was appointed assignee of Buckner by the court in Louisiana, " and thereby all the property and rights of property of every name and nature, whether real, personal, or mixed, of the said Buckner, and said Buckner, Stanton & Co., were, by operation of law, from the time of said decree in bankruptcy, divested out of said Buckner, and said Buckner, Stanton & Co. and vested in said Sill;" that among the effects surrendered by Buckner, by and with the knowledge and approbation of Stanton under the understanding and agreement before that time express or implied between Stanton and Buckner, that they would apply for the benefit of the bankrupt act, were two claims, being balances of accounts due the firm of Buckner, Stanton & Co., from the two Mississippi firms ; that an order of sale was made by the bankrupt court in Louisiana, directing " a sale of all the assets real and personal of Buckner and Buckner, Stanton & Co. surrendered by Buckner, and set forth in the inventory of the assets of Buckner, Stan-

ton & Co. annexed to Buckner's petition, amongst which assets were the two claims or balances of account;" that in pursuance of this order, the assignee made the sale of the two balances of account, and Oakey became the purchaser, and was afterwards, in the bankrupt court in Mississippi, allowed to prove his claim founded thereon, and to receive a dividend from the estate of Stanton.

It appears from this statement of the contents of the bill, that the application of Buckner to be discharged as a bankrupt was made in behalf of himself as an individual and on account of his liabilities for the firms mentioned. The recital of the proceedings in relation to the bankruptcy does not show that the firm of Buckner, Stanton & Co. went into bankruptcy, that it was declared bankrupt or that any fiat or decree was made by the court sitting in bankruptcy ordering the assignee to take possession of the assets of the firm as a bankrupt firm under the provisions of the 14th section of the bankrupt act. It does not appear that the court ever undertook or intended to act upon the firm; and without a special order for that purpose, the assignee could have had no power to take and dispose of the assets of the firm, so as to divest the rights of the other partners, and to vest the entire interest in the assets of the firm in a purchaser at his sale. This is an extraordinary power, only to be exercised by the special order of the court, which it is incumbent on any party claiming title under it to show affirmatively. *Parker & Blanchard* in re *Muggridge and others,* 5 Law Reporter, 351–359; *Ayer* v. *Brastow,* Ib. 498; and upon well-recognized principle, in the absence of a special showing, that the power was exercised by the court, it cannot be presumed to have been exercised under the provisions of the fourteenth section.

The order alleged in the bill is, that the assets surrendered by Buckner, in his own right, and as a partner of Buckner, Stanton & Co., should be sold. Now those assets were not surrendered by him in behalf of the firm, but the whole proceeding, as it is recited in the bill, shows that the object was his individual discharge from his private debts and liabilities as a member of the firms. This is plain from his petition and the decree as stated, and it is rendered more manifest by the fact,

that Stanton, although acting under an agreement that both he and Buckner should obtain discharges as bankrupts, and the firm debts were the principal cause of their insolvency, filed his separate petition and was separately decreed a bankrupt in Mississippi and discharged. This would have been unnecessary, if, as was most desirable to them, it had been intended to include the firm in bankruptcy as well as the individual members of it; for all this could have been effected by the one proceeding in New Orleans, by the provisions of the fourteenth section.

It is evident, therefore, that all that passed by operation of the order of court, and the sale made under it, was the interest which Buckner, whose rights alone were acted upon, had in the accounts due the firm of Buckner, Stanton & Co.

The agreement and understanding between Buckner and Stanton, alleged in the bill, are but private acts which are not shown to have been acted upon by the court in Louisiana, or to have been represented to that court; and if that could have warranted the assignee in disposing of the assets of the firm in any event, so far as the interests of Buckner and Stanton were concerned, they could not be allowed to affect the interest of Hamer; for he was then dead, and the partnership was thereby dissolved, and, under the law of Louisiana, the partnership property could not be transferred without the consent of his heirs. 4 La. R. 32; 8 Ib. 568; 18 Ib. 332.

What, then, was the position of Buckner as a member of the firms in Mississippi, in consequence of the sale of his interest in the New Orleans firm, and in the stated accounts due that firm from the Mississippi firms? It is clear that the transfer of his interest in the New Orleans accounts against the Mississippi firms, did not create or continue an indebtedness against him as a member of the Mississippi firms; for he was discharged as a bankrupt both from his indebtedness individually, and as a member of all the firms. He surrendered his interest in the firms, but was necessarily discharged from further liability as a member of the debtor firms to the creditor firm; for, otherwise, the declared object of his application, as stated in the bill, would have been defeated, and it would produce the

49*

absurd conclusion that he surrendered, as part of his assets, a claim against himself jointly with the other partners of the Mississippi firms, which remained a debt against him, notwithstanding his discharge from all his debts both as an individual and as a member of those firms.

The debt due the New Orleans firm, which passed to the assignee there, could, therefore, only be against Stanton and Hamer. Let us see what was its nature and legal effect.

The three partners being all members, and the sole members of the three firms, and being, in legal presumption, equal partners, when the assignee asserts his claim against Stanton or Hamer, in virtue of the assignment of Buckner's interest in the debt due the New Orleans firm, he learns that Buckner was indebted on account of the Mississippi firms, precisely in the same sum that he was creditor against them in the New Orleans firm. Buckner surrendered no greater right against his copartners than he could have exercised himself. If he had died, and his estate had passed into the hands of his administrator, it will not be denied that he would have been entitled against the copartners to such sum only as should be found due him upon a settlement of all accounts between the partners and firms, after the payment of all their debts. If he had assigned to an individual his interest in the accounts due the firm in New Orleans, it will not be pretended that the assignee could have taken any greater right than he had himself. He could but have taken his place in the settlement of the affairs of the firms. *Brown* v. *Heathcote,* 1 Atkyns, 160; *Mitford* v. *Mitford,* 9 Ves. 87; 6 Law Reporter, 347. Nor could such an assignee have claimed any equity, because the books of the firm in New Orleans showed, and it was a conceded fact, that there was a balance against the two other firms in favor of the New Orleans house; for he would have taken it subject to all the equities existing between the partners themselves. The very fact that all the firms were composed of the same members, would have been notice in law to him that if his assignor was a creditor on the New Orleans books, he was at the same time a debtor on the Mississippi books to the same amount; and if, under such circumstances, he had purchased the interest of the

New Orleans partner, under the delusion that he obtained it discharged of all responsibilities and equities attached to it in the assignor's hands, it would certainly give him no right to enforce such a demand in equity. The same result as to Buckner's interest would have taken place, if, upon the death of Hamer, instead of going into bankruptcy, there had been a private settlement, or by accounting in chancery of the partnership affairs. One could not have been equitably settled, to the exclusion of the other; and in any event, Buckner was only entitled to call upon the other partners for a settlement of all partnership accounts, and could only claim what should be due him after the payment of all the debts of the firms, and upon an account of the respective interests of the partners *inter se.* And we think it clear that the assignee of Buckner's bankruptcy acquired no greater right than this.

But suppose the interest of Stanton in the stated accounts of the New Orleans firm passed under the surrender of Buckner. According to the bill, this was done as a matter of private agreement and consent on the part of Stanton, in order that he might be discharged of all his debts, and especially those of the firms. The surrender of his interest was not by judicial proceeding, and is not shown to have been acted upon by any of the parties claiming as purchasers of the New Orleans debt, nor by the assignee in bankruptcy. . Under such circumstances, he would not be bound to surrender his interest; and unless he should be discharged of all his debts, he might well refuse his consent, the object of which had failed ; and surely a court of equity would hesitate long, before it would hold that an interest intended to be surrendered for such a purpose, should be used as the very means of preventing his discharge from his debts, in the hands of strangers who were not creditors either of the individual or of the firms, and not representing such creditors.

Again. There can be no pretence that the interest of Hamer in the assets of the New Orleans house, passed by the bankruptcy of Buckner; for the proceedings on his petition did not embrace the firm of Buckner, Stanton & Co., as is above shown, and it is not alleged that there was any thing apart from that which caused Hamer's interest to pass to the assignee in New Orleans.

It is clear, therefore, that the debts due the firm of Buckner, Stanton & Co., cannot be considered as having vested in the assignee in bankruptcy, and to have passed to Oakey as a purchaser, so as to constitute him a creditor of the Mississippi firms, in virtue of being the holder of those debts, and give him a right to sue thereupon; and that the assignee, and Oakey and Calcote, who derived title from him, only succeeded to the interest and rights of Buckner, which was to call for a settlement of the partnership accounts, and to demand any balance that should be found to be due thereupon to Buckner. This bill looks to no such purpose, but is founded on the claim that the complainant is the assignee of the entire debt due the firm of Buckner, Stanton & Co.

But it is insisted in support of the bill, that the debt due on the books of the New Orleans firm, as stated accounts against the Mississippi firms, were debts admitted to be due from the latter firms to the former, thus establishing the relation of debtor and creditor between them; that the three firms being, according to the allegations of the bill, entirely separate and distinct concerns, must be regarded as separate existences, and, though composed of the same members, capable of sustaining the independent relation of debtor and creditor, and that debts due to the New Orleans firm from the Mississippi firms, were assets of the creditor firm, to which the creditors of that firm were entitled without regard to the condition of the firms as between the individuals composing them. Upon this point many authorities from the English courts of bankruptcy have been cited, to show that a debt existed in favor of the New Orleans firm, which was available to the creditors of that firm. Without pursuing the many nice distinctions and artificial rules upon which those cases for the most part turn, it is to be observed, that the principle on which they appear to be founded, is, that when the firms are entirely separate and distinct, a debt due, upon distinct dealings, from the one to the other is, as to the creditors of the latter, considered as assets of the latter, and a trust fund for the payment of the creditors who have dealt with it; and that such creditors, in case of bankruptcy of the firms, are entitled to assert their claim against the debtor firm

in virtue of their claim as creditors of the creditor firm, the firms being considered as distinct concerns, for the purpose of distribution of their assets among their respective creditors.

But this appears to be a rule of administration of assets peculiar to courts of bankruptcy, which is only applied under the following circumstances : —

1. The firms must not only be separate and distinct, but there must be some of the members belonging to one firm, either actually or in law as to the rights of creditors, and not belonging to the other firm. This was the case in *Ex parte Cook*, Collyer on Part. § 1004; Ib. § 1000.

2. When the partners are all the same persons, not only the " firms " but the " trades " must be perfectly distinct. *Ex parte St. Barbe*, 11 Ves. 414; *Shakeshaft, Stirrup, and Salisbury*, Cooke's Bank. L. 538; for, otherwise, they will be considered as " one partnership arranging different concerns belonging to them in different ways." Lord Eldon lays down the rule in *Ex parte Stilletoe* to be, " that a partner in a firm against which a commission' issues, shall not prove a personal debt against that firm, in competition with the creditors of that firm, who are, in fact, his own creditors; and that this general rule admits of no exception, unless where the partner to whom the firm was indebted carried on a distinct trade, and the debt from the firm was in respect of that distinct trade; that the case of two or more partners carrying on a distinct trade, is the same as that of one partner carrying on a distinct trade;" that the question to be considered is merely, " whether the transaction is to be considered as one between trade and trade?" Collyer on Part. § 1003.

3. The rule has reference to the proof in behalf of one bankrupt firm against another, when all the partners are included in the commission. The court, in such case, has both estates under its administration, and the question for decision is simply whether the claim asserted is entitled to a dividend out of the debtor firm upon an equal footing with the proper creditors of that firm, or whether the partner or minor firm has only a general partnership account against the other firm, to be settled upon an adjustment of the partnership affairs *inter se*. And

the principle appears to be acted on in all the cases, that the one firm will not be held to be a creditor of the other, unless it be clearly shown that it is entitled to occupy that position under the rules above stated; for unless such claims are scrutinized with jealousy, it enables the partner "to come in competition with the creditors of the firm, who are in fact his own creditors."

Let us apply these principles to the facts appearing in this case.

The bill shows that all the partners were the same persons in the three firms; that "they transacted their commercial business and carried on their partnership trade" at three points, under three different "partnership names, firms, and styles," and that "said three firms were entirely separate and distinct from each other, and kept their business books and accounts accordingly;" that said three partners "continued to transact their partnership business under the said three firms, names, and styles," &c.

We think it manifest that these allegations do not bring the claim within the rules laid down.

First. The partners in all the firms are the same persons, and in such cases the claim is not allowed. It is allowed where "two or more, part, but not all, of a larger firm are partners in a distinct trade." *Ex parte Castell*, 1 Chit. Eq. Dig. 113; Eden on the Bankrupt Law, 178; Story, Partnership, § 394; Coll. Part. § 1004. But no case is cited where a claim has been allowed where all the partners were the same, unless it be *Ex parte Johns;* and there a third person was held out to the world as a partner in one of the firms who was not a partner in the other.

Secondly. It is not sufficient that the "firms" should be separate and distinct, it must also appear that the claim arose from "distinct dealings in the articles of distinct trades." Story, Part. § 394. It appears by the bill that all the partners were engaged in one "commercial business" and "partnership trade," but that the three firms were entirely separate and distinct from each other. This language is justly susceptible of no other construction than that the business of each firm was kept sep-

arate and distinct from the others. Suppose the New Orleans firm advanced money to the Mississippi firms for the purpose of purchasing cotton, or making advances to planters, and a balance thereby became due .the New Orleans firm, it could not be said to be a debt in respect to a distinct trade, for aught that appears in the bill. If all the firms were engaged in the business of cotton factors, it would be but an advance by one firm to the others, in the course of their business; and though the business of each was kept distinct and separate, the advance would constitute no debt capable of proof by the New Orleans firm against the Mississippi firms, but would be but a matter of account between the partners *inter se*. And if the New Orleans house had advanced money generally to the Mississippi houses, the result would not be materially different. It would be but a transfer of a part of their means in New Orleans for their own benefit in Mississippi. And yet, such transactions might have been carried on, and the three firms have been "entirely separate and distinct from each other, and kept business books and accounts accordingly."

Under the general allegations of the bill, the indebtedness of the Mississippi firms to the New Orleans firm cannot be considered as more than a general indebtedness without specification as to its character. Being a matter of indebtedness between the same persons engaged in commercial business, though acting under different partnership styles, in the absence of any thing showing the contrary, the reasonable and legal presumption would be, that the indebtedness grew out of the regular trade in which the partners were engaged, and did not arise from a distinct trade. In order to test this, let us suppose that the Mississippi firms had become bankrupt, the New Orleans house remaining solvent; could it be said for a moment that, under the allegations of this bill alone, without showing that the debt claimed was founded on dealings distinct from the partnership trade in Mississippi, the New Orleans firm could have come in *pari passu* with the creditors of the Mississippi firms, and received its dividend of their assets? We apprehend not; and yet this is the attitude in which the debt claimed to be derived from the New Orleans house is presented by the bill.

For the fact that the balances were entered on the books of the New Orleans house against the Mississippi houses would not tend in the least to show that they were founded on distinct trading between the firms, unconnected with their partnership, any more than it would show that they originated in partnership dealings, and as balances due in the regular course of their partnership trade.   Indeed, the latter would be the more reasonable presumption.   Taking all the allegations of the bill with respect to the nature of the claim together, and giving them their just legal force, we think the debt set up in right of the New Orleans firm cannot be treated as a debt due from one distinct trade to another, but that these transactions of the firms are rather to be considered as falling under the rule in Shakeshaft, Stirrup & Salisbury, "as one partnership arranging different concerns belonging to them all, in different ways, for the benefit of that joint concern," and that the claim was, therefore, not provable under the bankruptcy of Stanton, in Mississippi.

Third.  But another objection to the proof is that there must be joint bankruptcies of all the firms before it can be made. Eden on Bankrupt. 178 ; Story, Part. § 394; Cooke, Bank. L. 538.   When that is not the case, the individual interest only of the bankrupt partner passes to the assignee, who would not be entitled to the entire claim, whatever it might be, of the creditor firm against the debtor firm, but only entitled to take the place of the bankrupt partner, and have an account taken between the partners as individuals ; and, as is above shown, this is the only right which the assignee in bankruptcy, or the complainant claiming under him, could have acquired.   He could not in any just legal sense claim to be the creditor of the debtor firm for any other purpose than to call for a settlement of the partnership affairs among the individual partners.

. There is another view of this branch of the case, which has much force in respect to the equity of the complainants' demand.

The right of partners or minor firms, in England, to prove against the general firm in which they were partners, seems to be limited to the right of receiving a dividend, and the firms are regarded as distinct concerns only for the purpose of distri-

bution of assets among their respective creditors. Eden, Bank. Law, 180. No case has been cited by the learned counsel for the appellee, where a greater right has been claimed for the creditor firm than to receive a dividend, and this has always been in right and for the benefit of their creditors. When the assignee of the creditor firm has come in and received his dividend in behalf of the creditors he represents, he has obtained all that he was entitled to, and there is no precedent brought to our notice holding that he can assert a further claim against the bankrupt. He has claimed to be a creditor in the distribution of the bankrupt's assets in competition with his other creditors, treating the proceedings as valid. The claim is allowed in right of the creditors of the creditor firm; and after its avails have been received for their benefit, it would appear that the object of the equitable rule allowing the claim was accomplished, and that it would be any thing else than equity to permit it to be still further used at the instance of a mere volunteer, not a creditor, to compel the bankrupt to retrace his steps, to lose all that he had surrendered, a part of which the complainant or his assignor had received, and, without any offer to restore him to his condition, to have all his debts reinstated against him. This is the attitude which the assignee in bankruptcy, and his immediate assignee, would occupy, and it is the position to which the complainant has succeeded by his purchase from Oakey. In point of mere equity, it is not a position that commends itself very forcibly to the consideration of a court of equity.

We, therefore, think it abundantly manifest that neither the assignee in bankruptcy in New Orleans, nor the complainant claiming title under him, can occupy the position of a creditor of Buckner, Stanton & Co. or of Stanton, Buckner & Co., in virtue of the rights acquired under the bankruptcy of Buckner, and the assignee's sale of assets under that proceeding, so as to confer a right to impeach the discharge of Buckner or Stanton, or to sue them on account of the claim which passed to the assignee in bankruptcy.

In opposition to this view, the decision of the circuit court of the United States for the southern district of this State, on

appeal from the district court, allowing the claim of Oakey as a purchaser of the claims under consideration, and as a creditor of Stanton, has been confidently relied on. As to the soundness of the views taken in that decision, we can only say with great respect for the distinguished judge who made it, that we are unable to agree with the conclusion that Oakey became a creditor of the firm of Stanton, Buckner & Co., or of Stanton, by his purchase at the sale of the assignee in bankruptcy, except to the extent above stated. As to the effect of the decision ·as an adjudication of that point by a court of competent jurisdiction, which we are to consider as final and conclusive, we are bound by the judgment, but not by the reasons stated by the court, as the ground of it. So far as that judgment proceeds, there is no effort to disturb or to question it in this case. The judgment was that Oakey should prove his claim, and receive his dividend out of Stanton's estate. And that judgment has been carried into effect by Oakey's receipt of his dividend. It was a judgment *in rem*, and having been executed, it is *functus officio*, and, upon well-settled doctrine, cannot be made the basis of another suit, or otherwise enforced in an independent proceeding in another court. The grounds upon which the court placed its judgment, are not part of the *res adjudicata*, and cannot be the basis of a further proceeding founded thereon. We are only bound by what the court has ordered and adjudged to be done.

But giving to that decision all the force that can be attached to it, we do not think that it was intended to extend further than to allow proof of the claim of Oakey with a view to a dividend out of Stanton's estate, in reference to the principles above stated, upon which courts in bankruptcy in England proceed in like cases; and for that purpose alone must he have been declared a creditor. This would not give him the rights of a creditor in whose behalf a general judgment for so much money was rendered, which is the assumption on which the bill is based.

II. The second question which we will consider is, whether the debts against the appellants having been proved in bankruptcy, and dividends having been received upon them from the

bankrupts' effects, the creditor can afterwards bring any suit against the bankrupts founded on them.

This question depends upon the proper interpretation to be given to certain parts of the fifth section of the bankrupt act of 1841, which provide "that all creditors coming in and proving their debts under such bankruptcy in the manner hereinafter prescribed, the same being *bonâ fide* debts, shall be entitled to share in the bankrupt's property and effects, *pro rata*," &c. . . . . " and no creditor or other person coming in and proving his debt or other claim shall be allowed to maintain any suit at law or in equity therefor, but shall be deemed thereby to have waived all right of action and suit against such bankrupt; and all proceedings already commenced, and all unsatisfied judgments already obtained thereon, shall be deemed to be surrendered thereby," &c.

The language here employed appears to have been well considered. It is plain, definite, and comprehensive in itself, without any thing in the other parts of the act tending to limit its force or extent. It had been provided in the fourth section, that the bankrupt's discharge and certificate should be a complete bar to all suits against him, unless the same should be impeached for some fraud or wilful concealment by him of his property; thereby giving to all creditors the general right of impeaching the discharge for fraud. Then comes the fifth section which was plainly intended to be a limitation upon this right, by providing that if any creditor should come in and "share in the bankrupt's property and effects," he should be deemed thereby to have waived all right of action or suit against the bankrupt. These provisions appear to be so definite and obvious that it is difficult to perceive how they can be restricted to any particular 'class of debts or claims, without doing violence to the general and comprehensive language, and, indeed, without interpolating upon the act exceptions and qualifications which congress has not seen proper to specify or indicate. The policy manifest from the provisions of the two sections is, that any creditor who did not come in and take the benefit of the bankrupt's property and effects surrendered, should be permitted to impeach his discharge for fraud; but that if any creditor should make

his election to come in and share the bankrupt's property and effects, he should do so with full notice that he would thereby be concluded from all right of action either at law or in equity against the bankrupt. *Ex parte Comstock,* 5 Law Reporter, 165; *Everett* v. *Day,* Ib. 227; *In re Tibbetts,* Ib. 265.

The fourth section fixes the character and legal effect of the certificate, and expressly reserves to all persons having claims "provable" under the bankruptcy, the right to impeach it for fraud. The fifth section applies to claims "proved," and fixes the legal effect of that act. The two kinds of claims are thus placed in juxtaposition; and it is worthy of observation that, while as to those that are merely "provable," a right to impeach the certificate is expressly reserved, no such right is reserved as to those that are "proved." Why this reservation in the one case, and silence in the other? The answer is found in the plain and emphatic language of the fifth section, concluding the creditor of all further remedy whatever.

The correctness of this view is still more evident when we consider that unless the proof and receipt of a dividend were intended to conclude all further claim against the bankrupt, and as an adoption and ratification of his bankruptcy, these provisions of the fifth section are useless. For the right to impeach the certificate and discharge for fraud was already reserved in the fourth section; and if it was contemplated that the creditor should have the right to impeach them, notwithstanding his proof of his claim and receipt of a dividend, these carefully worded provisions of the fifth section mean nothing, and are wholly useless.

We think it clear, therefore, as well from the language as from the general purview of the act, that the fifth section intended to put an end to all further controversy whatever against the bankrupt, at the instance of a creditor who had come in and proved his claim and received his dividend.

Against this construction of the act, several objections are urged, which it is proper for us to examine.

1. It is said that the waiver was intended to apply to fiduciary debts and foreign creditors, and not to creditors generally, because fiduciary debts, &c., were exempted from the operation

of the act, and were not barred by the discharge, and, therefore, that the provision was made in order to bring such debts within the operation of the act; but that no such provision was necessary as to general debts, which were discharged whether proved or not in bankruptcy.

We do not consider this position tenable for several reasons. 1. The language is general, and expressly embraces " all creditors coming in and proving their debts," " no creditor or other person coming in and proving his debt or other claim," " all proceedings already commenced, and all unsatisfied judgments already obtained thereon," &c.   This language is altogether inconsistent with the idea that any particular class of creditors was in contemplation.   2. If it had been intended to embrace only such debts as were exempted from the general operation of the act, it is not to be supposed that these provisions would not have made special reference to such claims.   And it would, indeed, be strange that, in an act so well considered and showing such careful phraseology, a provision should be made with regard to claims not affected by the bankrupt proceedings, and in such general and comprehensive terms as to include all debts within the operation of the act constituting the great mass of the bankrupt's debts.   It would be much more reasonable to conclude that the general provisions of the act were made without reference to those debts, which did not come within the operation of the act, and were not to be discharged under it. But if they were contemplated, it is clear that they are but put upon the same footing with general debts, and that all alike are within the operation of the rule established by this section.   2 How. S. C. R. 202.   3. If the provision be construed to conclude fiduciary creditors who have proved their claims and received their dividends, and not to apply to general creditors who have done the same thing, the result would be that the former, who are manifestly a favored class by the provisions of the act, would be placed in a worse condition than the latter, to whom no special indulgence was intended to be shown.   The favored creditors would be concluded, and the less favored be at liberty to disregard the bankruptcy, though both classes had done but

50 *

the same thing, proved their claims and received their dividends. Such a construction cannot be sustained.

2. It is said that the terms of the act would conclude a creditor who had merely come in and proved his debt, in order to contest the bankrupt's discharge, and who had taken no dividend, and that such a claim would be barred though the bankrupt was not discharged.

This objection is not sustained by the spirit of the fifth section, nor by the general policy of the act. The policy of the act and the true intent of this provision had reference to all creditors coming in and proving their debts in order to "be entitled to share in the bankrupt's property and effects," and who should receive their dividends of the same. And, accordingly, it has been held that persons coming in for the purpose of merely contesting the right to a discharge, were not embraced in the provision, and were not concluded. *Morse* v. *City of Lowell,* 7 Met. R. 152; *Haxtun* v. *Corse,* 2 Barb. Ch. R. 156. But the same cases hold that the creditor is concluded by receiving a dividend; and in the case of *Chapman* v. *Forsyth,* 2 How. 202, the supreme court of the United States say in reference to a fiduciary debt, "if he not only proves it but receives his proportionate share of the dividend, he is estopped from saying that he was not within the law. As a creditor, he has a right to come into the bankrupt court and claim his dividend. He does not establish his claim as a fiduciary one, but as a debt provable under the statute, and having done this, he can never controvert the discharge." 7 Met. R. 430.

3. But it is insisted, nevertheless, that if the bankrupt's discharge was obtained in fraud of the act of congress, it affords him no protection, and may be impeached as a fraudulent judgment, upon general principles of equity jurisdiction.

Whatever may be the extent to which this general principle of equity should be justly applied,—whether to matters of fraud which took place before the judgment, and which the parties concerned had an opportunity of contesting, or to fraudulent acts done in the very fact of obtaining the judgment, and which could not have been contested,—we do not consider it applicable to a case of this particular nature, by reason of a counter

equitable rule established by the bankrupt act. That rule is, that when a party has made his election to take the benefit of the bankrupt's effects, he shall thereby be precluded of all right of action either at law or in equity against him, and, in the language of the supreme court of the United States, above quoted, "can never controvert his discharge." All the cases that have been cited declare this rule either directly or by recognition, and none has been adduced holding to the contrary. This effect of the creditor's act is so obviously created by the bankrupt law, that to hold the contrary would be to violate its positive provision and manifest design. *Humphreys* v. *Swett*, 31 Maine, 192.

III. The only remaining question which we deem it necessary to examine is, whether the complainant's claim is barred by the statute of limitations.

In order to prevent the operation of the statute, the bill alleges that neither Oakey, nor Montgomery and Boyd, nor the complainant, had any knowledge or notice of the alleged frauds committed by the appellants before their discharges as bankrupts, nor of any facts calculated to put them upon inquiry in relation to the said frauds, until within eighteen months preceding the filing of the bill. It is not alleged that any fraudulent representations have been made by Buckner or Stanton to the complainant or any of his assignors since their discharges, or that any direct acts of concealment of the alleged frauds have been practised by them upon the complainant or any of his assignors, before or since their discharges, by which the complainant and his assignors were prevented from discovering the frauds. Nor does it appear that any effort was made to discover the frauds until within eighteen months before the filing of the bill, the bill merely alleging that within that time every effort has been used to make the discovery. The frauds, as charged in the bill, consist in making fraudulent preferences of creditors by means of negotiations in bank and appropriating their assets to that purpose, and in fraudulent concealments of their property and assets, in fraud of their general creditors; all done before they filed their petitions, and in contemplation of bankruptcy.

The general rule is well established in courts of equity, that in cases of fraud, the statute of limitations begins to run only from the time of discovery of the fraud, and that in many cases of that nature, the court will interfere to prevent the bar of the .statute. But this rule is not without its restrictions, and will not be applied where, in reference to other principles of equity, it would defeat the policy and equitable operation of statutes of limitations; and, consequently, there are many limitations to the operation of this rule. Thus, it will not apply where the party affected by the fraud might with ordinary diligence have discovered it. In the leading case of *Smith* v. *Clay*, Ambler, 645, Lord Camden laid down the principle which has ever since been sanctioned, thus: — "A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, when the party has slept upon his rights and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing. Laches and neglect are always discountenanced." In *Bond* v. *Hopkins*, 1 Sch. & Lef. 429, Lord Redesdale said: — "If the party be guilty of such laches in prosecuting his equitable title as would bar him if his title were solely at law, he shall be barred in equity." And this principle has been repeatedly sanctioned by the most learned courts and ablest jurists of this country. *Kane* v. *Bloodgood*, 7 Johns. Ch. R. 90; 2 Story, Eq. Jur. § 1520, and the numerous cases there cited. The rule is thus stated in Angell on Limit. 195: "The presumption is, that if a party affected by any fraudulent transaction or management might, with ordinary care and attention, have seasonably detected it, he seasonably had actual knowledge of it." In a very elaborate and learned opinion by Chief Justice Parker, in *Farnam* v. *Brooks*, 9 Pick. 246, he says: "If the aggrieved party knew of the fraud when it was committed, or had full possession of the means of detecting it, which is the same as knowledge, neglect to bring forward his complaint for more than six years will deprive him of his remedy and ought to, upon the very principles and reasons upon which the statute of limitations was enacted."

" Courts of equity will not interpose if a party slumber upon his right unreasonably after the detection of fraud, or the means afforded of detection." Angell on Limit. 201; *Johnson* v. *Johnson*, 5 Ala. R. (N. S.) 90.

In order to excuse the use of proper diligence, it is well settled, upon reason and authority, that there must exist some relation of trust and confidence, as principal and agent, client and attorney, *cestui que trust* and trustee, between the party committing the fraud and the party who is affected by it, which rendered it the duty of the former to disclose to the latter the true state of the transaction, and showing that it was through confidence in the acts of the party who committed the fraud that the other was prevented from discovering it. If the relation of trust and confidence does not exist, and the acts complained of were not committed while that relation existed, it must be shown that some positive act of fraudulent representation or concealment directly towards the party injured was done, which lulled him into security and caused him to rely upon the good faith of the other party. In the absence of these circumstances, it is clear that when the right of action results from the fraud, the cause of action accrues from the time of the commission. These principles will be found to have governed all the leading cases upon this subject; and in much the greater part of them, the relation of trustee and *cestui que trust*, or some other such relation, gave rise to the complaint. This was the case in *Livermore* v. *Johnson*, recently decided by this court, and which is much relied on in behalf of the appellee in this case. In that case, after stating that it was contended to be not only a case of implied trust, but that it was accompanied by fraud committed under circumstances which were calculated to keep concealed from the complainants a knowledge of the transaction, it is said: " It has long been the settled rule in England, that where a party has been kept in ignorance of his rights by the fraud of the person sought to be charged, the statute shall not begin to run until after the fraud has been discovered." But when this relation of trust and confidence does not exist in the nature of the transaction, and has not superinduced the injury, there must be actual fraud, or some positive act of mis-

representation, deceit, or continued concealment towards the party affected by the fraud, to prevent the running of the statute. In the case of *Farnam* v. *Brooks*, above cited, the learned judge sums up the parts of the rule thus concisely but comprehensively — "that in cases of fraud, where the facts constituting the fraud are known, or where there is no subsisting trust or continuing influence, the same principle will apply," — that is, the statute will not be impeded.

When we apply these principles to the statements of this bill, which are relied upon to prevent the running of the statute, we think it manifest that they are insufficient to prevent its operation.

It is not pretended that the relation of trust and confidence in any respect existed between Buckner and Stanton and the parties holding these claims, or that any actual fraud by positive acts towards those parties, or any continuing influence after the return of the bankrupt schedules, was used, by which the parties were prevented from using efforts to discover the frauds. For aught that appears in the bill, the frauds might have been as well discovered by the exercise of due diligence within eighteen months after their commission, as within eighteen months before the filing of the bill. From their nature as charged, they were open and entirely capable at all times of being detected. The proceedings in bankruptcy were open to examination, and all parties interested were notified to contest them, if they thought fit to do so. Thus all parties were placed at arms' length, and each upon his own rights, with nothing of confidence or trust existing between them. The means of detecting the frauds in the bankrupts' schedules were accessible by proper diligence, even before their discharges were granted; but if not then, certainly, for aught that is shown in the bill, within the period limited by law for bringing an action.

Apart from the technical defence of the statute of limitations, it is a well-established rule of equity, that judgments will not be disturbed nor new trials granted and matters of litigation reopened, unless it be shown that all proper diligence has been used in the prosecution of the complainants' rights. If this were not so, what length of time and what extent of laches

would preclude a party from reopening settled transactions by a bill in equity? It would all rest in the undefined and arbitrary discretion of a court of equity, and the citizen could never know when he might safely repose in the confidence that long-settled transactions and even solemn judgments were beyond the reach of this formidable power. He would be subject at all times to have his rights opened to new examination, with his evidences lost, his witnesses dead, and all his means of justification impaired by the great lapse of time. Nothing could be considered as settled finally, however solemnly adjudicated or long acquiesced in, and all confidence in the judgments of courts of justice would be shaken. It is for the purpose of suppressing this mischief, that courts of equity have sanctioned the principle of statutes of limitation, and applied it in all cases where the complainant does not bring his case within the recognized exceptions; not that it may not in some instances work individual injustice or give a protection to fraud, but that it is better to act upon a rule which promotes the general peace of society, than to make an exception for an individual case, and thereby introduce a dangerous precedent.

In the present case, there was a lapse of about eleven years, according to the statements of the bill, before any efforts were made to investigate the alleged frauds, when from their nature as stated, they were open to detection all this period of time. It would be dangerous and mischievous in the extreme to sanction a rule that would, under such circumstances, permit transactions so long acquiesced in and involving immense interests, not only to the parties directly implicated, but in all reasonable probability to innocent persons whose rights are connected with, or dependent upon them, to be set aside and annulled without the clearest equity shown by the complainant, and the absence of all laches. Such rights are not to be disregarded at the instance of a mere volunteer. The laches of his assignee, not occasioned by the positive acts of the parties implicated since their discharge, is a sufficient ground for refusing the relief sought in equity; and that objection would apply with additional force to the complainant, who was not a creditor of these bankrupts and was not injured by the alleged frauds, but has voluntarily

placed himself in the attitude of a speculator in litigation. He cannot complain that his claim fails under the application of the well-established rules of the court whose aid he has sought.

We are brought to the conclusion, by the foregoing views, that this bill cannot be maintained, and that the demurrer to it should have been sustained.

The decree of the chancellor is, therefore, reversed, and the bill dismissed.

A petition for a re-argument was filed by L. Madison Day, counsel for the appellee, but the court refused to grant a re-argument of the case.